UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES VAN DE VELDE,<br>　　　　Plaintiff,<br><br>VS.<br><br>MELVIN WEARING, BRIAN SULLIVAN,<br>THOMAS TROCCHIO, EDWARD KENDALL,<br>ESTATE OF ANTHONY DILULLO, by Lisa<br>Bull DiLullo, Legal Representative,<br>JOHN DOES, RICHARD LEVIN,<br>LINDA LORIMER, RICHARD BRODHEAD,<br>THOMAS CONROY, and JAMES PERROTTI,<br>　　　　Defendants. | ：<br>：<br>：　CIVIL NO. 3:01CV02296 (RNC)<br>：<br>：<br>：<br>：<br>：　MAY __, 2008<br>：<br>：<br>：<br>：<br>： |

SECOND AMENDED COMPLAINT

I.　INTRODUCTION

　　1.　This is a civil rights action brought pursuant to 42 U.S.C. §§ 1983 and 1988, against the defendants, individually and collectively, for the deprivation of rights guaranteed to the plaintiff by the Fourth and Fourteenth amendments to the United States Constitution.  Plaintiff also seeks relief under Connecticut law.

　　2.　This case arises because the defendants, acting individually and collectively, caused the plaintiff to be publicly identified as a suspect in the December 4, 1998 murder of Suzanne Jovin, a Yale University student, in New Haven, Connecticut. Thereafter, the defendants, acting individually and collectively,

wrongfully and repeatedly named the plaintiff, and only the plaintiff, as a suspect in the Jovin murder.

3.    As discussed below, the repeated public branding of the plaintiff, and only the plaintiff, as a suspect in the Jovin murder has resulted in enormous negative publicity -- locally, nationally, and worldwide.  Defendants' wrongful conduct has damaged plaintiff's reputation, his job status, his present and future career, and his health and well-being.  Defendants' conduct has destroyed the life plaintiff enjoyed before December 1998.

4.    The effect of the repeated public "suspect" brandings, coupled with defendants' other actions with respect to the plaintiff during the police investigation, has been to proclaim to the world plaintiff's guilt in a heinous murder.

5.    The plaintiff has never been charged with the murder of Suzanne Jovin, and has consistently maintained his innocence.  All evidence points overwhelmingly to his innocence.

6.    Despite mounting evidence proving plaintiff's lack of involvement in the Jovin murder, and an utter absence of evidence of his involvement, defendants have refused to retract the "suspect" label from him and clear his name.  Instead, they have repeatedly branded him a suspect, and singled him out as the only named suspect.

7.    Plaintiff seeks declaratory and injunctive relief, and money damages, for the wrongful invasion of his right to privacy

under the Fourth and Fourteenth Amendments; for violation of his
Fourth and Fourteenth Amendment right to be free from
unconstitutional seizure; for violation of his constitutionally-
protected liberty and property interests under the Fourteenth
Amendment; for violation of his right under the Fourteenth
Amendment to equal protection of the laws; and for violation of
Connecticut law.

II.  JURISDICTION

8.   The Court has jurisdiction to hear this action under 28
U.S.C. §§ 1331, 1332, 1343(a)(3) and (4), and 1441(a),(b), and (c),
as well as the aforementioned statutory and constitutional
provisions.

9.   Plaintiff also invokes the jurisdiction of the Court
under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

10.  Plaintiff also invokes the Court's supplemental
jurisdiction under 28 U.S.C. § 1367 with respect to causes of
action arising under the laws of the State of Connecticut.

11.  The value of the rights in question exceeds $100,000.00,
exclusive of interest and costs.

III. PARTIES

12.  Plaintiff James Van de Velde is an American citizen, and
a resident of the State of Maryland.

13.  Defendant Melvin Wearing was, at all relevant times, the
Chief of Police for the City of New Haven.  At all relevant times,

defendant Wearing was acting under color of state law.  He is sued in his individual and official capacity.

14.  Defendant Brian Sullivan was, at all relevant times, a detective for the police department of the City of New Haven.  At all relevant times, defendant Sullivan was acting under color of state law.  He is sued in his individual and official capacity.

15.  Defendant Edward Kendall was, at all relevant times, a detective for the police department of the City of New Haven.  At all relevant times, defendant Kendall was acting under color of state law.  He is sued in his individual and official capacity.

16.  Defendant Thomas Trocchio was, at all relevant times, a detective for the police department of the City of New Haven.  At all relevant times, defendant Trocchio was acting under color of state law.  He is sued in his individual and official capacity.

17.  Defendant Lisa Bull Dilullo is the legal representative of the Estate of Anthony Dilullo, who, prior to his death and at all relevant times, was a detective for the police department for the City of New Haven acting under color of state law.  For ease of reference, defendant's decedent, Anthony Dilullo, will be referred to as a "defendant" herein, along with the other defendants. Defendant DiLullo is sued in his individual and official capacity.

18.  Defendants "John Does" were and/or are other police officers engaged in the investigation of the December 4, 1998

murder of Suzanne Jovin, acting under color of state law.  They are sued in their individual and official capacities.

19.  Defendants Wearing, Sullivan, Trocchio, Kendall, DiLullo and John Does (collectively, "the New Haven defendants") were, at all relevant times, engaged in the investigation of the December 4, 1998 murder of Suzanne Jovin, acting within the scope of their employment, in the performance of their duties, and under color of state law.

20.  At all times mentioned in this complaint, the New Haven defendants acted jointly and in concert with each other.  Each defendant had the duty and the opportunity to protect the plaintiff from the unlawful actions of the other defendant(s), but each defendant failed and refused to perform that duty, thereby proximately causing plaintiff's injuries.

21.  Defendant Richard Levin was, at all relevant times, President of Yale University.

22.  Defendant Thomas Conroy was, at all relevant times, Acting Director of the Yale University Office of Public Affairs, and an official spokesperson for Yale University.

