# EXHIBIT C



Not Reported in A.2d  
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)  
**(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))**

Page 1

**H**
Martin v. Griffin
Conn.Super.,2000.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.
Jerome L. MARTIN,
v.
John R. GRIFFIN et al.
**No. CV 990586133S.**

June 13, 2000.

MEMORANDUM OF DECISION ON PLAINTIFF'S JANUARY 7, 1999 APPLICATION FOR PREJUDGMENT REMEDY

LAVINE.

*1 The plaintiff in this case, which raises important questions concerning defamation by implication in the context of a televised campaign commercial, has applied for a prejudgment remedy, claiming, *inter alia,* that he was the victim of a defamatory political advertisement run during the 1998 campaign for High Sheriff in Hartford. Evidentiary hearings were held on August 22 and November 22, 1999. A detailed briefing schedule was established in light of the interesting legal issues raised. Delay ensued while transcripts of the hearings were being typed. Both sides filed memoranda on February 18, 2000, and responsive memoranda on March 17, 2000. For the reasons stated, in light of important First Amendment issues at stake and the overriding need to provide broad protection to political speech, the plaintiff's application is denied.

A. *Legal Standards Relating to Prejudgment remedies*

Plaintiff's Amended Complaint of October 12, 1999, sounds in four counts. Count One alleges what the plaintiff denominates libel per se; Count Two alleges what is described as libel by inference and/or innuendo; Count Three alleges intentional infliction of emotional distress; Count Four sets out a claim for negligent infliction of emotional distress.

The standards for the granting of a prejudgment remedy are well known. General Statutes § 52-278d(a) requires the court to determine "whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff." The plaintiff does not have to establish that he will prevail, but rather that such facts exist under the law such that a person of ordinary caution, prudence and judgment would conclude that the claim will probably be sustained. *Wall v. Toomey,* 52 Conn. 35, 36 (1884). "Probable cause is a flexible, common sense standard" and "does not demand that a belief be correct or more likely true than false." *Three S. Development Co. v. Santore,* 193 Conn. 174, 175 (1984). The court must evaluate the legal claims made by the plaintiff and also the defenses raised. While prejudgment remedies are granted frequently in certain types of cases, e.g., suits on a note, it has been observed that a prejudgment remedy, as a creature of statute, "is an extremely harsh remedy and exists in derogation of common light and common law." *Humiston v. Bishop,* 29 Conn.Sup. 324, 326 (1971), citing *Munger v. Doolan,* 75 Conn. 656, 659 (1903). The court is vested with broad discretion in making its decision. *Haxhi v. Moss,* 25 Conn.App. 16, 19 (1991). Such discretion is particularly warranted where important First Amendment concerns, implicating political speech occurring during the heat of a campaign, are involved. In ruling on an application for prejudgment remedy, the court, of course, is limited to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 3 of 18   Page 11 of 61

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))**

record before it. "The hearing in probable cause ... is not contemplated to be a full scale trial on the merits of the plaintiff's claim." *Three S. Development Co. v. Santore, supra,* 175.

B. *The Facts*

*2 The facts underlying this claim, as developed during the evidentiary hearings, may be summarized in relevant part as follows.

Walter Kupchunos, sheriff of Hartford County, testified that he had been elected in 1998. He met the defendant, John R. Griffin, in 1994 when Griffin was then a candidate for sheriff of Hartford County. Kupchunos testified that he and Mr. Griffin discussed the plaintiff, Jerome Martin, when the plaintiff was under consideration for the position of chief deputy sheriff.

Kupchunos testified that Griffin told him that "under no circumstances" should Kupchunos put Martin in that position because Martin was guilty of "a horrendous sexual crime." Tr. 8/27/99, p. 6. Kupchunos testified that Griffin stated that Martin had been "found innocent or not guilty" because of a "technicality." Kupchunos testified that Griffin had said that Martin had "taken a gun and put it to a girl's head and made her perform oral sex," and that on appeal he had been found not guilty, "but that doesn't mean he's not guilty." Tr. 8/27/99, pp. 8-9, 37, 69. (The complaint in this case is not based on this alleged statement, but rather on a televised campaign commercial, as will be explained below.) Kupchunos testified that Griffin had informed him that Martin's conviction had been successfully appealed. Tr. 8/27/99, pp. 8-9, 36.

Kupchunos testified that in response to Griffin's allegations, he told Griffin to get proof. Kupchunos testified that Griffin obtained newspaper articles describing the jury's verdict in a 1979 criminal trial in which Martin was the defendant. Kupchunos testified that Griffin warned him not to make plaintiff chief deputy sheriff because it was "not good to have a sexual offender in a position of authority." Tr. 8/27/99, pp. 11-12. Because of what he had been told, Kupchunos testified, he told Martin that he could not appoint him chief deputy sheriff, the number three position in his office.

Kupchunos testified that he had received a copy of Plaintiff's Exhibit 1. Plaintiff's Exhibit 1 is a May 8, 1995 letter from Attorney Joseph E. Fazzano, indicating a copy was sent to Mr. Kupchunos, with attached newspaper articles from *The Hartford Courant* relating to the trial and appeal in the Martin case. The letter reads as follows:

Dear Mr. Griffin:

This office represents Jerome Martin. Mr. Martin has reported to us that in recent weeks you have disparaged him and have circulated falsehoods concerning him. These activities have resulted in difficulties for Mr. Martin in his occupation. I am certain that I need not tell you that to disparage one in his trade or profession is actionable under the law. I will cite only one instance of your commentaries that are false and harmful. You have circulated information that Mr. Martin was convicted of a crime 17 years ago. That statement is false. That statement is libelous.

Please consider this letter as a formal request that you cease and desist from such conduct. In the event that you persist in circulating falsehoods concerning our client, we will have no choice but to take appropriate action. If you wish to have your attorney discuss the matter with me, I will be pleased to do so at any time.

*3 Attached to Plaintiff's Exhibit 1 are copies of two newspaper articles. The first, with a file stamp date of March 17, 1979, is headlined "Martin Convicted on Lesser Count." The article identifies plaintiff as a "former Hartford police union president and a 10 1/2 year veteran of the force," and recites, in part, that Jerome Martin "was convicted ... of a reduced sexual assault count in connection with an attack on a young woman whom he dated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 4 of 18

Page 12 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 3

more than a year ago." The article also states that the jury "first acquitted Martin ... of a first degree sexual assault count" before finding him guilty of "third-degree sexual assault." The second article, date stamped May 26, 1982, is headlined, "Court Says Ex-Officer Innocent Because of Mistake in Sex Trial." This article states, in relevant part, as follows: "The state Supreme Court Tuesday ordered a directed judgment of not guilty in the sexual assault case of Jerome Martin. In a footnote to the decision, the court said Martin could be retried on third-degree sexual assault charges." The article went on to state that the trial judge had erred when he told the jury that Martin, who was on trial for first-degree sexual assault, could be convicted of third-degree sexual assault. The Supreme Court concluded, the article indicated, that third-degree sexual assault was not a lesser included offense of first-degree sexual assault. At the prejudgment remedy hearing, the court took judicial notice of the reported decision in *State v. Martin,* 187 Conn. 216 (1982).