23.  Defendant Linda Lorimer was, at all relevant times, Vice President and Secretary of Yale University.

24.  Defendant Richard Brodhead was, at all relevant times, Dean of Yale College.

25.  Defendant James Perrotti was, at all relevant times, Chief of Police of Yale University.

26.  Defendants Levin, Conroy, Lorimer, Brodhead, and Perrotti (collectively, "the Yale defendants"), were, as detailed below, at all times and in all events relevant to this Complaint acting in concert with one or more of the New Haven defendants, and therefore were for purposes of this action "state actors" acting under color of state law.

27.  All defendants are residents of the State of Connecticut.

IV.  <u>FACTS</u>

A.  <u>Overview</u>

28.  As discussed above, the defendants collectively have caused the plaintiff to be branded as the only named "suspect" in the murder of Suzanne Jovin.  This has been done in a series of stages: (1) In December 1998, the New Haven defendants, in conjunction with one or more of the Yale defendants, anonymously caused plaintiff's name to be leaked to the press as the "prime suspect" in the case; (2) In January 1999, the Yale and New Haven defendants, acting in concert, officially caused plaintiff to be named and identified as a "suspect", singling him out from a pool of suspects, and naming only him; (3) the New Haven defendants continued to identify only the plaintiff as a "suspect" in the case, while declining to reveal the identities of other suspects and making affirmative statements clearing other potential

suspects; (4) the Yale defendants also continued to identify only the plaintiff as a "suspect" in the case in periodic public statements; (5) the New Haven defendants engaged in various activities designed to convey to the public that plaintiff was guilty of the Jovin murder, and which did in fact convey that message; and (6) the defendants consistently refused and failed to retract the destructive "suspect" label from the plaintiff, notwithstanding a complete lack of evidence linking him to the murder, affirmative evidence establishing his innocence, and an admitted "fresh start" to the investigation in 2007 in which "no one" and "everyone" was deemed to be a "suspect."

B.    <u>Background</u>

29.  Plaintiff James Van de Velde is currently 43 years of age.

30.  In December 1998, plaintiff was employed as a lecturer in Political Science at Yale University in New Haven, Connecticut.  He had been so employed since the Summer of 1998.

31.  At that time, plaintiff enjoyed an excellent reputation, and had an excellent professional and educational background. After attending and graduating from Amity Regional High School in Woodbridge, Connecticut, where he excelled as a student and otherwise, the Plaintiff attended Yale University.  He graduated from Yale College, with honors, in 1982.  He then attended the Fletcher School of Law & Diplomacy at Tufts University, where he

received two scholarships for academic excellence.  He received a
Ph.D. from the Fletcher School, with honors in American and Japanese
Diplomatic history, in 1988.

32.  Upon graduation from the Fletcher School of Law &
Diplomacy, the Plaintiff secured a position as an arms control
diplomat with the United States Department of State.

33.  At age twenty-nine, the plaintiff became a White House
appointee under then-President George H.W. Bush.  The plaintiff
served in Geneva, Switzerland as the executive secretary of a
strategic arms control delegation.

34.  The plaintiff joined the United States Naval Intelligence
Reserves and served in various assignments in Panama, Naples,
Singapore, Washington, D.C., Brussels, and Bosnia.  The plaintiff
was promoted to the rank of Lieutenant Commander in the United
States Naval Intelligence Reserves, and received various awards for
his service as an intelligence officer.  During his years as an
active member of the Reserves, he held a "top secret/special
compartmentalized intelligence" security clearance.

35.  In 1993, the plaintiff returned to Yale University to
become Dean of Yale University's Saybrook College.  While Dean of
Saybrook College, he lectured on a part-time basis in the Political
Science Department.

36.  In 1997, the plaintiff left Yale University and accepted a
position at Stanford University as Executive Director of the Asia

Pacific Research Center, which was part of the Stanford University
Institute for International Studies.

37.   After a nine-month period, plaintiff left Stanford, by
mutual agreement between the plaintiff and Stanford, because the
plaintiff missed, in part, teaching university students -- a
function not included in his position at Stanford University.

38.   In August, 1998, the plaintiff returned to Yale
University, and accepted a one-year contract as a lecturer in the
Political Science Department.

39.   During the Fall of 1998, in addition to teaching at Yale,
the plaintiff was enrolled in a master's degree program in broadcast
journalism at Quinnipiac College in Hamden, Connecticut.

C.   The Jovin Murder

40.   On Friday, December 4, 1998, Suzanne Jovin, a 21-year-old
Yale University senior, was found murdered in the East Rock section
of New Haven.  Ms. Jovin's body was found in the vicinity of
Edgehill and East Rock roads, at approximately 10 p.m.  According
to published reports, she was alive when discovered, but died later
at a local hospital.

41.   According to published reports, Ms. Jovin was last seen
on the Yale campus less than 45 minutes prior to her discovery.
The distance from where she was last seen, and where her body was
recovered, was approximately two miles.

42.   According to published reports, Ms. Jovin died from multiple stab wounds.

D.   The Immediate Murder Aftermath - Yale and
     New Haven Undertake Joint and Concerted Action

43.   The news that a Yale student had been brutally murdered in a quiet residential section of New Haven generated great publicity and concern, both in the New Haven community and on the Yale campus.   Ms. Jovin was the first Yale student murdered in New Haven since 1991, and the second since 1976.

44.   As a result, the Jovin murder immediately became a "high profile" case, with the media and the public intently focused on the circumstances surrounding Ms. Jovin's death, and the progress of the search for her killer.

45.   Because of all the facts and circumstances surrounding the Jovin murder, the police officials responsible for the murder investigation, including the New Haven defendants, were subject to great pressure to solve the crime quickly, or at minimum to demonstrate progress toward identifying the individual(s) responsible for Ms. Jovin's brutal slaying.

46.   Likewise, the Yale University hierarchy, including the Yale defendants, were also under great pressure to help effect a speedy solution to the crime, or to show progress toward identifying the individual(s) responsible for the brutal slaying. The Yale defendants had a strong interest in minimizing the

negative publicity to Yale arising from the violent death of one of its students.

47.   News of the murder reportedly interrupted an ongoing meeting of the Yale Corporation.  Corporation trustees reportedly devised a plan both to support the Jovin family in their time of tragedy, and to protect Yale's public image.  See Exhibit 10, p.3; Exhibit 12; Exhibit 15, pp.3-4.