Kupchunos testified that as a result of reading the newspaper articles, he understood that Martin's conviction had been overturned or reversed. Griffin told him that if Martin were elevated to a high position, the public would find out about the conviction. Kupchunos decided not to appoint Martin chief deputy sheriff because to do so "would not have been in the department's best interest." Tr. 8/27/99, pp. 46-47. Kupchunos testified that Martin worked on his 1998 campaign. However, Kupchunos said that Martin was never told he was authorized to make statements on behalf of the campaign. Tr. 8/27/99, p. 65. Kupchunos also stated that three members of the Hartford County Sheriff's Department had felony convictions as of October 26, 1998, and that they were members of the department on election day. Tr. 11/12/99, p. 12.

Plaintiff's Exhibit 2, a videotape of a campaign commercial and the basis for the allegations set out in the complaint, was played. The tape is approximately thirty seconds long. It aired on numerous occasions on different television stations during the campaign. The court has viewed it repeatedly.

The tape begins with the words "The Truth" visible on the screen. A voice continues to state: "As Hartford County Sheriff, Walter Kupchunos hired convicted felons as deputies." Police sirens become visible. So does a *Hartford Courant* editorial headline, "Felons as Deputies."

*4 Next, the following words are spoken: "Arrested for raping a 24-year-old girl at gunpoint." At the same time as these words are heard, on the screen appears the facesheet in the reported judicial decision of *State of Connecticut v. Jerome Martin,* with the citation and date of the opinion appearing. The case caption enlarges in size while on the screen, and is visible for three to four seconds. The name Jerome Martin is visible. While the facesheet of *State v. Jerome Martin* is enlarging, the words "Sexual Assault" appear on the screen.

The advertisement continues with the following words, appearing in sequence, accompanied by National Crime Information Center (NCIC) identification cards in the background: "Conspiracy to sell heroin," "Racketeering," "Larceny," and "Possession of marijuana."

The voiceover continues as follows: "Kupchunos even opposed the bill to prohibit convicts from serving as deputies, claiming that the quality of services would dramatically decline." A reference to Judiciary Committee Hearing Testimony of February 16, 1998, is then made on the screen. Continues the advertisement: "Convicts Serving as Sheriffs. The Kupchunos Record. Felon Friendly. Vote Griffin for Sheriff. Protect Your Family." The screen then displays a *Hartford Advocate* headline, "A Dysfunctional Department."

The commercial indicates, at the end, that it was "Paid For by Griffin for Sheriff '98, Joseph Batista, Treasurer."

The commercial is unambiguously a political ad-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 5 of 18   Page 13 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 4

vertisement. The only names used during the advertisement are those of Jerome Martin, which is visible in written form, and Walter Kupchunos. The plaintiff is not specifically stated to be a convicted felon, but he argues that a reasonable viewer would inevitably draw the conclusion that he is a convicted felon, based on the entire advertisement.

Jerome Martin testified. He stated that he does not have a criminal record today. From 1995 through 1998, he was a special deputy.

In 1998, Griffin approached him and asked for his support in the race against Kupchunos. He received mailings and phone calls from Griffin. Plaintiff's Exhibit 3 is an example of such a mailing. Martin decided not to support Griffin.

He first saw the television advertisement while sitting in his living room and was "enraged." The advertisement did not mention that his conviction had been overturned. He found the advertisement degrading and traumatizing. It caused him to become depressed and seek psychological treatment. Tr. 8/27/99, pp. 82-98.

On cross-examination, the plaintiff agreed that he had been arrested for an alleged sexual offense. He stated that it was also correct to say that there are deputy sheriffs with convictions of various crimes. The only thing not literally true in the advertisement, he testified, was the allegation that he had used a gun in connection with the alleged sexual assault. The omission of the fact that his conviction was overturned on appeal rendered the advertisement inaccurate in his view. Tr. 8/27/99, pp. 99-110.

*5 When questioned about his role in the Kupchunos campaign, he stated that he had made telephone calls, put lawn signs up, and attended some meetings. He denied having put out any press releases. Tr. 8/27/99, p. 111. Notwithstanding this denial, when confronted with Defendant's Exhibit D, he admitted to putting it out. Defendant's Exhibit D, entitled "Press Release" in bold letters, states at the bottom: "Press Release authorized by Jerome L. Martin, executive advisor for the Independent Special Deputy's Association. 860-610-0653 pager 279-0467." The press release states as follows in its entirety:

> Members of the Union Executive Board, for the Special Deputy Sheriff's, for Hartford County, were upset that a candidate for High Sheriff, John Griffin, made accusations against the department. The Union cited that Griffin [sic] comments were both inflammatory and politically motivated. The Union feels that, Mr. Griffin is attempting to use the incident to gain notoriety and the news media is accommodating him and his antics. (the [sic] accusation that is being referred to, is the Story in the newspapers on Monday, involving an incident that occurred last week between a prisoner and a special deputy sheriff.) The Union feels that the incident is being handled properly by the department and that the investigation will determine what happened. The remarks by Griffin calling the incident a "Rodney King beating," is so out of line that it is a joke. Griffin was not present nor can he identify anyone that can substantiate the incident. The saddest part of this is that the media prints what this phony says.

> The executive advisor for the Union, Jerome Martin, calls Griffin a lunatic and feels that a mental evaluation of him is needed. Martin states, "We have been listening to Griffin for years and I have always doubted his truthfulness. I have heard his stories about his so called military background and his training, but I have yet to see any creditable documentation to back it up. He is a phony and a blowhard. He boast [sic] of a law enforcement background, then tell me with what department and what police academy he graduated from."