48.   The Yale defendants also had a strong interest in publicizing any information that Ms. Jovin was not the victim of a random act of violence; the 1976 and 1991 murders of Yale students in New Haven were the product of random violence, and generated significant negative publicity for the University, because they bolstered a negative image of the City of New Haven as a potentially unsafe place at which to attend school.

49.   Accordingly, the Yale University administration and Yale University police, including the Yale defendants, and the New Haven police, including the New Haven defendants, began working together, in concert with each other, in an intensive effort to solve the murder.

50.   Yale University police officers are sworn police officers in the State of Connecticut, and possess the same powers and responsibilities as City of New Haven police officers, including the power to investigate crimes and arrest violators.  Defendant

Perrotti has been Chief of Police for the Yale Police Department from December 1998 to the present.

51.  Defendant Perrotti stated on or about December 5, 1998 that the Yale Police Department was working "shoulder to shoulder" with the New Haven Police Department in the Jovin murder investigation.  Defendant Perrotti further stated that six New Haven detectives and three Yale detectives had been assigned to the case by 1:00 p.m. on December 5, 1998.  See Exhibit 10.

52.  Later, on December 9, 1998, it was reported that Yale University police had four detectives working with eight city detectives on the case.  See Exhibits 2, 11.

53.  The collaborative effort between the Yale University law enforcement personnel and New Haven Police Department personnel constituted, in effect, a joint Yale/New Haven law enforcement task force.

54.  As detailed further below, the communication, collaboration, and concerted effort between and among the New Haven defendants and the Yale defendants continued into January 1999 and beyond, at all times relevant to this complaint, with all parties still attempting to identify the person or persons responsible for the Jovin homicide.

E.    December 1998 - Plaintiff's Name is
      Leaked as The "Prime Suspect"

55.    Prior to her death, Ms. Jovin had been a student in one
of plaintiff's Fall 1998 classes.    Plaintiff had also served as her
senior thesis advisor.

56.    Plaintiff's residence at the time, 305 St. Ronan Street
in New Haven, was approximately one-half mile from where Ms.
Jovin's body was found.    Numerous other Yale faculty and
administrators resided in the same residential neighborhood.

57.    On Monday afternoon, December 7, 1998, plaintiff met
briefly with members of the police task force investigating the
Jovin murder.    The investigating officers asked plaintiff for a
copy of Ms. Jovin's senior thesis draft, which she had left with
him on the afternoon of December 4, 1998.    They also asked for, and
received, a copy of a brief cover note from Ms. Jovin to the
plaintiff that accompanied the draft, indicating that she had
incorporated changes based on plaintiff's comments on a prior
draft.

58.    On December 8, 1998, the New Haven Register published a
front-page article on the Jovin murder investigation, over a banner
headline announcing that Suzanne Jovin "KNEW HER KILLER."    See
Exhibit 1.    The article quoted defendant Wearing as saying that the
police did not have a suspect.    Defendant Wearing also stated,
however, that the police believed that "the victim was known to the
assailant."

13

59.  In the same article, plaintiff was identified by name as a lecturer in Yale's Political Science department, and Ms. Jovin's senior thesis advisor.  It was also reported that Ms. Jovin had seen plaintiff on the day of her death, when she dropped off her draft paper.  Plaintiff was quoted as lauding Ms. Jovin and lamenting her tragic death.

60.  Plaintiff had previously offered similar comments at the request of WVIT-Channel 30, a Connecticut television station at which plaintiff had recently concluded an internship.  Plaintiff was requested to speak briefly about Ms. Jovin when officials at the station -- his former employer -- learned that he had been her thesis advisor.

61.  On Tuesday December 8, in the early evening, New Haven police officers again visited plaintiff, and requested that he accompany them to New Haven Police Headquarters to view photographs, and answer additional questions.  Plaintiff agreed.

62.  The December 8, 1998 interview turned into an interrogation spanning several hours.  Defendants Trocchio and DiLullo conducted this interrogation.  During the course of the interrogation, defendants asked plaintiff if he had killed Ms. Jovin.  The tone of the interrogation was accusatory, offensive, and distressing.

63.  Plaintiff voluntarily submitted to this interrogation -- even after it became apparent that the defendants had

misrepresented their intent in asking him to submit to questioning.
He flatly denied murdering Ms. Jovin.   Plaintiff explained that he
had seen her very briefly on the afternoon of December 4th, when
she dropped off her revised thesis draft at his office, in the
Political Science department on Prospect Street in New Haven.

64.  During the interrogation, plaintiff offered the defendant
officers the opportunity to search his vehicle, search his
residence, subject him to a polygraph examination, and take blood
and/or other DNA evidence from him.  The officers searched
plaintiff's vehicle with his consent, but otherwise declined
plaintiff's offers of assistance.

65.  Plaintiff left the interrogation with the defendant
officers after approximately four hours, when the officers stated
they had no further questions for him.  Plaintiff voluntarily
answered every question put to him, and never sought legal advice
or assistance.

66.  The next morning, December 9, 1998, the New Haven
Register announced, in a 1.5 inch bold-face headline, "YALE TEACHER
GRILLED IN KILLING."  See Exhibit 2.  A sub-heading read, "Prime
suspect lives near where slain student found, sources say".  The
article, citing "city and university sources close to the case",
stated that a Yale "educator" who taught Ms. Jovin was the "lead
suspect" in the police investigation into her murder.  It also

15

stated a "male Yale teacher" had been questioned "Monday and again Tuesday night."

67. Defendant Sullivan stated, on the record, that the police did not have any suspects.  Defendant Wearing issued similar on-the-record denials.  However, the information regarding plaintiff's interviews, and the statement that plaintiff had been interviewed on Monday and Tuesday night and was the "prime suspect" or "lead suspect," could only have come, directly or indirectly, from one or more of the New Haven defendants.

68. Indeed, in an interview published more than two years later in the Hartford Courant, defendant Wearing admitted that "you can blame the police to some extent" for the leaked publication and identification of the plaintiff -- and only the plaintiff -- as the lead suspect in the Jovin murder investigation.  Defendant Wearing conceded that it is "not a good thing for someone's name to get out there."