> Martin calls, [sic] Griffin a tin soldier and that he is a legend in his own mind. Martin further feels that if Griffin was ever allowed to run the Sheriff's Department, it would be like giving the prisoners the keys to the cells.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 6 of 18   Page 14 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 5

Also admitted into evidence was Defendant's Exhibit B, an August 6, 1998 story in the *Journal Inquirer* headlined, "Complaints turn sheriff's race into slugfest." The article discusses, among other things, the plaintiff's press release, Defendant's Exhibit D. Admitted also was Defendant's Exhibit C, an October 15, 1998 article in the *Hartford Advocate.* The article states as follows in relevant part:

> From the beginning, the campaign for sheriff has been less about issues than character, or rather, lack of character. For example, the *Advocate* recently got a long letter from special deputy and occasional Kupchunos campaign volunteer Jerome Martin. In it, Martin calls Griffin a phony, and makes a point-by-point analysis of Griffin's resume, highlighting apparent inconsistencies and exaggerations. Martin may be the wrong person to challenge anybody's character. In January 1978, he was accused of twice raping a 24-year-old West Hartford woman and forcing her to have oral sex with him and a companion. The former Hartford police officer was later convicted of third-degree sexual assault and sentenced to one to three years in prison, a conviction that was later overturned on a technicality.

*6 Martin admitted having made statements to the media about the Kupchunos Griffin race, having authored two or three letters for the Kupchunos campaign, and having faxed the press release to newspapers, but denied having injected himself into the campaign. Tr. 8/27/99, pp. 112-16, 120-21. Edward Katz, a principal in the firm of Cashman & Katz, testified. His firm makes television commercials. Mr. Katz testified about the number of times the commercial was aired and on what stations. Tr. 8/2/99, pp. 132-39. When asked if he thought the commercial was fair, he stated, "Political advertising tends to be hardhitting, I would say this falls in that realm." Tr. 8/27/99, p. 146. He also opined that it was "kind of standard" to omit information that is critical about a certain state of facts, "especially in ads that are casting doubts or, or putting the opposing candidate in a negative light that tends to be a very frequent occurrence." Tr. 8/27/99, p. 148. He added that "a lot of times political ads are created to create an impression and for no other reason the amount of only having thirty seconds to do that you can't tell a complete story in thirty seconds." Tr. 8/27/99, p. 149.

C. *Legal Analysis: General Discussion*

Count One alleges a claim of libel per se. In order to prevail on such a claim, the plaintiff must prove that a false and defamatory statement was made; that there was an unprivileged communication to a third party; and that there was fault on the part of the publisher of the statement. *Miles v. Perry,* 11 Conn.App. 584 (1987).

The degree of fault which must be demonstrated depends on the status of the plaintiff. Libel laws are designed to protect a person's most treasured asset- a good reputation. Under *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), however, because of our society's "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open, and that ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"; (internal quotation marks omitted) *Rosenblatt v. Baer,* 383 U.S 75, 85 86 (1966); persons categorized as "public figures" or "public officials" must surmount a high burden to prevail in a libel case.

As the Supreme Court stated *in New York Times Co. v. Sullivan, supra,* 376 U.S. 279-80:

> The constitutional guarantees [of the First and Fourteenth Amendments] require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice"-that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 7 of 18

Page 15 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 6

The Supreme Court continued:

> We have no occasion here to determine how far down into the lower ranks of government employees the "public official" designation would extend for purposes of this rule, or otherwise to specify categories of persons who would or would not be included.

*7 *Id.,* 283 n. 23.

In *Kelley v. Bonney,* 221 Conn. 549, 581 (1992), our Supreme Court remarked at length on factors to be considered when evaluating whether a particular individual should be deemed a public official:

> In determining whether a particular individual holds the status of a public official, courts have remarked on various significant considerations. The United States Supreme Court indicated that the underlying purpose of limiting an individual's ability to protect his reputation was to allow citizens to voice their opinions more freely on matters of public concern. *New York Times Co. v. Sullivan, supra,* 270. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."*Id.*"[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs."*Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *Moriarty v. Lippe,* 162 Conn. 371, 378, 294 A.2d 326 (1972). Additionally, it is important to consider whether "a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and importance of all government employees ..."*Rosenblatt v. Baer, supra,* 86; *Moriarty v. Lippe, supra.*Further, it has been postulated that public figures require less protection from defamation because they tend to enjoy greater access to the media for purposes of rebutting any defamatory publication. *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Numerous decisions have established that public figures, as well as public officials, must meet the high standard established in *New York Times* to prevail in a libel case. Moreover, there must be a finding of "actual malice" by the heightened standard of clear and convincing proof. *Holbrook v. Casazza,* 204 Conn. 336, 344 (1987), cert. denied, 484 U.S. 1006 (1988). A "public figure" has been defined as someone who has "assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345 (1974). Cf. *Charles Parker Co. v. Silver City Crystal Co.,* 142 Conn. 605, 615 (1955) (speechmaking and the broadcasting of political speeches are occasions of qualified privilege); *Pauling v. News Syndicate Co., Inc.,* 335 F.2d 659, 671 (2d Cir.1964), cert. denied, 379 U.S. 968 (1965).

*8 A review of Connecticut cases indicates that a wide range of people have been determined to be "public officials" or "public figures" for First Amendment purposes. See, e.g., *Woodcock v. Journal Publishing Co.,* 230 Conn. 525 (1994), cert. denied, 513 U.S. 1149 (1995) (member of planning and zoning commission); *Kelley v. Bonney, supra,* 221 Conn. 549 (public school teacher); *Brown v. K.N.D. Corp.,* 205 Conn. 8 (1987) (assistant city manager); *Holbrook v. Casazza, supra,* 204 Conn. 336 (town tax assessor); *Strada v. Connecticut Newspapers Inc.,* 193 Conn. 313 (1984) (former state senator); *Dacey v. Connecticut Bar Assn.,* 170 Conn. 520 (1976) (author/lecturer/consultant); *Moriarty v. Lippe,* 162

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 8 of 18

Page 16 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 7

Conn. 371 (1972) (police patrolman); *Abdelsayed v. Narumanchi,* 39 Conn.App. 778 (1995), cert. denied, 237 Conn. 915 (1996) (professor at state university); *Peters v. Carra,* 10 Conn .App. 410 (1987) (police officer); *Perruccio v. Arseneault,* 7 Conn.App. 389 (1986) (labor union president.

The first question that must be answered, therefore, is whether the plaintiff in this case should be considered to be a "public figure" or "public official" and thus subjected to the heightened "actual malice" requirements of *New York Times Co. v. Sullivan, supra,* 376 U.S. 279. This question must not be approached mechanistically, but rather, as the United States Supreme Court counsels in *Gertz v. Robert Welch Inc., supra,* 418 U.S. 352,"by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."

Analysis of the facts and law in this case leads to the conclusion that plaintiff-a former police officer and head of the police union-must be considered both a "public official" and a "public figure," for purposes of analysis of his claims in the first two counts, for two reasons: the first is the clearly public nature of his position itself; the second relates to the plaintiff's thrusting himself into the most public of disputes-an election campaign, although he himself was not the candidate.