69. As noted, the December 9, 1998 Register article cited city and "university" sources.  On information and belief, the "university" source or sources were one or more of the Yale defendants, who were working "shoulder to shoulder" in the Yale/New Haven task force's investigation and/or were kept apprised of the progress of that investigation; the information the source or sources provided to the newspaper included plaintiff's name.

70.   On information and belief, prior to the morning of December 9, 1998, one or more of the Yale defendants learned from one or more of the New Haven defendants, or from another law enforcement source, that plaintiff had been questioned at length by the New Haven police about possible involvement in the Jovin homicide and was considered a "prime suspect" or "lead suspect" by the New Haven police.

71.   The Register was aware prior to the publication of the December 9th article that plaintiff was the "prime suspect" or "lead suspect" to whom that article referred; the information provided to the newspaper specifically identified the plaintiff, not an anonymous "male Yale teacher." The reference to the plaintiff in those terms in the December 9th Register article was not because the information leaked to the newspaper lacked greater specificity.

72.   Even though plaintiff was not identified by name in the December 9th Register article, it was apparent that Van de Velde was the individual to whom the article referred. One day earlier, plaintiff had been identified by name as a Yale lecturer who taught Ms. Jovin -- in an article that proclaimed, according to the police, that Ms. Jovin "knew her killer." Likewise, the December 9th article identified the "prime suspect" as a Yale "educator" or "teacher" -- a label that applied correctly to a lecturer such as the plaintiff, but not to a professor. Plaintiff had been identified as a Yale "lecturer" in the December 8th Register

article.  Read in context, the December 9th "Prime Suspect" article effectively identified plaintiff – even though it did not use his name.

73.  Subsequent events demonstrated that plaintiff had effectively been identified.  On the morning of December 9th, while approaching his dentist's office, a television news reporter ambushed plaintiff on the street, with cameras rolling, and asked if he was the individual referred to in that morning's newspaper story.  The reporter asked plaintiff if he was responsible for Ms. Jovin's death.  After this report aired, plaintiff was approached by numerous print and television news media, asking about his possible involvement in the Jovin murder.

74.  The public identification of plaintiff as the "prime suspect" in the Jovin murder investigation generated a frenzy of publicity -- locally, regionally, nationally and internationally.

75.  One television news outlet, WVIT-TV Channel 30, specifically requested on behalf of the New Haven Police during a December 1998 newscast that anyone with information about the plaintiff come forward -- further reinforcing defendants' view that plaintiff was the "lead suspect" in the Jovin murder case.

76.  The plaintiff suffered immediate and irreparable harm from the defendants' conduct.  For instance, shortly after being identified as a suspect in the Jovin investigation, he was suspended from the Quinnipiac College Masters in Broadcast

Journalism Program.  The leaked disclosure cemented the plaintiff
in the public eye as <u>the</u> focus of the Jovin murder investigation,
and as <u>the</u> person likely responsible for the crime.  It spawned
intense public scrutiny of plaintiff's background and personal
life, and triggered public speculation, which continues to this
day, as to whether he killed Ms. Jovin.

77.  The defendants' disclosure branded plaintiff as the
"lead" suspect in the Jovin murder case, even though there was not
a shred of forensic or other evidence to link the plaintiff to the
murder; there was no credible motive evidence; there was no
evidence of any improper relationship between plaintiff and Ms.
Jovin; and there was no credible evidence regarding the plaintiff's
background to link him to such a terrible crime.

78.  Defendants' actions were undertaken with knowledge that
there was no evidence that would even approach the legally-defined
level of "probable cause" or "reasonable suspicion" to believe that
the plaintiff was responsible for the murder of Ms. Jovin.

79.  Nevertheless, defendants anonymously caused plaintiff,
and only the plaintiff, to be identified as the "lead suspect" or
"prime suspect" in the case.

80.  The leaked disclosure of plaintiff as the "prime suspect"
served all defendants' interest in showing progress in the Jovin
murder investigation, and in quelling public fear that a Yale
student had been brutally murdered in a random act of violence in

one of New Haven's most exclusive residential neighborhoods.  It conveyed a message to the public that the individual allegedly responsible for the Jovin murder -- the plaintiff -- had been identified.  The disclosure of the plaintiff as the "prime suspect" alleviated the pressure on the defendants connected with the Jovin murder investigation that had arisen in the immediate aftermath of Ms. Jovin's death.  Defendants' actions did not serve or further any legitimate law enforcement purpose, but instead were motivated by and advanced defendants' concerns about public appearance.

F.    January 1999 - Plaintiff Is Named An "Official"
      Suspect In An Otherwise-Anonymous Pool

81.  For approximately one month after the December 1998 leak of plaintiff's name as the "prime suspect", the New Haven defendants adopted an "official" position, in on-the-record comments regarding the Jovin murder investigation, that the inquiry was not focused on any individual in particular, and that there were no "suspects" in the case.

82.  During this time, from approximately December 7, 1998 to January 11, 1999, Yale University classes were in recess for the Christmas break.

83.  During this time, between December 7, 1998 and January 11, 1999, New Haven police officials, including some or all of the New Haven defendants, spoke regularly with Yale officials, including one or more of the Yale defendants, about the general

progress of the Jovin investigation, and specifically about the investigation of plaintiff.

84.   According to published reports, defendant Lorimer was, from the beginning, actively, regularly and continuously in communication with the New Haven Police Department, including the New Haven defendants, about the Jovin murder investigation.  See Exhibit 15, p.5.  On information and belief, defendant Lorimer discussed with the New Haven defendants plaintiff's status as a suspect.

85.   The New Haven defendants shared with the Yale defendants information about the Jovin murder investigation, and about plaintiff's status in that investigation, that was not shared with the general public.

86.   During this time, the New Haven police, including the New Haven defendants and the Yale police continued to work together in a collaborative law enforcement effort.

87.   For instance, on December 14, 1998, plaintiff attempted to enter his office in the Yale political science department building.

88.   Plaintiff was denied entry by Yale police officers, who were under the general command of defendant Perrotti, until a Detective Rodriguez of the New Haven Police Department could be called to the scene.