That the plaintiff's position during the relevant time period, deputy sheriff, is a public position can hardly be doubted,[FN1] as a review of General Statutes § 6-29 et seq. makes clear. Sheriffs' duties include execution and service of process; General Statutes §§ 6-31 and 6-32; and suppression of mobs; General Statutes § 6-34. Sheriffs are empowered to appoint deputies to act under them, who have the same power as the sheriff to serve civil process.General Statutes § 6-37. In the leading case of *St. Amant v. Thompson,* 390 U.S. 727 (1968), a Louisiana deputy sheriff was recognized as a "public figure." See also *Karr v. Townsend,* 606 F.Sup. 1121, 1131 (W.D.Ark.1985) (deputy sheriff held to be a "public official" in defamation action);

*Cline v. Brown,* 210 S.E.2d 446, 449 (N.C.App.1974) (deputy sheriff held to be a public official for First Amendment purposes); *Hagler v. Democrat News, Inc.,* 699 S.W.2d 96, 99 (Mo.App.1985) ("Where the operation of laws and activities of the police or other public bodies are involved, the matter is within the public interest."). As the court noted in *Cline v. Brown, supra,* 449:

> FN1. The plaintiff has assumed for the sake of argument, without conceding the point, that he was a public figure as defined by *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, and its progeny. See Plaintiff's March 17, 2000 Reply Brief, p. 9 n. 11.

*9 The relationship between a sheriff and his deputy is ... an official and not a private relationship. The deputy is a representative of the sheriff in his official capacity. He is a public officer whose authority and duties are regulated and prescribed by law. The public generally regards the acts of a deputy sheriff as the acts of the sheriff himself. The sheriff's position in government vests in him and his deputies "substantial responsibility for or control over the conduct of governmental affairs."This is certainly true where law enforcement and police functions are concerned. Additionally, though the office of deputy sheriff may be a comparatively low ranking one in the hierarchy of government, nevertheless, if the deputy's office be abused, it has great potential for social harm and thus invites independent interest in the qualifications and performance of the person or persons who hold the position. So that, in addition to the fact that technically under our court decisions a deputy sheriff is a public official, the test of *Rosenblatt v. Baer, supra,* has been met, and defendant is entitled to the benefit of the rule of *New York Times Co. v. Sullivan.*

Given the circumstances of this case, it is also apparent that the plaintiff thrust himself into an election dispute by undertaking certain political activities. These included sending out press releases, in-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 9 of 18   Page 17 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 8

cluding Defendant's Exhibit D, authoring campaign letters, and speaking to the press. One is hard-pressed to identify an event more public in nature-and more essential to a free society-than an election of public officials. Along with trials, they are among the most public of events in our state and nation. Who a public official chooses to hire, fire, promote, retain and discipline is inherently a matter of legitimate public interest and concern. As the Supreme Court of Kansas stated in *Coleman v. MacLennan,* 98 P. 281, 286 (Kan.1908):

> [I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. The public benefit from publicity is so great, and the chance of injury to private character so small, that such discussion must be privileged.

See also *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 271-72 n. 3 (1971); *Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 300 (1971).

It is also necessary to consider whether the events at issue in this case relate to the plaintiff's "official conduct." If not, the heightened proof required by *New York Times Co. v. Sullivan, supra,* 376 U.S. 279, is inapplicable. On its face, the argument that the conduct at issue is unrelated to the plaintiff's "official conduct" might seem persuasive, having concerned what began as essentially a private matter almost two decades prior to the running of the subject commercial. Analysis demonstrates, however, that the conduct does relate to the plaintiff's "official conduct" in a broad and flexible sense, for the following reasons.

*10 First, once one enters the public arena, and particularly in the context of an election campaign, the line between what is private and what is public quickly blurs, as practical realities and many court decisions have indicated. In *Monitor Patriot Co. v. Roy, supra,* 401 U.S. 265, for example, the United States Supreme Court decided a case brought by a candidate for public office who had been described, just prior to a primary election, as a "former small-time bootlegger" based on conduct in which he had allegedly engaged in the past. *Id.,* 266. The Supreme Court stated:

> The respondent argues that under *New York Times* a plaintiff has a special burden of proof only as to libels "relating to official conduct," that for a candidate "official conduct" means "conduct relevant to fitness for office," and that the public-private issue is one of fact for the jury. In our view, however, the syllogistic manipulation of distinctions between "private sectors" and "public sectors," or matters of fact and matters of law, is of little utility in resolving questions of First Amendment protection.

In *Garrison v. Louisiana,* [379 U.S. 64 (1964) ], we reversed a conviction for criminal libel of a man who had charged that a group of state court judges were inefficient, took excessive vacations, opposed official investigations of vice, and were possibly subject to "racketeer influences." The Louisiana Supreme Court had held that these statements were not "criticisms ... of the manner in which any one of the eight judges conducted his court when in session," but rather were accusations of crime and "personal attacks upon the integrity and honesty" of the judges. This Court rejected the proposed distinction:

> "Of course, any criticism of the manner in which a public official performs his duties will tend to affect his private, as well as his public, reputation. The *New York Times* rule is not rendered inapplicable merely because an official's private reputation, as well as his public reputation, is harmed. The public-official rule protects the paramount public interest in a free flow of information to the people concerning public offi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 10 of 18

Page 18 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 9

cials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character."379 U.S., at 76-77. *Cf. Ocala Star Banner Co. v. Damron, supra.*

The considerations that led us thus to reformulate the "official conduct" rule of *New York Times* in terms of "anything which might touch on an official's fitness for office" apply with special force to the case of the candidate. Indeed, whatever vitality the "official conduct" concept may retain with regard to occupants of public office, cf. *Garrison, supra,* at 72 n. 8, it is clearly of little applicability in the context of an election campaign. The principal activity of a candidate in our political system, his "office," so to speak, consists in putting before the voters every conceivable aspect of his public and private life that he thinks may lead the electorate to gain a good impression of him. A candidate who, for example, seeks to further his cause through the prominent display of his wife and children can hardly argue that his qualities as a husband or father remain of "purely private" concern. And the candidate who vaunts his spotless record and sterling integrity cannot convincingly cry "Foul!" when an opponent or an industrious reporter attempts to demonstrate the contrary. Any test adequate to safeguard First Amendment guarantees in this area must go far beyond the customary meaning of the phrase "official conduct."