89.  Detective Rodriguez subsequently arrived at the scene. He asked plaintiff if he and the Yale officers could search the plaintiff's office.  The officers handed plaintiff a consent-to-search form.  Plaintiff declined to sign the form, stating to Detective Rodriguez that, as previously directed, all communications should be with his counsel.

90.  On the evening of January 10, 1999, the night before the start of Yale University's spring semester, plaintiff was summoned to meet with defendant Brodhead.  Defendant Brodhead, acting on behalf of the Yale defendants, informed plaintiff that the two spring semester classes he was scheduled to teach had been cancelled.  Plaintiff was advised that he could continue in his job performing "research," but was denied the opportunity to teach in the classroom, or to serve as a senior essay advisor or directed reading tutor for any students during the Spring 1999 semester.

91.  Prior to January 10, 1999, the New Haven defendants informed Yale University officials, including the Yale defendants, that plaintiff was among a "pool of suspects" in the Jovin murder investigation, and that police would be questioning Yale students in the coming weeks.

92.  On January 11, 1999, Yale University, through defendant Conroy, issued a statement in response to inquiries about the cancellation of plaintiff's spring classes.  The statement said that, although Yale presumed Van de Velde to be innocent of the

Jovin murder, it had been informed by the New Haven Police Department that plaintiff was in a "pool of suspects" in the Jovin murder, and that police would be questioning people on campus about him in the coming weeks.

93.  A spokesperson for defendant Wearing admitted that defendant Wearing had been involved in formulating the "pool of suspects" statement released by Yale.  See Exhibit 13.

94.  Yale University's January 11, 1999 statement was the first official public disclosure of plaintiff's "suspect" status, and, when read in context with prior events, confirmed the "prime suspect" information that had been leaked in December 1998.

95.  The other Yale defendants were aware of and/or approved the statement issued by defendant Conroy prior to its release.

96.  The statement repeated information provided by defendant Wearing and/or the other New Haven defendants about the plaintiff. After Yale released the "pool of suspects" statement, New Haven police officials, including the New Haven defendants, were called upon by the media to confirm plaintiff's "suspect" status.  The New Haven defendants confirmed that plaintiff was indeed in a "pool of suspects."

97.  According to published reports, "Yale's decision to cancel Van de Velde's classes" came after "weeks of discussion between Yale and police officials about what to do about Van de Velde's employment once the new semester started."  See Exhibit 14.

98.  No other individual in the "pool of suspects" was publicly named and identified in January 1999.  To date, no other member of the "pool of suspects" has been identified.

99.  By contrast, the New Haven defendants have specifically announced that Ms. Jovin's boyfriend, as well as an adult she was mentoring in a "Best Buddies" program on the evening she died, were not and are not suspects.

100. There was, and still is, no rational basis for the defendants to have identified the plaintiff, and only the plaintiff, as a suspect, and not to have published the identities of the others in the "pool of suspects."

101. The formal announcement that plaintiff was a suspect in the Jovin homicide investigation triggered another, more intense, frenzy of publicity.  National television news organizations, among others, aired stories about the Jovin murder, and the fact that plaintiff, a respected former teacher of Ms. Jovin's, had been singled out as a suspect.

102. A common theme has infected virtually all media coverage that ensued in the wake of the January 1999 announcement -- the Jovin murder case was a tantalizing mystery, with a Yale faculty member as the prime suspect in that mystery.  The common question underlying the media frenzy was, "Is James Van de Velde a murderer?"  The defendants' announcement legitimized and caused such debate and speculation -- and further cemented Van de Velde's

link to the Jovin murder.  See Exhibit 3 (February 14, 1999 New Haven Register article summarizing media coverage of plaintiff and Jovin murder; "Their pictures always appear together").

103. For instance, prior to the January 11, 1999 official "pool of suspects" announcement, the Hartford Courant had declined to publish plaintiff's name, and had only reported that a Yale teacher had been questioned in the Jovin investigation.

104. After the January 11, 1999 announcement, the Courant determined such restraint was no longer necessary, and began printing plaintiff's name.  On January 13, 1999 the newspaper published a front-page article entitled "From Pillar to Pariah - Yale Lecturer Combats Suspicions He Killed 'Inspiring' Senior". See Exhibit 4.  The article discussed plaintiff's stellar background and teaching record, but, citing "sources", claimed that he had been the subject of police complaints by television reporters.  The implication of this report was that plaintiff may have had some character flaw that made him capable of murder.

105. On information and belief, the anonymous "source" statements in the January 13, 1999 Courant article were provided by one or more of the New Haven defendants.  They were another part of a calculated campaign by the New Haven defendants to portray plaintiff as an individual capable of murder, and to further the public perception that he, the lone named "suspect," was guilty of murder.

106. Indeed, in a June 29, 1999 <u>Courant</u> article summarizing the state of the investigation, it was reported that "Police have mostly declined to speak on the record for months, and instead have leaked information to the media."

107. The publicity frenzy that ensued from the January 11, 1999 official branding of plaintiff as a "suspect" cemented plaintiff in the public eye as <u>the</u> Jovin murder suspect.  In effect, as a result of defendants' conduct, plaintiff was charged, tried and convicted in the media, and therefore in the minds of much of the public -- without regard to facts, logic, legal standards, or the rule of law.

G.   January 1999 - Continued Joint Action
     By Yale and New Haven Parties

108. The joint action between the Yale and New Haven defendants continued after the official announcement of plaintiff as a "suspect" in the Jovin homicide.

109. On January 21, 1999, plaintiff, who remained as a nominal lecturer and Yale employee after Yale cancelled his classes, was summoned to meet with Deputy Dean of Yale College Joseph Gordon, who was working under the direction of defendants Levin, Brodhead and Lorimer.

110. Gordon stated he had been "tasked" by defendant Lorimer to discuss certain questions with plaintiff about his political science classes.  Gordon further indicated that the questions had

been prompted by a letter received by Yale from the family of Suzanne Jovin.

111. Plaintiff answered all of Gordon's questions relating to his classes.

112. Gordon continued to ask questions of plaintiff not related to the issues raised in the letter -- such as whether he had received e-mail from Suzanne Jovin, and when he had last seen her.