*11 Given the realities of our political life, it is by no means easy to see what statements about a candidate might be altogether without relevance to his fitness for the office he seeks. The clash of reputations is the staple of election campaigns, and damage to reputation is, of course, the essence of libel. But whether there remains some exiguous area of defamation against which a candidate may have full recourse is a question we need not decide in this case. The trial judge presented the issue to the jury in the form of the question: "It is more probable than otherwise that the publication that the plaintiff was a former small-time bootlegger was a public affair on a par with official conduct of public officials?"This instruction, and the others like it, left the jury far more leeway to act as censors than is consistent with the protection of the First and Fourteenth Amendments in the setting of a political campaign.

*We therefore hold as a matter of constitutional law that a charge of criminal conduct, no matter how remote in time or place, can never be irrelevant to an official's or a candidate's fitness for office for purposes of application of the "knowing falsehood or reckless disregard" rule of New York Times Co. v. Sullivan.*(Emphasis added; footnote omitted).*Monitor Patriot Co. v. Roy, supra,* 273-77; see also *Time, Inc. v. Johnston,* 448 F.2d 378, 381 (4th Cir.1971) ("[M]ere passage of time will not necessarily insulate from the application of *New York Times Co. v. Sullivan,* publications relating to the past public conduct of a then 'public figure.' No rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such public career."); *Sidis v. F R Publishing Corp.,* 113 F.2d 806 (2d Cir.1940).

Second, once a citizen is arrested and brought to trial, a matter is transformed from a purely private affair to a matter of public concern. As the United States Supreme Court stated in *Craig v. Harney,* 331 U.S. 367, 374 (1947): "A trial is a public event. What transpires in the court room is public property.""Where the operation of laws and activities of the police or other public bodies are concerned, the matter is within the public interest."*Hagler v. Democrat-News, Inc., supra,* 699 S.W.2d 99. Once the plaintiff's case found its way into the courts, it lost its private character, notwithstanding the result on appeal. See *Miller v. News Syndicate Co.,* 445 F.2d 356 (2d Cir.1971).

Finally, one can make a strong argument that the criminal histories of members of law enforcement,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 11 of 18    Page 19 of 61

Not Reported in A.2d    Page 10
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

or quasi-law enforcement, entities is fair grist for the mill. The public has the right to know, within limits, who is enforcing the laws. Certainly, the topic is appropriate for discussion in the midst of an election campaign.

These concerns, taken together, persuade the court that the plaintiff should be subjected to the *New York Times* "actual malice" standard for purposes of analyzing his claims on his application for a prejudgment remedy.

D. *Legal Analysis: Count One*

*12 Paragraph 14 of Count One of the Amended Complaint alleges as follows:

> This television commercial broadcast contained in relevant part, defamatory statements of fact which were false and known to be false by the defendants. More specifically, this television commercial represented that the plaintiff had been arrested for sexually assaulting a woman at gunpoint.

This allegation consists of two parts: that the commercial represented that plaintiff had been arrested for sexually assaulting a woman; and that the assault had occurred at gunpoint. Each part requires separate discussion and analysis.

The plaintiff first argues that the statement that the plaintiff was arrested is false in its entirety because the arrest "was deemed never to have occurred pursuant to C.G.S. Section 54-142a(e)," "Erasure of criminal records." See Plaintiff's March 17, 2000 Reply Brief, pp. 4 et seq. Assuming that the erasure statute applies,[FN2] the plaintiff's argument evidences a fundamental misunderstanding of its scope and effect.

> FN2. In this opinion, I assume, without deciding, that the erasure statute applies.

The erasure statute operates in the legal sphere, not the historical sphere. That is, the erasure statute is designed to return a person's criminal record to the status quo when that person is found not guilty as a consequence of a final judgment, or a charge is dismissed. The erasure statute does not, and could not, purport to wipe from the public record the fact that certain historical events have taken place. Only in a totalitarian system could law purport to have such a sweeping effect. "The Erasure Act was not intended to obliterate memory or to exclude any testimony not shown to have been derived from erased records."*Rado v. Board of Education,* 216 Conn. 541, 550 (1990)."[T]he erasure statute applies only to records of a prior prosecution, not to a victim's memory of an assault, which is based not on records but on personal knowledge. *State v. Morowitz,* 200 Conn. 440, 451, 512 A.2d 175 (1986).'The statute does not and cannot insulate [a litigant] from the consequences of his prior *actions*.'(Emphasis in original.) *Id.*"*Rawling v. New Haven,* 206 Conn. 100, 109-10 (1988). The erasure statute is powerless to eradicate from the historical record the fact that plaintiff was arrested for a sexual assault. The statement that plaintiff was arrested for a sexual assault, because a true statement of an historical fact, is not defamatory. See, e.g., *Garrison v. Louisiana,* 379 U.S. 64 (1964).

The second part of the allegation-that the commercial asserts that the plaintiff was arrested for sexually assaulting woman *at gunpoint*-raises different legal issues. Examination of Defendant's Exhibit E, Brief of Appellant, *State v. Jerome Martin,* SC 9612, Appendix, pp. 13 and 15, indicates that there was testimony about a gun during the trial. Specifically, this exhibit, an appellate brief filed by Attorney F. MacBuckley on behalf of Mr. Martin, references testimony by the alleged victim that while at a restaurant she asked the plaintiff for his gun, which he gave her and she placed in her pocketbook; Defendant's Exhibit E, p. 5 (referencing transcript, pp. 22-24); testimony by the alleged victim that while being forced to perform certain sexual acts "Martin was threatening to shoot her ... because he had a gun and he was also yelling for his gun," and that the alleged victim "then did not re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 12 of 18    Page 20 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 11

member where her pocketbook and the gun were"; Defendant's Exhibit E, p. 8 (referencing transcript, pp. 33-34, 337-39, 344, 373); testimony by the alleged victim that Martin forced someone else to rape her, and that "This time Martin was threatening her with the actual gun."Defendant's Exhibit E, p. 8 (referencing transcript, pp. 340 and 254). Examination of the record indicates that the plaintiff has failed to demonstrate that there is probable cause to conclude that the assertion that the plaintiff was arrested for sexually assaulting a woman at *gunpoint* was made with "actual malice." FN3

> FN3. In light of this conclusion, I see no need for present purposes to consider whether the challenged statement is "substantially true ." See Sack, *Libel, Slander and Related Problems* (1980), Section III4.1, "Substantial Truth," pp. 137-39. Cf. *Goodrich v. Waterbury Republican American, Inc.,* 188 Conn. 107, 132-33 (1982).