113. Well before the Gordon interview, on or about December 10, 1998, plaintiff had informed the New Haven defendants, through counsel, that he would continue to respond to questions, but that all communication should be directed to him through his lawyers.

114. On information and belief, Gordon's inquiries into plaintiff's activities and interaction with Ms. Jovin during the week of her murder were undertaken at the request of the New Haven defendants, as part of the ongoing joint law enforcement collaborative effort with the Yale defendants.

115.  On information and belief, the Yale defendants shared the information gathered from plaintiff during the Gordon interview with the New Haven defendants.

116. In late April 1999, in a published report, defendant Lorimer stated that she had regular conversations with the New Haven police during the initial investigation, and that, as of

April 1999, she still spoke with the New Haven police two or three times a week about the Jovin case.  See Exhibit 15, p.5.

      H.   1999 to the Present - Defendants Continue To
           Brand Plaintiff A "Suspect", And To Identify
           Only Him As A Suspect, Even When Faced With
           Exculpatory Forensic Evidence; They Also Refuse
           To Retract The "Suspect" Label and Clear His Name

117. From 1999 to the present, the New Haven defendants have continued to label plaintiff, and only the plaintiff, as a "suspect" in the Jovin murder case, and have continued to preserve the confidentiality of other members of the "pool of suspects."

118. From 1999 to the present, the Yale defendants have likewise continued to label plaintiff a "suspect" in the Jovin murder, although not as frequently as the New Haven defendants.

119. Defendants have never identified another suspect in the Jovin murder case, even though the New Haven defendants have admitted that such suspects exist.

120. For instance, in a June 29, 1999 article in the New Haven Register, defendant Wearing stated that Van de Velde "has not been ruled out" of the pool of suspects.  He stated further that "[n]obody has been ruled out in the pool of suspects," but refused to identify any other suspects.  See Exhibit 5.

121. Likewise, in an August 12, 1999 article in the New Haven Register, defendant Sullivan stated that plaintiff remained in the

"pool of suspects."  As in January, no other members of that pool were identified.  See Exhibit 6.

122. On December 3, 1999, defendant Wearing convened a press conference on the occasion of the one-year anniversary of Ms. Jovin's murder.  Numerous representatives of the print and electronic media attended this press conference.

123. At the conference, Wearing admitted that "ten people remain in the 'pool of suspects'".  He reaffirmed that Van de Velde remained a suspect, but did not state what evidence, if any, supported that label.  Defendant Wearing again refused to identify any of the other individuals in the "suspect" pool with the plaintiff.

124. Defendant Wearing admitted that the police "[had] a long way to go" before solving the case.  After acknowledging the difficulty of the investigation, defendant Wearing reaffirmed his department's resolve to find Ms. Jovin's killer, stating "If we have to ruffle feathers, disrupt some people's careers to do that, we will."  See Exhibit 7.

125. The "ruffle feathers" comment was clearly directed at the plaintiff, and was consistent with the defendants' pattern of publicly targeting the plaintiff, and only the plaintiff, as a suspect in the case.  Plaintiff's career had already been significantly disrupted by the defendants' conduct.

126. Defendant Wearing also issued a written statement noting the world-wide media attention devoted to the Jovin murder investigation, and describing it as a high profile case.  <u>See</u> Exhibit 8.

127. In September 2000, defendant Levin referred to plaintiff as a "major suspect" in the Jovin murder investigation, in a public statement published in the <u>Hartford Courant</u>.  <u>See</u> Exhibit 16, p.2.

128. In or about late 2000, as part of their ongoing collaborative effort with New Haven in the Jovin murder investigation, the Yale defendants hired Andrew Rosenzweig, a private investigator, to assist in the murder investigation.

129. On information and belief, the New Haven defendants provided Mr. Rosenzweig, who at all times was acting on behalf of the Yale defendants, with access, either direct or indirect, to their Jovin case investigation file.  Further, the New Haven defendants provided Mr. Rosenzweig with a desk at the New Haven police department.

130. Case investigation files are typically kept confidential from private civilians, such as Mr. Rosenzweig.  He was provided access to the Jovin case file, on information and belief, as the result of an agreement between the Yale defendants and the New Haven defendants, among others.

131. In March 2001, as further part of their ongoing collaborative effort, Yale and the New Haven police convened a

joint press conference to announce an increased reward for information solving the Jovin murder investigation, and to solicit the public's assistance with respect to a previously-unidentified light brown or tan van that was spotted at the crime scene at the time Ms. Jovin was stabbed.

132. The new reward money, $100,000, was offered by Yale to supplement a $50,000 reward previously offered by the State of Connecticut.

133. Defendant Wearing represented the New Haven Police at the press conference.  Defendant Perrotti attended on behalf of Yale, at the request of defendant Levin.

134. Defendant Levin stated in connection with the announcement of the new reward money that Yale had offered the increase to the state reward after investigators, which on information and belief included the New Haven defendants, requested it.

135. At this press conference, defendant Wearing reiterated yet again the plaintiff was a suspect in the Jovin homicide.  He acknowledged that other unnamed suspects ["a pool of suspects of several people"] "could have had the opportunity" to commit the murder, but refused to identify any of those individuals.

136. Defendant Wearing also declined to state what evidence supported plaintiff's continued status as a "suspect," and the only named suspect, in the Jovin case.

137. In a lengthy April 1, 2001 <u>Hartford Courant</u> article, defendant Wearing again reaffirmed that plaintiff was a suspect in the Jovin murder; he acknowledged that there "absolutely" were other suspects, but declined to disclose their identities.

138. In the same April 1, 2001 <u>Courant</u> article, defendant Wearing admitted that "you can blame the police to some extent" for the fact that plaintiff's name became public as a suspect in the Jovin murder.  <u>Id</u>.

139. On April 25, 2001, in a front-page article in the <u>New Haven Register</u>, defendant Wearing stated again that "on the basis of everything we have been able to develop, [Van de Velde] is a legitimate, bona fide suspect."  Defendant Wearing again did not identify any other suspects.