*13 The fact that a statement about a public figure may have been motivated by bad motives, ill will, or an intent to inflict harm, is not sufficient to support a finding of "actual malice." *Holbrook v. Casazza, supra,* 204 Conn. 346-47. Nor, of course, is a merely negligent misstatement. *Id.,* 346.Neither will failure to investigate alone. *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 692 (1989). Under *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, and its progeny, a finding of "actual malice" requires that a statement have been "knowingly false" or made with "reckless disregard for the truth." This requires that clear and convincing proof be provided that a statement was a "calculated falsehood." *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 253 (1974). As the United States Supreme Court stated in *St. Amant v. Thompson, supra,* 390 U.S. 730-32:

> "Reckless disregard," it is true, cannot be fully encompassed in one infallible definition. Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases, whether the standard is provided by the Constitution, statutes, or case law. Our cases, however, have furnished meaningful guidance for the further definition of a reckless publication. In *New York Times, supra,* the plaintiff did not satisfy his burden because the record failed to show that the publisher was aware of the likelihood that he was circulating false information. In *Garrison v. Louisiana,* 379 U.S. 64 (1964), also decided before the decision of the Louisiana Supreme Court in this case, the opinion emphasized the necessity for a showing that a false publication was made with a "high degree of awareness of ... probable falsity."379 U.S., at 74. Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153 (1967), stated that evidence of either deliberate falsification or reckless publication "despite the publisher's awareness of probable falsity" was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.*Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

> It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and [was] unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations that would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 13 of 18   Page 21 of 61

Not Reported in A.2d   Page 12
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones. We adhere to this view and to the line which our cases have drawn between false communications which are protected and those which are not.

*14 (Emphasis added.)

Under governing legal standards, the plaintiff has failed to demonstrate that the defendant Griffin acted with "actual malice" in connection with the allegation that the plaintiff sexually assaulted someone "at gunpoint." See *Washington Post Co. v. Keogh,* 365 F.2d 965 (D.C.Cir.1966), cert. denied, 3-85 U.S. 10-11 (1967); *Brown v. K.N.D. Corp.,* 7 Conn.App. 418, 423-24 (1986), rev'd, 205 Conn. 8 (1987); *Pauling v. National Review, Inc.,* 269 N.Y.S.2d 11 (1966), aff'd, 281 N.Y.S.2d 916 (1967), and aff'd, 292 N . Y.S.2d 913 (1968); *Izzo v. Deafenbaugh,* Superior Court, judicial district of New Haven, Docket No. 392311 (September 23, 1998) (Blue, J.) (22 CONN.L.RPTR. 650).

E. *Legal Analysis: Count Two*

Count Two alleges as follows:

1. Paragraphs one through thirteen of the First Count are hereby incorporated and made Paragraphs one through thirteen of this, the Second Count, as if more fully set forth herein.

14. This television commercial broadcast contained in relevant part, defamatory statements of fact which were false and known to be false by the defendants. More specifically, this television commercial:

(a) Represented that High Sheriff Walter Kupchunos had hired convicted felons to serve as deputy sheriffs;

(b) Represented that the plaintiff had been arrested for sexually assaulting a woman at gunpoint; and

(c) Displayed a series of identification cards for several unnamed ex-convicts.

14. These defamatory statements of fact expressed, or otherwise implied by design, that the plaintiff is a convict and a felon in an effort to impart upon the listener or viewer by inference or innuendo, the false notion that the plaintiff had been convicted of a felonious crime.

15. The defendants omitted material facts from the television commercial, namely, the fact that the plaintiff's felony conviction was overturned by the Connecticut Supreme Court, which omission gave rise, in whole or in part, to the false innuendo or inference that the plaintiff had been convicted of a felonious crime.

16. The defendants' conduct caused the plaintiff to suffer emotional distress, loss of income, and harmed the plaintiff's reputation.

The gist of the plaintiff's allegation in Count Two is that he was defamed because the commercial omitted the material fact that his felony conviction was overturned, and that, taken as a whole, the commercial imparted the false notion that the plaintiff was a convicted felon. In essence, Count Two is alleging two different, although closely related, theories: that the plaintiff was defamed due to the overall *implication* created by the commercial; and that the plaintiff was defamed due to the *omission* of material facts.[FN4]

FN4. For a helpful analysis of legal issues in cases of this sort, see Cohn, "The Problem of Indirect Defamation: Omission of Material Facts, Implication, and Innuendo," 1993 U. Chi Legal F. 233.The au-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 14 of 18   Page 22 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 13

thor defines "indirect defamation" as "those statements whose defamatory nature arises from omissions, implications, or innuendo." *Id.,* n. 5. See also LaBarbera, "The Art of Insinuation: Defamation By Implication," 58 Fordham Law Review 677 (1990).

Before evaluating the issues presented, a review of the precise words used in the commercial is necessary. The precise words used, and the context within which they appear, must be carefully considered. *West v. Thomson Newspapers,* 892 P.2d 999, 1009 (Utah 1994). The statements "John Jones is a convicted felon" and "John Jones was once convicted of a felony" may sound similar, but they impart very different meanings. Saying "John Jones is a convicted felon" communicates a fact about John Jones' *present* legal status. Saying "John Jones was once convicted of a felony" communicates something about an historical event relating to John Jones. Likewise, the statement "John Jones was arrested on a sexual assault charge" does not communicate that John Jones was convicted of a sexual assault charge, but simply the historical reality that he was arrested.

*15 The commercial in this case does not by its terms state that the plaintiff was once *convicted* of a felony; nor does it by its terms state that the plaintiff *is* a *convicted felon.* Rather, the facesheet of the reported decision in *State of Connecticut v. Jerome Martin* identifies the plaintiff by name while the words "Arrested for raping a 24 year old girl at gunpoint" are seen.

The plaintiff claims, however, that these words, juxtaposed with his name, viewed in the context of the rest of the advertisement would lead the average viewer interpreting language in its normal way to conclude that the plaintiff had been *convicted of* the felonious crime of raping a 24-year-old girl, and doing so at gunpoint. This raises an interesting issue. What inferences the average viewer might draw from viewing the advertisement are not entirely clear. With respect to whether a communication is defamatory, the issue is how the ordinary reader or viewer would naturally understand the language used. *Rose v. Koch,* 154 N.W.2d 409, 417 n. 12 (Minn.1967); *Ventresca v. Kissner,* 105 Conn. 533 (1927). If the average viewer were to conclude, however, that plaintiff had in the past been convicted of a felony, as discussed above, truth provides a defense because the historical fact is that the plaintiff was once convicted of a felony.

The plaintiff also contends that the advertisement implies that plaintiff *is* a convict and a felon, that is, that he presently remains a convict and a felon. See Count Two, ¶ 15. This, the plaintiff contends, is defamatory. Assuming for the sake of argument that the advertisement is susceptible to such an interpretation by the average viewer, a legal question must be confronted: Can someone with the plaintiff's status at the time of the advertisement be defamed as a consequence of the omission of a material fact in a campaign commercial? I conclude that this presents a close issue given the facts of this case but that the answer to the question under *Strada v. Connecticut Newspapers, Inc., supra,* 193 Conn. 313, in light of overriding First Amendment concerns, is "no."