140. In the April 1, 2001 <u>Hartford Courant</u> article, John Pleckaitis, a former member of the New Haven Police Department under the supervision and direction of defendant Wearing, spoke about his involvement in the Jovin murder investigation.  On December 4, 1998, Pleckaitis was a sergeant in the NHPD at that time, with a specialty in processing crime scenes.  He was in charge of forensics on the Jovin murder investigation.

141. In the April 1, 2001 <u>Courant</u> article, Mr. Pleckaitis confirmed that the search of plaintiff's vehicle revealed no evidence linking him to the crime.  He stated, "From a physical evidence point of view, we had nothing to tie him [the plaintiff]

to the case . . . I had nothing to link him to the crime." Pleckaitis also stated that the police made mistakes investigating the crime.

142. Between 1998 and the present, the defendants have steadfastly refused to remove the suspect label from the plaintiff, or to identify any evidence that justifies this destructive label.

143. During this same period of time, the defendants have stated that the investigation has "exhausted all avenues," that they have few if any leads, and little if any evidence identifying Ms. Jovin's killer.

144. In October 2001, the Office of the State's Attorney for the Judicial District of New Haven announced that unidentified male DNA had been recovered from the fingernails of Ms. Jovin. According to the State's Attorney's statement, the male DNA was commingled with Ms. Jovin's blood.

145. The existence of this DNA sample had not previously been revealed.  Prior to this revelation, in April 2001, plaintiff voluntarily provided a DNA sample when requested to do so during a meeting with Mr. Rosenzweig and another private investigator hired by the Yale defendants.

146. The October 2001 statement confirmed that the unidentified male DNA commingled with the blood from Ms. Jovin's fingernails did not match the plaintiff's DNA, and was not his.

147. Even in the face of this forensic evidence excluding the plaintiff as the source of critical DNA material, the defendants refused to retract the "suspect" label from the plaintiff, or to officially clear him of involvement in the Jovin murder.

148. On November 30, 2007, the Office of the State's Attorney for the Judicial District of New Haven announced that four retired detectives from the Connecticut State Police had assumed, and would continue to have, primary responsibility for the Jovin murder investigation.  The official statement issued in conjunction with this announcement stated, "The idea is to approach the case as if it were brand new.  Therefore, no person is a suspect in the crime, and everyone is a suspect in the crime."  See Exhibit 17.

149. As a result of defendants' December 1998 leak and repeated statements confirming his "suspect" status, plaintiff has been irretrievably linked with the Jovin murder.  Virtually every article about the Jovin murder identifies Van de Velde by name, as "the suspect" in the case.  Indeed, even at the November 30, 2007 press conference announcing the "brand new" investigation, questions were raised by the media about James Van de Velde – and no other individual.

I.    Other Conduct Designed To Establish
      Plaintiff's Guilt In The Public Eye

150. Between December 1998 and the present, defendants have engaged in a continuing course of conduct designed to insinuate, and which did insinuate, plaintiff's guilt in the public eye.

151. The defendants' conduct was not limited to the repeated naming of plaintiff, and only the plaintiff, as the "suspect" in the "pool of suspects."

152. The defendants attempted to manipulate the media coverage of the Jovin murder investigation to increase the pressure on the plaintiff, and further the public perception that he was guilty of murdering Ms. Jovin.

153. For instance, in April 1999, the defendants enlisted the assistance of an amateur "treasure hunters" club -- a group of metal detector enthusiasts -- to help in the search for physical evidence connected to the Jovin murder.

154. The defendants notified members of the media in advance of this orchestrated search.  Television film crews were present, having been alerted by the defendants.

155. The defendants led the search, beginning in the vicinity of Edgehill and East Rock roads, where Ms. Jovin's body had been found.  The search was interrupted, and resumed in the vicinity of 305 St. Ronan Street -- where plaintiff resided.  See Exhibit 9.

156. The next day, the media reported that during the search an item was recovered on the '300' block of St. Ronan Street, approximately 100 feet from plaintiff's residence.  Defendant Sullivan described the discovery as "forensic evidence."  Anonymous "sources" said the recovered item was not the murder weapon.

157. In a subsequent newspaper article, similar anonymous "sources" reported that the item recovered was an automobile owner's manual, and "described the finding as potentially important."  For the record, Defendant Sullivan declined comment. See Exhibit 9 (series of articles).

158. The conduct of the metal detector search -- in the presence of invited media -- was intended to, and did, further emphasize plaintiff's status as "the suspect" in the Jovin murder, and further the public perception that plaintiff was responsible for the murder.  The defendants' conduct, and comments about the location and supposed significance of the recovered evidence, created a public perception that the investigative "net" was closing in on the plaintiff.

159. On information and belief, the item recovered was the owner's manual from plaintiff's Jeep Wrangler, which had been broken into in October 1998.  Plaintiff's owner's manual had been missing since that theft -- before the Jovin murder -- and therefore had no "forensic" significance.

160. Plaintiff informed the defendants of these facts, immediately after learning that the mystery "forensic evidence" was supposedly an automobile manual.  The defendants did not issue any subsequent statement disputing the potential significance of the alleged "forensic evidence" recovered near plaintiff's home, or correcting the public perception they had created that significant evidence relevant to the Jovin homicide investigation had been recovered near plaintiff's home.

J.    Conclusion and Damages

161. As described above, beginning in December 1998 and continuing to the present day, the defendants have repeatedly branded plaintiff as a "suspect," and the only named suspect, in the brutal murder of Suzanne Jovin, and have engaged in other conduct which created and furthered a public perception that plaintiff committed that murder.

162. As described above, the plaintiff has consistently maintained his innocence, and has never been charged with the Jovin murder.

163. The actions of the defendants were reckless or intentional, and violated the plaintiff's constitutional and civil rights.

164. The actions of the defendants were willful or wanton, were undertaken without regard for plaintiff's rights, and were so offensive as to shock the contemporary conscience.

165. As a result of the defendants' actions, plaintiff received a great amount of unfavorable publicity, irreparably damaging his reputation and causing him to experience humiliation, disgrace, mental anguish, psychological trauma, and severe emotional distress.