The parties both cite the *Strada* case in support of their arguments, but each side contends for a substantially different reading of that case. In *Strada,* the plaintiff was a former state senator who claimed that he had been defamed by a newspaper article published seven days before an election. The trial court held that "there can be no libel by innuendo if the challenged communication is true and concerns public officers and public affairs even though a false implication may reasonably be drawn by the public."(Internal quotation marks omitted.) *Strada v. Connecticut Newspapers, Inc., supra,* 193 Conn. 315. The Supreme Court affirmed the ruling of the trial judge. A lengthy quotation from *Strada* is necessary to understand the competing arguments made by the parties in this case. The court stated:

*16 The plaintiff's next claim of error goes to "numerous stylistic and journalistic innuendoes

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC   Document 109-4   Filed 06/20/2008   Page 15 of 18   Page 23 of 61

Not Reported in A.2d                                                                Page 14
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))**

and inferences ... which reflected adversely on the reputation of the Plaintiff." We have already concluded that the trial court was correct in its finding that the article was composed of true or substantially true statements. The trial court did not decide whether a reasonable reader might draw a false inference from certain statements as alleged by the plaintiff. Rather, the trial court held that "there can be no libel by innuendo if the challenged communication is true and concerns public officers and public affairs even though a false implication may reasonably be drawn by the public."

Innuendo or inference may result merely from the tone or "slant" of an article, or innuendo or inference may also result from the failure to present the whole picture. In *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn.1978), a newspaper article correctly stated that the plaintiff had been shot when she had been found with another woman's husband. The article neglected to report, however, the additional fact that the plaintiff and the other woman's husband were at a social gathering, the several members of which included the plaintiff's husband. The clear inference from the article was an adulterous affair; the additional fact clarified the plaintiff's position as an innocent bystander. But in the present case, the plaintiff seeks to recover from a publication where all the underlying and stated facts have been proved to be true, or substantially true, claiming that the "slant" of the article gives rise to allegedly false and defamatory implications. Unlike *Memphis Publishing Co. v. Nichols, supra,* the plaintiff here has not alleged, nor has our examination of the record disclosed, the existence of additional material facts which, if reported, would have changed the tone of the article. *In the absence of such undisclosed facts, first amendment considerations dictate that an article concerning a public figure composed of true or substantially true statements is not defamatory regardless of the tone or innuendo evident.*

The goal of nurturing a free and active press in the political arena mandates denial of recovery by a public figure where the allegation of defamation "depends fundamentally on an interpretation of various aspects of the broadcast, not anything directly said in it." *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 500 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978).

The cases in other jurisdictions that have considered this issue support this view. Recovery was denied in *Loeb v. New Times Communications Corporation,* 497 F.Sup. 85 (S.D.N.Y.1980), where the court specifically found that "[t]he authors' clear intent was to portray an overwhelmingly negative picture of Loeb by presenting purported examples of his ridiculous idiosyncrasies and prejudices, shady political maneuverings, and dishonest reporting practices." *Id.,* 88-89. In spite of the "suggestive context," the article was constitutionally protected because the "defendants have reported the facts accurately and carefully, avoiding the defamatory conclusion which Loeb claims they intended the reader to draw." *Id.,* 91.

*17 In *Mihalik v. Duprey,* 11 Mass.App. 602, 417 N.E.2d 1238 (1981), each individual statement published in a "riddle" about a public figure was true. The court held that recovery could not be had "merely because in the aggregate they have an insinuating overtone." *Id.*

In a Louisiana case the public official plaintiff admitted "there was nothing factually incorrect in the article. However, 'the way people looked at the thing' he was accused of misusing state funds for personal benefit." *Schaefer v. Lynch,* 406 So.2d 185, 188 (La.1981). The court there held that "truthful statements which carry a defamatory implication can be actionable. However, that is only true in the case of private citizens and private affairs. Even false statements about public officials are constitutionally protected unless known to be false or printed with a reckless disregard for the truth. *New York Times Co. v. Sullivan,* [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ]. It surely follows that all

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 16 of 18    Page 24 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 15

truthful statements are also constitutionally protected. Even though a false implication may be drawn by the public, there is no redress for its servant. Where public officers and public affairs are concerned, there can be no libel by innuendo."*Id.*

Still another court held that: "Unless he can successfully identify particular false statements that, taken in context, create the impression he is a 'throwback to the middle ages,' [the plaintiff doctor] cannot complain."*Rinsley v. Brandt,* 700 F.2d 1304, 1310 (10th Cir.1983). A publisher cannot be responsible for every strained interpretation that a plaintiff might attribute to its words. See *Lewis v. Time, Inc.,* 710 F.2d 549, 553-56 (9th Cir.1983); *Cibenko v. Worth Publishers, Inc.,* 510 F.Sup. 761, 765 (D.N.J.1981).

"The Court is aware that any article replete with snide innuendoes can be hurtful to a subject, and indeed may damage him in his business reputation. But if he is a public figure, then he must bear the risk of such publicity as the price he pays for conducting activities or business in the public arena."*Reliance Ins. Co. v.. Barron's,* 442 F.Sup. 1341, 1352 (S.D.N.Y.1977)."An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. And society's interest in the officers or government is not strictly limited to the formal discharge of official duties."*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); see *Garrison v. Louisiana,* 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The defendants have no obligation to place the plaintiff in the most favorable light. *Rinsle v. Brandt,* 6 Med.L.Rptr. 1222 (D.Kan.1980), aff'd, 700 F .2d 1304 (10th Cir.1983); *McIntire v. Westinghouse Broadcasting Co.,* 479 F.Sup. 808 (D.Mass.1979).

*When any inference or innuendo does not arise from the omission of material facts, but rather from the editorial choice of layout, the plaintiff may not recover for libel by innuendo.*The media would be unduly burdened if, in addition to reporting facts about public officers and public affairs correctly, it had to be vigilant for any possibly defamatory implication arising from the report of those true facts. "[T]he pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedoms cannot survive."*New York Times Co. v. Sullivan, supra,* 278; see *Washington Post Co. v. Keogh,* 365 F.2d 965, 968 (D.C.Cir.1966).