166. As a further result of defendants' actions, plaintiff lost, and continues to lose, employment opportunities, suffered damage to his future earning capacity, and was forced to incur legal and other expenses.

167. As a further result of defendants' actions, plaintiff's job status at Yale University, and with the United States Navy Reserves, was altered.

168. The stigma associated with plaintiff's branding as a "suspect" in a notorious murder has continued to affect plaintiff's job status within the Naval Intelligence Reserves. For instance, between 1999 and 2002, the Navy adopted a policy of refusing to approve any requests by plaintiff for work assignments outside of the United States. Plaintiff did not learn of this policy until 2002, and in the interim suffered months of unemployment, applying for and being denied many assignments for which he was otherwise qualified.

169. In addition, in 2002 plaintiff's Naval assignment with the National Infrastructure Protection Center at FBI Headquarters in Washington, D.C. was terminated after officials learned that he

had previously been named as a "suspect" in the still-unsolved
Jovin murder.

170. Further, in 2003, again based on the past branding as a
"suspect" in the Jovin murder, another assignment plaintiff had
obtained through the Naval Reserves, at the Defense Intelligence
Agency, was terminated.  In addition, plaintiff's security
clearance with the Department of Defense was withdrawn, effectively
ending his active career, since he could no longer serve as a Naval
Intelligence Officer.  Since that time plaintiff has been on
inactive status, which effectively ended his Naval career and,
among other things, made him ineligible for Naval retirement
benefits (for which plaintiff would have been eligible after
another four years, having served 16 of the required 20 years of
service).

171. As a further result of defendants' actions, plaintiff's
standing within the Quinnipiac College Masters in Broadcast
Journalism Program was damaged, and plaintiff was suspended from
that program.

172. The devastating impact of defendants' actions on
plaintiff's reputation and livelihood is illustrated by the
comments of several students after plaintiff was first officially
identified as a suspect, and after his classes were cancelled.  One
student stated, "[a]lthough I believe a person is innocent until
proven guilty, I would not register for a course with a professor

who's been named a suspect in a murder."  Another student was
quoted as saying: "I had registered for one of his seminars, and I
redid my schedule.  It's not worth the risk."  Yet another student
stated, "There is this, like, maybe general sense in people's minds
that maybe he is guilty even though they haven't really proven
anything yet."

173. Yet another student stated in January 1999: "By now it
would be almost impossible for him [Van de Velde] to find another
teaching job, no matter what he has to offer to students.  Even if
the case is never solved, there will always be suspicion
surrounding him wherever he goes."

174. Because no amount of money damages would be sufficient to
remedy fully the damage plaintiff has suffered, plaintiff lacks an
adequate remedy at law, and therefore seeks, in addition to money
damages, declaratory and injunctive relief from the Court.

<u>FIRST COUNT (42 U.S.C. § 1983 against all defendants)</u>

175. Paragraphs 1 through 167 are hereby incorporated by reference and re-alleged as though fully set forth herein.

176. The individual, collective, and concerted actions of the defendants described above violated rights guaranteed to the plaintiff under the United States Constitution, as follows:

    a.    plaintiff's right to equal protection of the laws, under the Fourteenth Amendment to the United States Constitution;

    b.    plaintiff's right to privacy under the Fourth and Fourteenth Amendments to the United States Constitution, i.e., the right to be free from governmental intrusion, and to be "left alone";

    c.    plaintiff's right to procedural and substantive due process, under the Fourteenth Amendment to the United States Constitution, including but not limited to his "liberty" and "property" interests thereunder;

    d.    plaintiff's right to be free from unreasonable searches and seizures, under the Fourth and Fourteenth Amendments to the United States Constitution.

177. The defendants' conduct also violated plaintiff's rights under the Constitution of the State of Connecticut.

<u>SECOND COUNT (Invasion of Privacy – False Light Against All Defendants)</u>

178. Paragraphs 1 through 167 are hereby incorporated by reference and re-alleged as though fully set forth herein.

179. The individual, collective and concerted actions of the defendants described above, beginning in December 1998 and continuing to the present day, caused plaintiff to be placed in a

false light that would be highly offensive to a reasonable person, i.e., that he was responsible for a brutal and infamous murder.

180. In undertaking these actions, the defendants acted with knowledge of the falsity of the matters published, or with reckless disregard to the falsity of the publicized matter and the false light in which plaintiff as a result would be placed.

THIRD COUNT (Intentional Infliction of Emotional Distress Against All Defendants)

181. Paragraphs 1 through 167 are hereby incorporated by reference and re-alleged as though fully set forth herein.

182. In engaging in the course of conduct described above between December 1998 and the present with respect to the plaintiff, defendants intended to inflict upon him severe emotional distress.

183. Defendants knew, or should have known, that plaintiff would suffer severe emotional distress as the likely result of their actions.

184. The actions of the defendants with respect to the plaintiff in connection with the Jovin murder investigation were extreme and outrageous.

185. As a direct result of defendants' conduct, in addition to the damages already specified above, plaintiff suffered, and will suffer in the future, extreme mental anguish, nervousness, anxiety and illness, and emotional distress.

WHEREFORE, the plaintiff prays that this Court:

1.    Assume pendent party and pendent claim jurisdiction, if necessary;

2.    Award compensatory damages to the plaintiff;

3.    Award punitive damages to the plaintiff;

4.    Order appropriate declaratory and injunctive relief;

5.    Award costs of this action, plus attorney's fees; and

6.    Award such other and further relief as the Court deems appropriate and just.


                        THE PLAINTIFF
                        JAMES VAN DE VELDE

                  By_____
                        David T. Grudberg, ct01186
                        JACOBS, GRUDBERG, BELT & DOW, P.C.
                        350 Orange St.
                        P.O. Box 606
                        New Haven, CT  06503
                        Ph.:(203) 772-3100
                        Fax:(203) 772-1691
                        Email: dgrudberg@jacobslaw.com


                        James I. Meyerson
                        64 Fulton St. – Suite 502
                        New York, N.Y. 10038
                        Ph.:(212) 226-3310
                        Fax:(212) 513-1006
                        Email: jimeyerson@yahoo.com


                        His Attorneys