*18 The result we reach in this case, which undeniably may have a harsh impact on those persons who are public figures, is a corollary to the privilege accorded false statements concerning public officials published without malice. Just as the goal of a free and active press protects false statements of fact regarding public figures published without malice, so too must the law protect truthful facts that may give rise to false innuendo or inference ...*Under the circumstances of this case, the trial court did not err in concluding as a matter of law that there could be no libel by innuendo of a public figure where the challenged communication is true.*(Citations omitted; emphasis added; footnotes omitted.) *Strada v. Connecticut Newspapers, Inc., supra,* 193 Conn. 322-27.

The reason the parties in this case cite *Strada* for different propositions is that *Strada* can indeed be read to encompass different propositions. It stands for the proposition, as the defendants contend, that a public figure plaintiff may not recover for libel by inference where the challenged communication is true. It also stands for the proposition, as the plaintiff contends, that a public figure may maintain an action for libel by inference where the inference or innuendo arises from the omission of material facts .[FN5]

> FN5. Numerous courts have grappled with the difficult issues raised by claims of libel by implication, innuendo and omission, with varying approaches and results. Many of the cases involve suits against media defendants based on published reports. Relat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 17 of 18    Page 25 of 61

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))

Page 16

ively few arise in the context of an election. For a sampling of these cases, see *Diesen v. Hessburg,* 455 N.W.2d 446 (Minn.1990); *Price v. Viking Penguin, Inc.* 881 F.2d 1426 (8th Cir.1989); *Pietrafeso v. D.P.I.,* 757 P.2d 1113 (Colo.App.1988); *Ramada Inn v. Dow Jones & Co.,* 543 A.2d 313 (Del.Super.1987); *Janklow v. Newsweek, Inc.,* 788 F.2d 1300 (8th Cir.1986); *DeFalco v. Anderson,* 506 A.2d 1280 (Sup.Ct.N.J., App.Div.1986); *Cibenko v. Worth Publishers, Inc.,* 510 F.Sup. 761 (1981); *Milialik v. Duprey,* 417 N.E.2d 1238 (1981); and *Memphis Publishing v. Nichols,* 569 S.W.2d 412 (1978).

In Count Two, the plaintiff is in effect alleging as follows: that he was defamed *by implication* because the advertisement would lead the reasonable viewer to conclude that he had been *convicted* of a felony; and that he was defamed by *omission* because the reasonable viewer, having concluded that he was *convicted* of a felony, was not informed that his conviction was subsequently reversed.

On careful consideration, I conclude that the claim set out in Count Two is too attenuated to prevail in light of the overall broad thrust of *Strada.* If the advertisement explicitly stated that the plaintiff had been *convicted* of a felony, a different result might obtain. Then, the argument that the omission to mention the reversal of the conviction is actionable would have support under *Strada.* But the advertisement does not so state. The reasons that led the court to deny the plaintiff's claim in *Strada* are equally applicable here, notwithstanding some of the factors which distinguish *Strada* from this case. They include a desire to foster open and vigorous debate about matters of public concern and the desirability of creating an environment in which the press will avoid self-censorship. They also include the inadvisability of overinvolving the courts in superintending election campaigns. As our Supreme Court cautioned in *Charles Parker Co. v. Silver City Crystal Co., supra,* 142 Conn. 614-15:

Any political campaign is a process of debate and appeal publicly conducted in a way to bring knowledge to the voters to assist them in making a choice on election day. It is a time-honored American institution indispensable to our way of life. Courts must be careful not to permit the law of libel and slander to encroach unwarrantably upon the field of free public debate.

*19 See also *Monitor Patriot Co. v. Roy, supra,* 401 U.S. 275("Given the realities of our political life, it is by no means easy to see what statements about a candidate might be altogether without relevance to his fitness for the office he seeks.

The clash of reputations is the staple of election campaigns, and damage to reputation is, of course, the essence of libel."). As one commentator famously remarked:

"If actionable defamation is possible in this field, one might suppose that the chief energies of the courts, for some time after every political campaign, would be absorbed by libel and slander suits."Noel, "Defamation of Public Officers and Candidates,"49 Col.Law Rev. 875 (1949).

A final concern relates to the time, cost and expense of exposing candidates for public office to litigation for libel suits. Easy access to such suits might impose substantial litigation costs on candidates with fewer resources who might be less willing to engage in the rough and tumble which public campaigns often entail.

*Conclusion*

This case involves someone formerly a public figure who, by virtue of his position and activities, again attained public figure status. While not himself a candidate, he thrust himself into a political campaign in which the issue of the criminal histories of members of the sheriff's department became an issue. As such, the "actual malice" standards of *New York Times Co. v. Sullivan, supra,* 376 U.S. 279, apply.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-02296-RNC    Document 109-4    Filed 06/20/2008    Page 18 of 18    Page 26 of 61

Not Reported in A.2d                                                                Page 17
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2000 WL 872464 (Conn.Super.))**

Whether the public approves of political advertisements such as the one at issue here is ultimately an issue for the voters to decide when they render their verdict at the ballot box on election day. The Court is aware that cases like this may lead to results that some consider harsh. However, the narrow legal issue presented is whether the plaintiff has demonstrated probable cause to believe that he will prevail. For the reasons stated above, given the need to protect robust speech in the context of an election campaign and provide the breathing room the First Amendment requires, the Court concludes that the plaintiff has failed to make the required showing in light of *Strada* and other controlling cases. The plaintiff's application is therefore denied.[FN6]

> FN6. With respect to Counts Three and Four, the application is also denied. Count Three alleges intentional infliction of emotional distress. Count Four alleges Negligent Infliction of Emotional Distress. Research has not disclosed any Connecticut cases-either state or federal-upholding a claim for intentional or negligent infliction of emotional distress based on defamatory statements made in the context of a political campaign or political commercial. In the absence of any authority suggesting that such a claim can be independently maintained under the circumstances presented here, these claims fail to provide the basis for a probable cause finding. See, e.g., *Izzo v. Deafenbaugh, supra,* 22 CONN.L.RPTR. 652 (because claims of negligent infliction of emotional distress and invasion of privacy by false light attack the same act of protected speech, the First Amendment principles that have been identified are dispositive of those claims as well); *Boyles v. Mid Florida Television Corp., supra,* 431 So.2d. 636 (allegation of intentional infliction of emotional distress based on allegedly defamatory news report were merely an "imperfect repetition" of allegations of libel and therefore do not set out an independent claim). Cf. *Morris v. Hartford Courant Co.,* 200 Conn. 676, 681-82 (1986).

> While this opinion addresses the claim against Mr. Griffin, it should be noted that there is nothing in the record to support claims against the other named defendants, David F. Hubbs, Joseph Batista, and Peggy Tibbals. The application is therefore denied as to them as well for the reasons set out above.

Conn.Super.,2000.
Martin v. Griffin
Not Reported in A.2d, 2000 WL 872464 (Conn.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.