# EXHIBIT G

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

**C**
Snyder v. Cedar
Conn.Super.,2006.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut,Judicial District of
New Haven.
Daniel R. SNYDER
v.
Deborah S. CEDAR, et al.
No. NNHCV010454296.

Feb. 16, 2006.

Tinley Nastri Renehan & Dost, Waterbury, for
Daniel R Snyder.
Diane Polan, Law Offices, New Haven, for Deborah S. Cedar and Edwin R. Vincent.
PATTY JENKINS PITTMAN, Judge.
*1 On April 28, 1997, the defendant Deborah Cedar
received a call from a middle school social worker
for her minor daughter Aviva, indicating that Aviva
was troubled by some kind of physical contact
between Aviva and the plaintiff. Daniel Snyder, her
father. Cedar assisted Aviva in making a report to
the Branford Police Department. Cedar filed paperwork in court for a restraining order against the
plaintiff Later, upon inquiry from others who knew
that Aviva was refusing all contact with her father,
Cedar repeated the general allegation made by
Aviva: that Daniel Snyder had sexually molested
Aviva.

The plaintiff denies molesting Aviva. The plaintiff
has filed this lawsuit as a defamation action against
Cedar and Cedar's husband Edwin R. Vincent, Jr.
The plaintiff's complaint alleges that Cedar and
Vincent each made specific defamatory statements
to third persons to the effect that Snyder was a child
molester. Snyder also claims that Cedar directed
Aviva to fabricate the allegations against him, with

the intention of causing him to suffer severe emotional distress.

The defendants do not deny making certain statements about what Aviva said. They deny that any
such statement was defamatory, they deny any conduct that amounts to intentional infliction of emotional distress, and they assert special defenses, including that of privilege, that they claim insulate
them from any liability.

For reasons stated herein, the court finds for the
plaintiff and against the defendant Cedar as to one
specification of defamation contained in Count One
and in Count Two of the Fifth Amended Complaint,
and finds for the defendants on all other counts and
specifications.

PARTIES

The plaintiff Daniel R. Snyder [FN1] is 65 years old.
He holds a Ph.D in psychology, awarded in 1972.
For the next twelve years, he was employed at Yale
University in various capacities. After leaving Yale,
Snyder spent his time doing consulting work and
attempting to develop a number of small businesses
in the field of intravenous therapy systems, catheters, adult incontinence devices, and surgical tourism. Mostly these businesses foundered because
Snyder found himself in conflict with his investors,
his business partners, his customers, and even his
lawyers. Since 1990 by Snyder's own admission,
his chief occupation has been in the field of litigation-his own-in order to attempt to straighten out
his business affairs. In the last fifteen years, the
plaintiff has had no steady source of income. He
now relies for support on his female companion and
on a small monthly check from Social Security.

> FN1. This decision will refer to the
> plaintiff as "Snyder" throughout. Although
> he is the plaintiff in this lawsuit, he was
> the defendant in certain other lawsuits to
> which this opinion refers.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

No evidence was offered about the educational history of the defendant Deborah Cedar.[FN2] During the last fifteen years, it appears that she has worked as a legal secretary or paralegal, a capacity in which she is now employed.

> FN2. This opinion will refer to this defendant as "Cedar" throughout. Although she is a defendant in this lawsuit, she was the plaintiff in certain other lawsuits to which this opinion refers. She is now known by her married name Deborah Vincent. She was known as Deborah Snyder during her marriage to Daniel Snyder. After her divorce from the plaintiff Daniel Snyder, she resumed the use of her birth name Deborah Cedar, and it is under that name that she was sued in this case. Neither Cedar nor her counsel have objected to the court referring to her as "Cedar."

The defendant Edwin R. Vincent, Jr., has been employed since 1990 as an officer with the New Haven Police Department.

Aviva Vincent,[FN3] formerly Aviva Snyder, is the daughter of Snyder and Cedar. Aviva is now 20 years old. She has not had any relationship with Snyder since April 1997. Her estrangement from Snyder is so pronounced that Aviva changed her last name to Vincent, surname of her stepfather. Aviva is not a party to this lawsuit.

> FN3. Although Aviva Vincent is no longer a minor, so that ordinarily she should be given the courtesy of reference by her surname, she was aged ten, eleven, and twelve during most of the events that gave rise to this lawsuit. For that reason, this opinion will refer to her as "Aviva" throughout.

### THE COMPLAINT OF THE PLAINTIFF

**\*2** Daniel Snyder has filed a complaint in three counts against Cedar and Vincent. The operative complaint is the Fifth Amended Complaint

(amending Count Three) filed with leave of the court during trial, over the objection of the defendants.

*Count One:* This count alleges that both Cedar and Vincent made false and defamatory statements about Snyder that caused him to suffer actual injury.

*Count Two:* This count alleges that both Cedar and Vincent made false and defamatory statements about Snyder that constitute libel and slander per se, without the need for proof of actual injury to Snyder.

*Count Three:* This count alleges that Cedar exercised influence over the minor child Aviva such that Aviva made false charges of sex abuse against Snyder at Cedar's suggestion and direction, constituting the tort of intentional infliction of emotional distress.

*The Special Defenses:* Cedar and Vincent allege by way of special defense that their statements were privileged or that their statements were matters of opinion rather than statements of fact. Previously they withdrew a special defense that alleged that the statements were true. The court allowed them to amend their special defenses, in response to the filing of the Fifth Amended Complaint, to allege that the statute of limitations bars any claim for intentional infliction of emotional distress that arose more than three years before the commencement of this lawsuit.

### THE LEGAL AND CUSTODIAL RELATION-SHIPS

The plaintiff Daniel Snyder and the defendant Deborah Cedar were married on January 26, 1985. Their daughter Aviva was born on October 21, 1985. In July 1990, Cedar instituted an action for a family violence restraining order and an action for dissolution of marriage.

All aspects of the divorce [FN4] were hotly con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

tested, most particularly the issue of the custody and visitation of Aviva. Between the time litigation was first instituted by Cedar in July 1990 and the time the parties put in place the first of two stipulations regarding custody almost three years later, each had hired and fired numerous attorneys, each had filed numerous motions to find the other party in contempt for one thing or another, and each had engaged in self-representation for a time. As for Aviva, she had been represented by two different court-appointed attorneys, Helen Murphy and Michael Perzin, by the time of the second putatively permanent court order concerning custody on June 8, 1994.

> FN4. The parties agreed that this court could take judicial notice of the dissolution of marriage file, *Deborah Snyder v. Daniel Snyder,* D.N. FA 90 302881, Judicial District of New Haven.

As evidence of the intensity and energy that went into the battle over Aviva's custody, the court in the dissolution matter reviewed and approved attorneys fees of $40,000 for Aviva's lawyers, upon a finding that this sum was fair and reasonable for the amount of work her attorneys had done through the summer of 1994. Many more hours of attorney time and effort were to be expended thereafter on Aviva's behalf in 1996, 1997, and 1998.

The stipulation signed by the parties on June 8, 1994, was designed to permanently settle the issue of custody and visitation. Stated in general terms, the agreement was for joint legal custody, with the child's primary residence to be with Cedar. Snyder's visitation was to be on Tuesday and Thursday afternoons from the time of school dismissal until 7:30 P.M. Also Aviva was to spend every other weekend, including overnights, at the home of her father, and was to spend substantial holiday and vacation time with him. The marriage of the parties was dissolved on June 10, 1994. Although the parties continued to have disputes about Aviva's upbringing, they largely complied with the custody and visitation schedule set forth in the 1994 agreement until

the time of the events that gave rise to this lawsuit.

*3 After the parties separated from one another in 1990, Cedar met Edwin Vincent, Jr., and began keeping company with him. Once Snyder and Cedar were divorced, Cedar and Vincent were married. Prior to marrying Cedar, Vincent had been married to Diane LaPaglia, with whom he had one daughter, Rachel Vincent, who was about a year younger than Aviva. Though Rachel Vincent's custody was with Ms. LaPaglia, Rachel spent substantial amounts of visitation time in the Cedar/Vincent household before 2000.

Shortly after New Year's Day 1994, the plaintiff Daniel Snyder met Susan LaPointe, now known as Susan Davis, with whom he quickly developed a romantic relationship. Beginning in 1994, Snyder and Davis saw each other regularly, frequently spending weekends together. They have been living together since 1999.

## THE EMOTIONAL RELATIONSHIPS
## BETWEEN THE PARTIES

The litigation over the custody of Aviva did not end with the stipulation and divorce in June 1994, nor with the conclusion of an agreement about certain post-judgment financial matters on May 30, 1995. Although the schedule of Tuesday and Thursday evenings and weekend and holiday visits at her father's home was one to which the parties largely adhered up to the Spring of 1997, Snyder had become increasingly dissatisfied with that schedule. According to Snyder, he began to feel like a "chauffeur" during his visits, because of the need to drive Aviva-then age 11-to riding lessons and to birthday parties and such. Snyder also continued to believe that any defects he perceived in Aviva's personality were wholly the fault of Cedar's influence. He determined to remedy this state of affairs by altering the visitation schedule so that he could spend more time with Aviva. On August 6, 1996, Snyder had his attorney file a motion to modify the custodial schedule to allow Aviva to spend more

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

overnights with Snyder.

Without regard to the fact that Aviva had finally settled into a predictable and relatively peaceful custodial framework, Snyder decided to try to convince Aviva that it was in her interests that she spend more time with him. Snyder did not recognize that spending more time with him in no way appealed to Aviva.

Snyder embarked on a virtual campaign to win over Aviva to his way of thinking about a change in the custodial schedule. He made promises to Aviva and gave her unnecessary presents at a time when he could ill afford to do so. He made disparaging comments and unwelcome jokes about Cedar in Aviva's presence. Snyder typed a memorandum to Michael Perzin, Aviva's lawyer, about Snyder's preferred overnight schedule for Aviva, compelled Aviva to sign the memo as her own, and faxed it to the attorney.

Snyder's manipulative nature was not lost on Aviva. While telling her father that she wanted to spend more time with him, Aviva was at the same time telling her mother, and telling her lawyer, that she did not.[FN5]

> FN5. Michael Perzin, Aviva's attorney during the 1990s, testified in this trial. In the best professional manner, he declined to testify about the confidential communications between himself and his young client. The court's finding about Aviva's state of mind is an inference drawn from the totality of the evidence and not from the disclosure of any attorney-client confidence.

On April 10, 1997, when Snyder realized that he was making no headway in his battle for Aviva's custody, he verbally attacked Aviva. During what should have been an ordinary, pleasant Thursday afternoon visit at his house, Snyder lit into Aviva about her deception, accusing her of lying to him, and accusing *her* of manipulating *him.* As he turned away from Aviva to attend to a telephone call,

Susan Davis, the romantic companion of Snyder, took up where Snyder had left off, accusing Aviva of being ungrateful for her father's largesse, and suggesting that Aviva capitulate to her father's wishes because of the financial sacrifices he had made on her behalf. Finishing his phone call, Snyder returned to resume the "conversation" with Aviva, only to see her, in tears, pick up her school backpack and leave the house. Since that day, father and daughter have never spoken again.

**\*4** Snyder's view of this incident is that it was not indicative of his true relationship with Aviva and that the incident had nothing significant to do with any of the events that followed.

## AVIVA'S FIRST ALLEGATIONS OF SEXUAL MOLESTATION AGAINST SNYDER

On April 28, 1997, the school social worker Diane Palazza, now known as Diane Queen, called Cedar to tell her that Aviva was expressing distress over her relationship with her father. Cedar at first had no reason to suspect that Aviva was trying to articulate anything other than the continuing distress that Aviva felt over the overbearing nature of her father. After meeting with Palazza, Cedar became more concerned about what it was that Aviva was trying to articulate. Later that same day, Cedar took Aviva to the Branford Police station to have Aviva interviewed.

Aviva was first interviewed by a police officer outside the presence of Cedar. Aviva was then asked to record a statement in the presence of Cedar and two members of the Branford police department. In her interview with the police, Aviva described, among other things, the fact that her father used the bathroom when she was showering, that he was able to see into her room when she was getting dressed, that he washed food and spills off the front of her body in a rough manner, that he walked around the house in his underwear, and that on at least one occasion when he was undressed he left a door open in a way that Aviva could see his body. All of this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                   Page 5
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

made Aviva uncomfortable.

Equally disturbing to Aviva were Snyder's rude comments to Aviva about Cedar and Snyder's use of petty bribery and guilt to make Aviva conform to his wishes. Snyder used a number of manipulative techniques. He threatened to stop paying for her horse riding activity. He used the promise of favors or gifts, such as allowing her to attend karate or gymnastics, to try to convince Aviva to spend additional overnight visits at his house. He berated her to tell him the source of any statements she made that seemed to him to be oppositional.[FN6] He followed her in his car while she was in the neighborhood and waited near Cedar's home to try to see Aviva, conduct that Aviva found to be intimidating and frightening.

> FN6. Presciently, Aviva made the following statement in the police interview: "... he says things like, you know, 'why is this,' you know, 'who did this,' 'why did you say that-give me the reason' and he will not go on unless I answer and if I say nothing he makes sure I'm not lying and I have to lie sometimes because if I don't, it's almost like I get punished for telling the truth and my mother now has told him before *it's almost as if I don't know the difference between a lie and telling the truth because of my father.*"

On April 30, 1997, Cedar applied for a family violence restraining order against Snyder in the Superior Court, requesting that Snyder be ordered to stay away from both Cedar and Aviva. In her affidavit in support of the application, Cedar recounted statements that Snyder had made to her in the past and asserted that since April 10, 1997, Snyder had been driving up to Cedar's house and had been following Cedar and Aviva in his car. Cedar stated that Aviva expressed fear that Snyder would try to kidnap Aviva.

Cedar included the following statement in the affidavit: "[Diane] Pelazza discussed ... her concern that she SUSPECTED, but had no evidence, that Aviva has been sexually abused. Just a suspicion. Ms. Pelazzo did indicate that there was, however, much inappropriate behavior occurring."(Caps and alternate spellings in original.)

## AVIVA'S LATER ALLEGATIONS OF SEXUAL ABUSE AGAINST SNYDER

*5 In the Spring of 1998, during her seventh grade year, Aviva revealed to a school friend that Snyder had touched Aviva's vagina. The friend urged Aviva to tell Cedar, and Aviva did so later that same evening. From 1998 to the present, Aviva has spoken to various therapists and medical providers about her perception that her father molested her, although Aviva has disclaimed memory of most of the details. During her freshman year in college, Aviva told a gynecologist that she could not recall if she had been "penetrated," although Aviva has testified under oath that she remembers one occasion in which her father put his finger in her vagina. Aviva denies the ability to recall if there were any further instances of genital contact by Snyder than the one instance of which she has a vague memory.

The court finds that it was not until 1998 that Aviva made a definite statement to Cedar that Snyder had molested her. Before that time, the subject of Aviva's statements had been about how Snyder looked at her and touched her in an inappropriate sexual way, without any actual allegation that he had touched her genitals.

## THE SOURCE OF THE ALLEGATIONS OF SEXUAL ABUSE

Snyder has alleged and has sought to prove that Aviva's allegations of sexual abuse did not in fact originate with Aviva. Snyder's theory is that Cedar, filled with antipathy toward him and willing to use whatever weapons existed in her arsenal, decided to convince Aviva that Aviva had been sexually abused by Snyder. Moreover, Snyder asserts that Cedar saw the argument between Snyder and Aviva of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                           Page 6
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

April 10, 1997, "as an opportunity to turn her child against Dr. Snyder once and for all."Plaintiff's Post-Trial Brief, p. 2.

Snyder asserts that, beginning on that day, if not before, Cedar began to coax Aviva into believing that Snyder was a child molester. As evidence of this, he points to the admissions of Cedar and Aviva that they spent time between April 10 and April 29, 1997, talking about Aviva's grievances against her father. Snyder further points to the testimony of Diane Rotnem for the proposition that Aviva succumbed to the "Parental Alienation Syndrome" and the "Sex Abuse In Divorce" phenomenon, under the Svengali-like sway of Cedar.

The court finds this theory unconvincing, to say the least. The evidence to support it in this case is not credible. To be sure, parents do sometimes hurl shocking and untrue allegations at one another in contested family cases: one parent may even falsely accuse the other of child sex abuse to gain the upper hand in litigation. In this case, the court does not find that Cedar coached or directed Aviva on what to think or what to say to the school social worker, to the police, to the lawyers, or to her father. Rather the court concludes that Aviva's statements were Aviva's own.

The question then presents itself: were Aviva's statements true? The court finds that Snyder did not sexually molest Aviva. While one could engage in speculation about why Aviva made such accusations, and why Aviva continues to claim that she has memories of Snyder's inappropriate intimacies, the court declines to do so. For purposes of this defamation case, the court must determine from all of the evidence whether Snyder did or did not molest Aviva. The court determines that he did not.

THE POST-JUDGMENT CUSTODY PROCEEDINGS

*6 On April 9, 1997, the day after Aviva missed an after-school visit with Snyder, Cedar's attorney filed a Motion to Suspend Visitation, alleging that Snyder's conduct was having a detrimental impact on Aviva's emotional well-being. Nonetheless, Aviva went to visit her father the next day, April 10, which was the day that Aviva left Snyder's house, never to return. On April 24, 1997, Cedar's attorney filed a Motion for Sole Custody. Before any action could be taken on either of these motions, Cedar filed her application for a restraining order on April 30, 1997.

The court did not enter any ex parte orders on Cedar's application. Rather, the court (Alander, J.) set the matter down for a hearing on May 14, 1997. Between the date of the application and the date of the hearing, the Branford Police Department, the Connecticut Department of Children and Families, and the Yale Sex Abuse Clinic all undertook some kind of evaluation of the claims made in the application, and all concluded that no further action was warranted. It is unclear whether any of these agencies conducted further interviews of Aviva or whether the determinations were made solely on the basis of Aviva's previous statements to the police.

On May 14, 1997, Snyder and Cedar attended court with their lawyers. Along with Aviva's lawyer, they agreed that Cedar would withdraw her restraining order application. They also agreed that there would be no contact between Aviva and her father until the next court date on June 11, 1997, at which point all pending motions would be reviewed. As part of the May 1997 agreement, the parties agreed that Aviva would enter therapy at Clifford Beers Child Guidance Clinic.

While a reasonable person could certainly have questioned whether Aviva had been sexually abused by Snyder, no one could seriously doubt that there was grave trouble in the relationship between father and daughter. Aviva had previously declined to go on a visit with Snyder on April 8, and then had seen her father watching the house, which made Aviva fearful and angry. Aviva had run away from her father's home after the ugly argument of April 10, had refused any contact with him since,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 7
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

and had caused sufficient concern to her school social worker that the social worker had involved the child's mother. Snyder continued to deny that there was any difficulty in his relationship with Aviva. Rather, he developed the theory that all of this was Cedar's fault. Snyder decided to fight back. He adopted an aggressive litigation strategy and, as part of that, proceeded to resist any idea that seemed to him to have Cedar's endorsement, no matter how reasonable or benign.

First he had his attorney file an opposing Motion for Sole Custody on May 30, 1997. Next, he began to withhold his cooperation in the dispute resolution process. For example, when the Clifford Beers Clinic decided to do its own investigation of the allegation of sex abuse, through its child sex abuse treatment team (which would presumably have concluded, as had others, that treating the child for intrafamilial sex abuse was the wrong focus for this family) Snyder refused to abide by the agreement to cooperate with the Clifford Beers referral and demanded that Aviva be seen elsewhere. When Cedar acceded to this wish and set Aviva up with a different therapist, Snyder objected that the initial therapy plan for Aviva did not include inviting Snyder himself into Aviva's sessions. After a court order on June 11, 1997, (entered by agreement) that a child psychiatrist undertake a forensic evaluation of the family for the purpose of providing an opinion to the court of what custodial and visitation arrangement would best meet Aviva's needs, Snyder stopped cooperating with the forensic study when he got wind that the psychiatrist might recommend that Cedar be granted sole custody of Aviva.

*7 Snyder described himself as hurt and desperate during this initial estrangement from Aviva. No doubt that was true. But rather than allowing Aviva to get the therapy she needed to work through her conflicted feelings, and rather than allowing the lawyers and forensic evaluator to set the case up for a relatively prompt judicial determination about custody and visitation, Snyder compounded the already troubled family dynamics and complex dispute resolution process by refusing to pay the privately-retained evaluator,[FN7] by filing a formal lawyer-grievance against the guardian ad litem who had been appointed for Aviva, by firing his own lawyer, and by filing a motion to "quash" the custody evaluation on the grounds that the psychiatrist performing the evaluation had conducted it in an unprofessional manner.

> FN7. The intensity of Snyder's distrust and vitriol toward Joseph D. Saccio, M.D., the specialist in child psychiatry who was conducting the forensic evaluation of the family for the custody litigation, is particularly tragic. Snyder seems to have become obsessed with two issues regarding Dr. Saccio: first, that the cost of the evaluation was greater than had first been estimated, and second, that Saccio had not undertaken to reinstitute contact between Snyder and Aviva (although, of course, that was not at all Saccio's role). As to the first, Snyder clearly had the means to borrow the cash necessary to pay Saccio for the crucial completion of the evaluation, but Snyder stood on principle that he should not advance any more money to see the report finished unless Cedar did likewise. As to the second, Snyder became infuriated when he received a copy of a letter from Saccio to Atty. Michael Perzin, Aviva's attorney in the custody case, detailing the need for an additional payment, due to the complexity and volume of work involved in the evaluation. Had Snyder read the letter, Exhibit 35, carefully, Snyder would have realized that Saccio was considering "two additional interviews with Aviva with each of her parents," the very breakthrough for which Snyder had been hoping all along. By the time Snyder was finally compelled by the court to resume making payments for Saccio's evaluation, months had passed and Saccio completed the family interviews without seeing father and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

daughter together.

When these and other aggressive and destructive tactics on Snyder's part prolonged the resolution of the rift between Snyder and Aviva, Snyder's only way of explaining his predicament to himself was that a conspiracy was afoot. The chief architect of the campaign against him was Cedar, whom he perceived as having plotted all along to alienate Aviva from him.

For example, Snyder testified in this trial that prior to April 1997, Cedar had habitually interfered with the visitation schedule in an attempt to alienate him from Aviva. But the court finds that the visitation schedule was followed by both parents in the years from 1994 to 1997, with only occasional disputes between the parties about adjusting the days and times of the schedule. Snyder testified that Cedar suffered from severe pathology and that only if Aviva were wrested away from Cedar would Aviva be able to truly express herself. But in the summer of 1997, only months after Aviva stopped visiting Snyder, Aviva would write her father a letter from summer camp-a site away from whatever immediate influence Snyder suspected Cedar of exercising over Aviva-stating her feelings about the situation and her wish for the end of the conflict.

More pertinent to this defamation case, Snyder believes that Cedar engaged in an ongoing assault on Snyder's reputation by broadcasting the rumor that he was a child molester. But after the May 14, 1997, agreement to withdraw the restraining order application, Cedar refrained from making any further statement on the topic of whether Snyder had or had not engaged in inappropriate sexual behavior with Aviva to anyone involved in the custody case. In fact, it was not until after Aviva told Cedar in 1998 that Snyder had touched Aviva's vagina that Cedar made any further statement on that subject to any third party. Snyder remains convinced that Cedar put words in Aviva's mouth concerning the allegations about Snyder's intimate viewing and touching of Aviva, and he has so alleged in this lawsuit. But this court finds that Cedar did not do

so.

When Snyder found it impossible to schedule the trial of the custody and visitation case because of the roadblocks he himself had created to its resolution, he eventually dropped efforts to do so. On December 15, 1998, Snyder filed a withdrawal of his motion for sole custody. Snyder continued to feel wronged by what he saw as Cedar's attempt to turn Aviva against him. His focus on Cedar, rather than on his own relationship with Aviva, was fueled by the enlistment of an unlikely ally.

THE ROLE OF DIANE ROTNEM

*8 One of Snyder's witnesses was Diane Rotnem, Ph.D., a licensed clinical social worker who provided psychotherapy to Aviva that began when Aviva was 4 1/2 and ended in January 1992 when Aviva was 7. Rotnem testified that in her expert opinion Aviva currently displays all of the characteristics of a severe victim of "parental alienation syndrome." Rotnem explained that this syndrome occurs when a parent known as the "obsessed alienator" undertakes actions designed to influence a child to reject the "targeted parent" with the goal of creating a complete alienation of the child from the targeted parent. One aspect of this syndrome that is sometimes seen, according to Rotnem, is an allegation by one parent that the other parent has sexually abused the child, known by the handy acronym "SAID" (presumably "Sexual Abuse In Divorce").

Rotnem initially testified that "parental alienation syndrome" is well-recognized by mental health professionals and has been studied and written about most particularly by Dr. Richard A. Gardner who first described the syndrome. In Gardner's description of the syndrome, there are ten or eleven criteria which define the phenomenon. These criteria can be identified by an evaluator, presumably upon taking a history of the family and conducting clinical interviews of the various family members. Rotnem testified that Aviva-the "victim"-exhibited all of the classic characteristics of an "alienated child," not-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

withstanding that Rotnem had not interviewed any-one other than Snyder himself about the situation nor even laid eyes on Aviva since 1992. [FN8]

> FN8. When Rotnem was asked to specify the source of the information that formed the basis of her opinion that Aviva met each of the criteria for parental alienation syndrome, Rotnem admitted that virtually all of the information on which she based her opinion came to her not through any clinical impressions to which she was privy but rather through Daniel Snyder's characterizations to Rotnem of the family's rocky course during the intervening years since Rotnem last saw Aviva.

There is insufficient evidence that the description offered by Rotnem of "parental alienation syn-drome" has any scientific basis. There is no cred-ible evidence that this syndrome has been the sub-ject of any scientific studies published with approv-al in peer-reviewed scientific literature. Rather, to the extent that there have been longitudinal studies of children of "high-conflict" divorces in peer-reviewed literature, Rotnem admits that none of these studies uses the colorful, pejorative language such as "obsessed alienator" and "targeted parent," that Gardner uses in his many published works. In fact, there appears to be an absence of empirical re-search that reliably identifies a cause for the beha-vior of a pre-adolescent child who decides to reject contact with a parent. The prevailing opinion in the field, as Rotnem herself admitted when pressed, is that such empirical studies are unlikely ever to res-ult in a reliable means of identifying such a "syndrome" or its causes. Rotnem agrees that there are likely to be multiple factors that contribute to the estrangement of a child from a parent, and that the motives and conduct of the parent with whom the child becomes aligned is only one of them.

Indeed, as it became clear on re-cross examination, Rotnem appears to have only a vague familiarity with how empirical studies in social or psycholo-gical fields are designed and for what types of vari-ables such a study must control in order to have any scientific validity, much less the kind of validity that would result in its acceptance within the re-search or clinical community referenced by that study.

*9 Early in her testimony Rotnem stated her opin-ion to a reasonable degree of scientific certainty within the profession of clinical social work that Aviva suffers from parental alienation syndrome. The purpose of such testimony was evidently to convince the court that Cedar was capable of, and actually succeeded in, causing Aviva to reject con-tact with Snyder, that is, that such rejection was not due to any fault of Snyder and was not due to Aviva acting on her own. In Rotnem's expert opinion, Ce-dar's manipulation of Aviva explained why Aviva accused her father of molesting her, a charge that Rotnem did not believe was true, apparently based on her personal opinion that Snyder would not have done such a thing. But Rotnem's answers to ques-tions about her "scientific certainty" make clear that Rotnem's opinion, far from being held to any degree of certainty, scientific or otherwise, is both subjective and fluid and is based on no more than Rotnem's individual human observations and con-clusions having nothing to do with her proffered expertise. While an experienced clinical social worker may be able to understand and interpret complex human behavior, it does not necessarily follow that the social worker can offer her conclu-sions in court under the guise of expert testimony when those views lack any scientific foundation.

The court finds that "parental alienation syndrome" has no scientific validity at this time. There is no credible evidence that "parental alienation syn-drome" as defined or described by Rotnem, or that the "SAID" phenomenon, has been recognized within any of the mental health professions. Most importantly, in reference to our current case law, the diagnosis of parental alienation syndrome and the identification of the perpetrator of such an af-fliction lacks any methodological underpinning. When the methodology underlying proferred evid-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

ence is sufficiently invalid to render the evidence incapable of helping the fact finder determine a fact in dispute, such evidence is inadmissable.*State v. Porter,* 241 Conn. 57, 89, 698 A.2d 739 (1997). Rotnem's opinion that Cedar caused Aviva to suffer from "parental alienation syndrome" and thus caused Aviva to accuse her father of molesting her is not competent evidence under *State v. Porter,* and as such it is inadmissable.

Even if our rules of evidence and procedure permitted the admissibility of Rotnem's opinion, Rotnem's testimony is entitled to no weight whatsoever for a reason more troubling than a mere lack of expert foundation. Rotnem appears to be so emotionally caught up in Snyder's narrative of this family's troubles that Rotnem's testimony is totally lacking in objectivity.

The sad and surprising fact is that Rotnem has allowed herself to be retained by her former patient's father in this lawsuit for money damages against her former patient's mother without the knowledge or consent of her patient who is now an adult. Rotnem's agreement to act as an expert witness for the father against the mother was evidently undertaken without any attempt to secure consent or approval from Aviva. Even if this professionally dubious arrangement does not amount to a violation of the ethics rules that apply to social workers (there is no evidence that it is a violation), it certainly is sufficient to undermine the force of Rotnem's testimony.

**\*10** Rotnem's credibility is further eroded by her evasiveness about the number and nature of contacts between herself and Snyder in the years since her therapy with Aviva ceased. At first, Rotnem denied that she had had any substantial communication with Snyder after 1992. Then on cross examination Rotnem admitted that she had regular telephone and face-to-face "consultation sessions" with Snyder to provide him with emotional support when he was locked in post-dissolution litigation struggles with Cedar over Aviva in 1997 and later. The correspondence and notes introduced as exhibits make it clear that Rotnem and Snyder were fre-

quently in touch in the period after Aviva stopped visiting with Snyder. During the important phases of the post-dissolution custody litigation in 1997 and 1998 when the events of which Snyder complains were occurring, Rotnem regularly provided Snyder with ideas about how to approach the child custody litigation in which he, Cedar, and Aviva were all involved.

Snyder was sometimes in touch with Rotnem on a daily basis, sending her materials and soliciting her comments. One of Snyder's purposes in regularly sending to Rotnem copies of the letters and memos, some of which are exhibits in this case, was to attempt to enlist Rotnem to intercede on Snyder's behalf with the neutral custody evaluator, Dr. Saccio, with Aviva's attorney Michael Perzin, and with the court-appointed guardian ad litem Marianne Charles. The contacts proposed by Snyder were not just that Rotnem respond to professional inquiries from these individuals about Rotnem's prior involvement with Aviva, to the extent that the parties consented to the release of such information and to the extent Rotnem's role as the child's therapist permitted. Snyder also convinced Rotnem to initiate discussions with these individuals to plead Snyder's cause.

Indeed in one letter to Rotnem, Snyder proposes that Rotnem "convince Dr. Saccio to participate in a strategy designed to bring Deborah (Cedar) to the table ..." The strategy would be for Rotnem to convince Saccio to falsely claim that Saccio's custody evaluation was about to result in a recommendation of sole custody to Snyder, as a way of persuading Cedar to capitulate and agree to joint custody. Rotnem denies having made such an overture to Dr. Saccio; but neither did Rotnem repel such requests from Snyder and advise him that such entreaties to her were inappropriate. Not only did Rotnem continue to accept such correspondence from Snyder, but she always took his phone calls and responded to his requests for advice. Eventually Rotnem allowed herself to become fully involved behind the scenes of the custody litigation as a kind of shadow

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

Page 11

attorney for Snyder.

While Rotnem denies participating in Snyder's scheme to manipulate Cedar through Dr. Saccio, it is clear through Rotnem's own testimony and through copies of her correspondence with Snyder that Rotnem actually 1) strategized with Snyder about how to influence the progress of the custody litigation, 2) assisted Snyder in formulating meeting agendas with lawyers and other participants in the litigation, 3) coordinated the scheduling of one or more meetings with the lawyers involved in the litigation, and 4) led the discussion in at least one such meeting in order to advocate Snyder's position about gaining custody of Aviva.

*11 Rotnem's allegiance to Snyder is so close as to be unsettling. In 1999, after the custody litigation had died down, and there was no reason for any further contact between Rotnem and Snyder except to settle Rotnem's bill for services, Rotnem wrote a note to Snyder that included the following sentiments: "My heart breaks for you ... Meanwhile, you're a good man Dan, and you deserve to be happy and to find some peace in your life."More recently when Rotnem met with Snyder in 2005 to be recruited as a witness in this lawsuit, Rotnem learned that Snyder had hired a private investigator to gather personal information about Aviva, who is now in college. Rather than become disturbed or alarmed by whatever Snyder's purpose toward Rotnem's former patient was, Rotnem seems to have recorded Snyder's intentions without comment in her notes and continued to cooperate with Snyder and his litigation team as though Snyder's covert behavior towards Aviva was completely benign.FN9

> FN9. By continuing to accept such a role and continuing to offer emotional and litigation support to Snyder during the custody battle and up to the present, Rotnem implicitly violated the trust of her former patient. Whatever Aviva's role in the accusations made against Snyder-whether Aviva was lying or was mistaken or was actively

misled by Cedar-Aviva is still a former patient of Rotnem. In advising and counseling Snyder, Rotnem was doing much more than "leaving the door open" to assist a parent in addressing the needs of a troubled child. Rotnem abandoned her alliance to her patient and enlisted in the cause of her patient's father.

Regardless of any past association with the child, the long-standing, supportive bond between Snyder and Rotnem appears to have irreparably skewed Rotnem's professional objectivity. She has become the worst kind of "hired gun" expert witness. The evidence Rotnem has offered on behalf of Snyder on all topics in this case is entirely unworthy of belief.

THE LAW OF DEFAMATION

"Defamation is comprised of the torts of libel and slander. Defamation is that which tends to injure reputation ..."*DeVito v. Schwartz*, 66 Conn.App. 228, 234 (2001), citing W. Prosser & W. Keeton, Torts, (5th Ed.1984), p. 773. To find the defendants liable for defamation, the court must find that the defendants "published false statements that harmed the [plaintiff] and that the defendants were not privileged to do so."*Kelley v. Bonney,* 221 Conn. 549, 563, 606 A.2d 193 (1992).

Certain categories of defamation are deemed actionable per se, that is, without evidence of actual injury. They are ones in which the defamatory meaning of the speech is apparent on the face of the statement. *Battista v. United Illuminating Co.,* 10 Conn.App. 486, 491-92,cert. denied, 204 Conn. 802 (1987). An accusation that one has engaged in criminal behavior which involves moral turpitude constitutes defamation per se. *Id.,* at 493.An accusation that one has sexually molested one's child is therefore defamatory. The defendants do not contest that a false accusation of child molestation is actionable per se.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

The burden is on the defendants to specially plead and to prove matters in defense or in avoidance of the cause of action alleged in the complaint. The defendants have pleaded the defense of privilege to the defamation counts and have pleaded the statute of limitations as a defense to the intentional infliction of emotional distress count.

The defendants initially filed a special defense of truth, but they withdrew that special defense without objection prior to trial. Under the common law, truth is an affirmative defense to defamation. *Cweklinsky v. Mobil Chemical Co.,* 267 Conn. 210, 228-29 (2004). That is, at common law, although falsity was an element of a cause of action for defamation, once a statement was shown to be defamatory, falsity was presumed. Restatement, Second, Torts §§ 581A, 613(2) (1977); Prosser, Torts § 116 (4th Ed.1971). Although cases that involve public comment on public figures, such as *New York Times Co. v. Sullivan,*[FN10] make clear that the burden of establishing falsity rests on the plaintiff when the "actual malice" standard applies, there is no indication in these cases that the common-law rule has been altered for defamation by a private party of a non-public figure. Accordingly the falsity of the defamatory statements is presumed.[FN11]

> FN10.376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

> FN11. Though the defendants withdrew their special defense of truth, the court nonetheless considered in the alternative whether, had it been specially pleaded, the defendants would have carried their burden to prove that Snyder molested Aviva. The court has determined that it has not been proved; so that whether falsity is presumed or not, the court finds that the accusation is false.

**\*12** The defendants have asserted the defense of privilege: that some or all of the statements were made in a context for which the law provides immunity from liability. The effect of an absolute

privilege in a defamation action is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. *Kelley v. Bonney, supra,* at 565.The law recognizes an absolute privilege for communications uttered or published in the course of judicial proceedings. *Petyan v. Ellis,* 200 Conn. 243, 245-46, 510 A.2d 1337 (1986). Other statements may be covered by a conditional privilege.*Miles v. Perry,* 11 Conn.App. 584, 529 A.2d 199 (1987).

The defendants have also asserted as a defense that Vincent's statements were not statements of fact but rather statements of opinion. In order for a statement to be defamatory, it must be understood to convey an objective fact, reasonably capable of being proved true or false. *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 795, 734 A.2d 112 (1999).

### THE DEFAMATORY STATEMENTS OF CEDAR

In Count One and Count Two of the Fifth Amended Complaint, there are five sets of defamatory statements allegedly made by Cedar and two sets allegedly made by Vincent. The allegations are listed below, followed by the court's findings about each statement in context, and by an analysis of the applicable law.

¶ *8.a. On April 30, 1997, Cedar filed an Application for Relief from Abuse in the Superior Court that contained the following false statements:*

*1. My ex-husband stalked me and my daughter on April 8, 1997. He has a history dating back to 1991 of this behavior.*

*2. Diane Pelazza telephoned me ... while [Aviva] was in her office, requested I come right in to speak with her. [Aviva] has been visiting her office frequently, 2, 3, times per week for some time, at least since December of 1996 ...*

*3. In addition, her concern that she SUSPEC-TED, but had no evidence, that [Aviva] has been*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

*sexually abused.*

*4. He has threatened me repeatedly over the years ...*

*5. Dan [Snyder] has told me I am going to have a blood-bath.*

*6. [Snyder's son by a prior marriage] is concerned about our safety as well because he has been victimized by his father as well and has warned us to be careful.*

*7 .... of a long history with Dan [Snyder] of verbal threats, verbal abuse, the fact that he has taken off with [Aviva] before, was arrested in 1990 for violating a restraining order ...*

Each of the above statements was in fact made by Cedar in the affidavit in support of her Application for Restraining Order dated April 29, 1997, contained in the Superior Court file of which the court has taken judicial notice. The focus of the evidence in this case has been the statement in paragraph 8.a.3 above, although the other statements provide relevant context.

As to # 1, above, Aviva missed a visit with Snyder on April 8, 1997 (the visitation day immediately preceding the blow-up between Snyder and Aviva). Either Cedar or Aviva had called Snyder to say that Aviva was feeling ill and was staying home from school and would not be coming to Snyder's house for the visitation as a result. Snyder drove over to Cedar's house and attempted from his car to observe who might be at Cedar's house. He concluded that Aviva's grandmother was at the house, that Aviva must have been staying home to visit with the grandmother, that Aviva was not in fact ill, and that Cedar must have lied to him about the reason for Aviva's failure to attend the visitation with Snyder that day. The word "stalked" is likely the word or innuendo with which Snyder takes issue in this statement.

**\*13** Stalking has both a legal meaning and an ordinary non-legal one. Under Conn. Gen.Stat. §

53a-181d, stalking is characterized by a person wilfully and repeatedly following or lying in wait for another and intending to cause and actually causing the other to reasonably fear for her physical safety. In ordinary usage, to stalk means to pursue, to shadow, to skulk, to move stealthily, or, even more benignly, to travel on foot. On April 8, Snyder did in fact position himself outside of Cedar's house to do reconnaissance.

Regarding # 2 above, Aviva had been meeting regularly with Diane Pelazza for some months and it is true that Pelazza called Cedar to arrange for an urgent meeting.

Regarding # 3 above, despite Pelazza's lack of memory of the exact substance of her conversation with Cedar, the court finds that Pelazza was indeed concerned about whether there was more to Aviva's distress about her father than Aviva was currently sharing. The court finds it more likely than not that Cedar's account of Pelazza's statement-that Pelazza told Cedar that Pelazza suspected but had no evidence that there may have been sexual abuse-is accurately rendered by Cedar.

As for # 4 and 5 above, the court has no difficulty believing that hyperbole was utilized by both parents throughout their entanglement with one another. Although the court does not find that Snyder ever intended to physically harm either Cedar or Aviva, he did make threats about how he would triumph in court and the like, and more likely than not used a term such as "blood-bath" to explain his seriousness of purpose.

Regarding # 6 above, Snyder admitted that he was estranged from his two grown sons for a period of time during the 1990s. There was occasional cordial contact between these young men and their half-sister Aviva. The court credits the evidence that one of Snyder's sons commiserated with Cedar and Aviva, expressed concern for their safety, and warned them to be careful of Snyder.

Regarding # 7, the court finds it to be true that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

Snyder was arrested, though it was in 1990 rather than in 1991, for violating a restraining order that Cedar had obtained against him. In the face of a prohibition against going to Cedar's place of work, Snyder went to her place of work. Even during this trial Snyder sought to justify and minimize this incident apparently still not appreciating the seriousness of violating a family violence restraining order. Also, on occasion, Snyder picked up Aviva for visits when he was not supposed to, and he sometimes failed to return Aviva at the agreed-upon time at the end of a scheduled visit. As previously noted, there were angry exchanges between Cedar and Snyder-verbal threats, though not of bodily harm. Both engaged in "verbal abuse" of the other.

Even if every statement in Cedar's Application and Affidavit of April 30, 1997, were false and defamatory however, the entire written affidavit is covered by the absolute privilege for statements made during court proceedings. *Petyan v. Ellis,* 200 Conn. 243, 251-52, 510 A.2d 1337 (1986). The Special Defense of privilege applies and Cedar cannot be liable for any statement in the application and affidavit that was filed in court.

**\*14** 8.c. *On or about April 29, 1997, Cedar made a false report to the Branford Police Department that the (sic) Aviva had been sexually abused by Dr. Snyder.*

Cedar made no such report. Rather it was Aviva who made the report and whom the police interviewed. Aviva made a series of statements, which were somewhat vague and which were insufficient to support further investigation or action regarding sexual abuse at that time. Cedar brought her daughter to the Branford Police Department when Cedar became aware of Aviva's statements to Diane Palazza. But Cedar, who had no first-hand knowledge about whether Snyder had or had not molested Aviva, did not make this report. Especially reviewing the transcript of Aviva's recorded statement, Exhibit 9, and the entire police report of that evening,[FN12] Exhibit 10, the court finds no defamatory statement by Cedar as alleged in this para-graph.

FN12. Detective Anthony Morro, who interviewed Aviva for her recorded statement, and who then prepared a report of the incident, seems to have accurately assessed the family dynamics. "Aviva feels that the touching (by) her father is sexually wrong, but ... there were no incidents that could be documented in which a direct contact was made to Aviva by her father in areas that were private," wrote Morro. He concluded his report by saying, "It appears, at this time, that Mr. Snyder is possibly trying to get more control over his daughter and that she (Aviva) is reluctant to become a pawn in this relationship between him and (Cedar)."

Nonetheless, were the court to find to the contrary, the question of privilege again arises. Conn. Gen.Stat. § 17a-103 provides that any person who has "reasonable cause to suspect or believe that any child under the age of eighteen is in danger of being abused, or has been abused ... may cause a written or oral report to be made to ... a law enforcement agency."Conn. Gen.Stat. § 17a-101e(b) provides immunity to any person who, in good faith, makes a report pursuant to section 17a-103. The statute is not limited to mandated reporters, but is broad enough to cover one parent's report of another parent. The court finds that Cedar acted in good faith in facilitating Aviva's interview and report to the Branford police. Even if Cedar herself had made the report instead of Aviva, the defense of privilege under this statute has been proved.

¶ 8.d. *On or about April 8, 1997, Cedar made a false statement to the Branford Police Department that Dr. Snyder had stalked her and also falsely reported that [minor child] called up her personal attorney to contact her father and advised him of her not wanting to come over to the house.*

Aviva stated to the police on April 29 that she was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                Page 15
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

afraid because she had seen her father outside of her mother's house at a time when he had no business being there. No credible evidence was offered at trial regarding the substance of any similar statement that may have been made by Cedar to the police on April 8. Accordingly the plaintiff has failed to prove that Cedar made such a statement and that such a statement, if made, was false or defamatory.

In fact, it is true that during the week of April 8, Aviva communicated to her attorney, Michael Perzin, that she did not wish to visit her father anymore. Whether Aviva said that on April 8 or April 10 or thereafter, no such statement can be the basis in this case for a claim of defamation by Cedar.

> ¶ 8.e. *In or about December 1999, Cedar stated to Diane Massaro LaPaglia that Dr. Snyder had not seen his daughter for a long time because Dr. Snyder had molested her.*

**\*15** Diane LaPaglia was the former wife of Edwin Vincent, Jr. Vincent and LaPaglia were the parents of Rachel Vincent who was about a year younger than Aviva. Rachel visited at the Vincent/Cedar home often. LaPaglia was having great difficulty raising Rachel. In 1999, Vincent and LaPaglia were engaged in discussions about whether it would be in everyone's best interests to have Rachel move from LaPaglia's home to the Vincent/Cedar home.

One concern of LaPaglia was her knowledge that Aviva did not have contact with her father. LaPaglia was aware that there had been no such contact for some years. LaPaglia feared that this was the result of some kind of parenting decision in the Cedar household, and that if LaPaglia ceded custody of Rachel to Edwin Vincent, LaPaglia could expect to be shut out of Rachel's life just as Snyder seemed to be shut out of Aviva's.

One day in December of 1999, LaPaglia called to speak to Rachel, and Aviva answered the phone. What LaPaglia said to Aviva on the phone caused Aviva to become upset, a fact observed by Cedar. Cedar took the phone from Aviva. LaPaglia identi-

fied herself to Cedar and began to inquire about the custody and visitation circumstances of Aviva. LaPaglia stated that she was concerned about why Aviva did not visit with Snyder. In response to the inquiry of LaPaglia about those circumstances, Cedar replied that there was no visitation between father and daughter because Aviva said that Snyder had molested her.

On its face, the statement is objectively true: Aviva *did* say that Snyder had molested her. Aviva revealed that to her mother in 1998. Nonetheless, as discussed below, the fact, as found by the court, that Snyder did *not* sexually molest Aviva renders Cedar's publication of this statement to LaPaglia defamatory.

> ¶ 8f. *In or about December 1999, Cedar stated to Susan L. Jacobs, Esq., Dr. Snyder's attorney, that Dr. Snyder had molested his daughter.*

Snyder had been ordered to pay child support to Cedar during Aviva's minority. He had also been ordered to pay over to Cedar an annual payment from an annuity known as TIAA. Snyder was sporadic in making the former payments, necessitating Cedar to utilize the services of the state Child Support Enforcement Services Unit in collecting these payments. Also each year Snyder intentionally refused to make the TIAA payment, knowing that Cedar would first have to expend time and energy and attorney fees in taking him back to court before he could be compelled to make the TIAA payment.

By 1999, Cedar could no longer afford an attorney. Instead, in September 1999, while using the services of the Child Support Enforcement Unit to try to get regular payments of her child support, Cedar attempted to use the same court proceeding to collect the overdue payment of the TIAA annuity.

In the summer of 1999, Snyder retained Susan Jacobs as his new attorney. Jacobs was a close personal friend of Susan Davis, the woman with whom Snyder now resides. Snyder initially consulted with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

Jacobs to see what Jacobs could do to get his visitation restarted with Aviva. But when the child support enforcement division cited him to appear (again) in September of 1999, and when Cedar *pro se* tried to piggy-back the motion to collect the overdue TIAA payment in the same proceeding, Snyder directed Jacobs to represent him on those matters as well. By that time, Jacobs had been fully briefed by Snyder about the history of the disputes with Cedar, including the disputes about Aviva's custody and visitation; and Jacobs had thoroughly reviewed the court file, including the application and affidavit from April 1997 that contained the accusation that Snyder had engaged in possible sexual misdeeds with Aviva.

*16 During a court proceeding at the family magistrate session in October of 1999, Cedar and Jacobs engaged in a negotiation session in the hallway of the court prior to entering the courtroom for the formal presentation to the child support magistrate of a Motion to Dismiss that Jacobs had filed on the TIAA collection issue. As part of an effort to negotiate not only the TIAA issue, but the child support and visitation issue as well, Jacobs stated to Cedar that the financial issues might be resolved more easily if Snyder's visitation with Aviva could be reinstituted. At first Cedar responded that the law considered child support and child visitation to be unrelated to one another, a fact that Jacobs well knew. Jacobs pressed on with a query about why Cedar was reluctant to try to negotiate a settlement on visitation. Cedar replied that Aviva considered Snyder to be a child molester, as a way of explaining why Aviva was continuing to refuse all contact with her father.

Jacobs testified in this trial that Cedar's statement that Snyder was a child molester was unqualified by any preface about Aviva holding such a view, and was unsolicited by any question or other conversational invitation by Jacobs. Jacobs testified that, although she had been initially retained by Snyder to deal with the visitation problem, and although she would have preferred to work toward a

"global" settlement of both financial and visitation issues, Jacobs did not bring up the subject of Aviva. Rather, Jacobs stated that Cedar's comment about Snyder as a child molester was voluntary and gratuitous, and was made after their argument to the magistrate had been concluded. Weighing all the evidence, the court finds Cedar's version of the encounter the more credible.

The court finds that Cedar was representing herself in a court proceeding. As in all litigation, the parties, whether pro se or represented by counsel, are encouraged by the court to engage in negotiations or dialogue prior to the presentation of the case, in order to settle the dispute or at least to narrow the issues and agree on a manner of presentation. Jacobs, as opposing counsel, did nothing inappropriate in broaching with Cedar all of the outstanding disputed issues between the parties; indeed it was a propitious opportunity to do so.

But having initiated such a negotiation session at court, and having invited Cedar to justify the lack of contact between Snyder and Aviva, Snyder cannot use Cedar's response to his attorney's question as a further instance of defamation. The court finds that in this situation the Special Defense of privilege ought to apply as a matter of sound public policy.

The law recognizes an absolute privilege for statements made in the context of a court proceeding. "An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." 3 Restatement (Second) Torts § 586 (1977). There is no logical reason that the privilege should not cover the statement of a pro se party to the same extent as it would cover the statement of an attorney.

*17 To be sure, the absolute privilege can be lost "by unnecessary or unreasonable publication to one

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

for whom the occasion is not privileged."*Kelley v. Bonney*, 221 Conn. 549, 575, 606 A.2d 693 (1992). That is not the case here, where the publication was made only to Snyder's attorney and overheard by no one else.

While the judicial proceedings privilege applies to statements made in pleadings or other documents prepared in connection with a court proceeding, see *Petyan v. Ellis, supra*, at 251-52, it is not essential that the statement be spoken in open court or contained in a pleading, brief or affidavit. *McManus v. Sweeney*, 78 Conn.App. 327, 335-36, 827 A.2d 708 (2003), citing *Romero v. Prince*, 85 N.M. 474, 477, 513 P.2d 717 (1973). The policy underlying the absolute privilege for statements made in the course of judicial proceedings is that "in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements."*Petyan v. Ellis, supra*, at 246.

Here the statement was made in a negotiation session between a pro se party and opposing counsel prior to their matter being presented in court the same day. The court's finding that Cedar's statement is insulated by the privilege might be different if the court believed that Cedar had made the comment gratuitously, or if the parties were involved in a proceeding that did not involve an aspect of the ongoing family case, or if Cedar had uttered the statement to Jacobs within the hearing of others. But on the basis of the particular interchange between Cedar and Jacobs and the context in which it occurred, the privilege applies in this case.

Courts encourage litigants involved in complicated family cases to engage in comprehensive and, if necessary, lengthy negotiations in an attempt to settle all outstanding disputes. It would chill the process of negotiations in family cases to hold that a litigant is liable for damages for presenting her perspective on the family dynamics in private in response to a question from her ex-husband's lawyer. That is especially true when the lawyer was well aware of the sex abuse claim before these negotiations ever

began. The privilege should extend to pro se litigants as well as attorneys in these circumstances, especially since the attorney is likely to have superior legal knowledge and tactical skills that may, intentionally or innocently, cause the overmatched unrepresented litigant to utter a slander.

The court holds that the negotiations immediately preliminary to an in-court presentation constitute part of the course of a judicial proceeding. The statement of Cedar, in response to a question from Jacobs, was integrally related to the entire family dispute of which the child support and property division matters were a part. Cedar's statement to Jacobs is absolutely privileged.

### THE DEFAMATORY STATEMENTS OF VINCENT

**\*18** ¶ 8g. *In or about December 1999, defendant Vincent stated to a psychotherapist, whose name, based upon information and belief is Harlie Kesten, that Dr. Snyder did horrible things to Dr. Snyder's daughter and should be locked up.*

¶ 8h. *In or about December 1999, defendant Vincent reiterated, outside the presence of Harlie Kesten, to Diana Massaro LaPaglia and in the presence of Rachel Vincent that Dr. Snyder did horrible things to Dr. Snyder's daughter and should be locked up.*

In December 1999, Vincent, his former wife Diane LaPaglia, and his minor daughter Rachel were participating in a family therapy session. LaPaglia was having difficulty raising Rachel and there was discussion of Rachel going to live at the home of Vincent and Cedar, where Aviva was residing. LaPaglia broached the issue of Aviva's estrangement from Snyder. Vincent replied that Snyder was "a piece of crap and ought to be locked up."

The court finds that this was the only statement made by Vincent, and that it was made in the course of a therapy session related to the custodial and visitation arrangements with which Rachel

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

might come in contact at the Vincent/Cedar home. The court does not credit the testimony of LaPaglia or of Rachel that Vincent said "[Snyder] did horrible things to Aviva" or that Vincent reiterated any statement about Snyder outside of the therapy session, in the parking lot, or elsewhere.

Having found that Vincent made the statement that "[Snyder] is a piece of crap and ought to be locked up," the question is whether the Special Defenses of privilege or opinion apply.

Vincent argues that the statutory psychotherapist-patient privilege applies to insulate Vincent from liability for statements made in the therapy session, Conn. Gen.Stat. § 52-146q or 146s. These statutes prevent the therapist, or those under the supervision of the therapist, from revealing confidential statements made during therapy sessions. The statutes do not prevent the patients or participants themselves from disclosing what was said in the sessions. In the context of group therapy, there is no statutory prohibition on one patient or participant revealing the statement of another patient or participant. See, e.g., *Skakel v. Benedict,* Connecticut Superior Court, Judicial District of Fairfield at Bridgeport, CV 98 357386, Nov. 10, 1999 (LoisLaw 1999 Ct.Sup. 14727) (Stodolink, J.) (25 Conn. L. Rptr. 667). The special defense of privilege does not apply.

Vincent asserts that the statement is one of opinion, rather than a statement of fact, such that it cannot form the basis of a defamation claim. To prevail on a common-law defamation claim, a plaintiff must prove that the defendant published a false statement. *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 27, 662 A.2d 89 (1995). To be actionable, the statement in question must convey an objective fact, as generally a defendant cannot be held liable for expressing a mere opinion. *Daley v. Aetna Life & Casualty Co.,* 249 Conn. 766, 795, 734 A.2d 112 (1999) (citations omitted).

*19 The Restatement, Second, Torts, § 566, recog-

nizes that a statement of opinion can nonetheless be actionable if the statement implies the allegation of an undisclosed defamatory fact as the basis for the opinion. The application of the fact/opinion analysis is a difficult one. See, e.g., *Kimber v. Bancroft,* Connecticut Superior Court, Judicial District of New Haven, CV 01 0455708, June 25, 2004 (LoisLaw 2004 Ct.Sup. 9615) (Corradino, J.). The coarseness of modern conversation and the increasing acceptance of hyperbole in social discourse have made the proper application of the concept even harder. See, Prosser & Keeton, 5th Ed. § 111, p. 776. ("A certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more.")

"He is a big piece of crap" is clearly an expression of opinion that is not actionable, as it implies no specific undisclosed facts. However, what is one to make of Vincent-a police officer-stating "he ought to be locked up"? In speaking such words to a brother officer, say, it might be that the words would be understood to convey specific undisclosed facts that amounted to an accusation that Snyder had committed a crime. In the context of a discussion among family members, where Vincent's status as a police officer is tangential or irrelevant, there is no reasonable likelihood that such a statement would be understood to be anything other than hyperbole or exaggeration. Considering the entire context in which the statement was made, the court finds that Vincent has carried the burden of proving that the statement made was understood as a mere expression of opinion and not a statement that expressed or implied a false fact.

Vincent has also carried the burden of proving that a qualified or conditional privilege covers the statement he made in his daughter's family therapy session. There are five elements to be met in establishing a conditional privilege: (1) an interest to be upheld, (2) a statement limited in its scope to this purpose, (3) good faith, (4) a proper occasion, and (5) a publication in a proper manner to proper parties only. *Miles v. Perry,* 11 Conn.App. 584, 595, 529

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 19
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

A.2d 199 (1987). No conditional privilege exists where the defamatory remarks are activated by malice, improper motive, or lack of good faith in making the statement. See *Charles Parker Co. v. Silver City Crystal Co.,* 142 Conn. 605, 615, 116 A.2d 440 (1955).

Participants in therapy sessions have an expectation that the confidences they disclose and the emotions they vent will not become part of public discourse outside of the session. Even though there is no statutory privilege against one participant in a therapy session disclosing the statements of another, there is certainly a privacy interest which the law ought to recognize, so that participants in group or family therapy, or proper third parties invited in to individual therapy sessions, can feel safe in speaking. Vincent's statement about Snyder was prompted by the topic then being discussed in the session: what were the relative benefits of Rachel living in the Vincent/Cedar home, and were there any impediments or disadvantages to her living there? What was the policy in that home about access of the child to a visiting parent? Vincent responded, coarsely and somewhat cryptically, with his opinion on Aviva's relationship with Snyder. The response was limited in scope, made on a proper occasion, and made only to the persons attending the therapy session and not beyond. The fact that it contained an insult to Snyder does not indicate that it was made in bad faith. The fact that Vincent did not elaborate on his opinion of Snyder tends to indicate that Vincent was attempting to exercise good faith and his better judgment in limiting the statement as he did.

*20 Given all the circumstances, the court finds that Vincent has carried his burden of proving that a conditional privilege should attach to the statement he made in the therapy session he attended with Rachel, Rachel's mother, and Rachel's therapist.

THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM

In order for the plaintiff to prevail on this claim, he must establish four elements: (1) that the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Appleton v. Board of Education,* 254 Conn. 205, 210, 757 A.2d 1059 (2000). The court finds that neither Cedar nor Vincent engaged in any conduct the intent of which was to inflict emotional distress on Snyder.

Snyder has attempted to plead and prove that the allegations that he sexually molested Aviva were part of a scheme devised by Cedar to alienate Snyder from his daughter, that as part of that scheme Cedar concocted the allegation that Snyder abused Aviva, convinced Aviva to make the accusation public, and then that Cedar maliciously spread this rumor with the intent of doing as much harm as possible to Snyder. The court does not find this to be the case.

The claim that Cedar engaged in conduct intending to create a rift between Aviva and Snyder is particularly unsupported. The actual break between father and daughter began as a result of Snyder's and Aviva's own prickly personalities and was fueled by the hostility that was created in the ongoing family litigation-for which Snyder is just as responsible as Cedar. It came to a head on April 10, 1997, two weeks before the allegations of sexual abuse surfaced, and it came to a head without any involvement by Cedar. After that, it was Aviva-who is not a defendant in this case-who raised the issue that Snyder had molested her. Although Cedar assisted Aviva in reporting this to the police and to those involved in the family litigation, the court finds that Cedar neither conspired with Aviva to make such an allegation nor encouraged or directed Aviva to make such an allegation.

By May 14, 1997, all of the individuals and entities to whom the allegation was initially reported had determined that Aviva's vague statements did not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

amount to proof of sexual abuse. For all practical purposes, that was the end of any statement Cedar made on this topic to anyone except Diane LaPaglia and Susan Jacobs, as found above. The statements to LaPaglia and to Jacobs were Cedar's responses to inquiries made by persons whom Cedar legitimately believed ought to have a direct and, as far as Cedar knew, truthful answer. Although Snyder urges the court to find that Cedar was engaged in some kind of campaign to besmirch Snyder's good name, there is simply no credible evidence of this. Nor is there sufficient credible evidence to persuade the court that Cedar undertook any of the alleged conduct with the intent to alienate Aviva from Snyder.

**\*21** To be sure, there is no love lost between Cedar and Snyder. Cedar has certainly wished Snyder ill from time to time; she has even wished him dead. But like most litigants in family cases, she has not acted on these emotions in any overt way. She has not turned Aviva against Snyder and has not engaged in any "campaign" to brand Snyder a child molester. Her repetition of Aviva's statements to a few select individuals was without malice. Cedar did not intend to inflict emotional distress upon Cedar. Snyder has failed to prove the first element of the tort of intentional infliction of emotional distress.

As for the second element-the conduct was extreme and outrageous-that element would certainly be satisfied if the court believed that Cedar had made up these allegations and had somehow convinced Aviva to parrot them. Branding an innocent person as a child molester is extreme and outrageous. But as previously stated, the court does not find that Cedar conspired with Aviva or directed or encouraged Aviva to tell this tale about her father. The fact that Cedar stated her honest belief that Aviva's statements were true, while opening Cedar to a defamation claim, is not sufficient to constitute the "extreme and outrageous conduct" element of this tort.

Snyder also seeks to extend his claim of intentional infliction of emotional distress to Vincent under the general purview of paragraph 7 of the complaint: that "the campaign [to inflict emotional distress on Snyder] has been joined by Vincent, and constitutes a continuous course of conduct which, on information and belief, is ongoing."Aside from uttering the one insulting comment about Snyder to his ex-wife in December 1999, there is no credible evidence that Vincent has engaged in any conduct disparaging to Snyder. Vincent has not engaged in any conduct that was intended to inflict emotional distress upon Snyder, nor has Vincent engaged in any conduct that could remotely be considered extreme and outrageous. The court finds that Snyder's proof on Count Three fails as to Vincent.

As for the third and fourth elements of the tort of intentional infliction of emotional distress, the court will address them below in the sections on injury and damages.

The defendants have presented a statute of limitations defense: that any conduct of Cedar or Vincent that occurred more than three years before the service of process in this action is time-barred. Conn. Gen.Stat. § 52-577. This action was commenced in July 2001, so that any conduct of Cedar or Vincent before July 1998 is insulated from liability by the statute of limitations. Even if the court were to believe that Cedar engaged in conduct designed to alienate child from father, that conduct was fully completed by April 10, 1997, and in the few months thereafter, when Aviva dug in her heels and decided that she no longer wished to have anything to do with Snyder. There is certainly no credible evidence that Cedar engaged in any conduct after July of 1998 that contributed to any further alienation of father and daughter. By November 1997, Snyder himself had determined that he did not wish to have further contact with Aviva if the primary custody of Aviva continued to be with Cedar. Whatever "damage" was done, it was done before July 1998, so that the statute of limitations bars Snyder's claim for intentional infliction of emotional distress. Also, Snyder's claim that there was a "continuing course of conduct" by Cedar or Vincent after July

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

1998 is unsupported by the evidence. The special defense has been proved, and Snyder's claim is time-barred.

### SNYDER'S INJURIES

**\*22** Snyder claims that the primary injury from which he suffers is the alienation that has taken place from his daughter and the pain that flows from such alienation.[FN13]The court finds that no such injury was proximately caused by any of the conduct alleged against Cedar or Vincent in this lawsuit.

> FN13. Neither party has raised or briefed the issue of the effect, if any, of Conn. Gen.Stat. Sec. 52-572b.

Snyder also claims that his reputation has been injured by the publication of the falsehood that he sexually molested Aviva. This claim is more complicated than it first appears. The first problem is the source from which any injury to reputation may have flowed. The original publication of the allegation was by Aviva to the police. The next publication was Cedar's court filing to which the absolute privilege attaches. Though those two avenues, neither of which can be used to assess damages against Cedar, all of the people in the family litigation learned of the original accusation of sexual misconduct. If the greater community acquired knowledge that Snyder was a child molester such that Snyder's reputation was damaged, the burden is upon Snyder to prove that such knowledge came by way of a non-privileged publication uttered by Cedar or Vincent. With only one exception, Snyder has failed to prove this.

That one exception is the knowledge that Diane LaPaglia acquired from Cedar in the December 1999 phone call. The court finds that until that phone call LaPaglia was unaware of any such charge. LaPaglia was alarmed by the news, and did not at first know whether to give it any credence. Within weeks, she repeated Cedar's statement to Snyder, whom she knew slightly. After speaking with Snyder, LaPaglia became convinced that the accusation was *not* true.

There is no credible evidence that anyone in Snyder's community knew that he had been accused of being a child molester. Even certain of the witnesses who testified in this trial as to Snyder's upstanding character did not seem to know that the subject matter of this trial was an accusation that Snyder had molested Aviva. If Snyder's character witnesses are to be believed, Snyder has enjoyed a good reputation in the community consistently during all of the last twenty years or more. None of the witnesses to Snyder's good character offered any evidence that Snyder's reputation ever suffered in any way, and they certainly offered no support for the proposition that his reputation was injured by anything having to do with Aviva or with statements about sexual conduct with Aviva. There is simply no credible evidence that Snyder's reputation had been damaged by any statements or conduct of Cedar or Vincent.

The evidence is that Diane LaPaglia is the only person to whom Cedar published, in a non-privileged context, the accusation that Snyder had molested Aviva. Diane LaPaglia was not sure at first whether to believe it, but satisfied herself within weeks thereafter that it was untrue. That being so, there is evidence to support an injury to Snyder's reputation with LaPaglia for that brief period of time in which LaPaglia harbored doubts about whether the accusation might be true. As for the publication to Susan Jacobs, even if that publication had occurred in a non-privileged context, it created no injury to Snyder. Jacobs, after all, had already reviewed the contents of the restraining order application of April 1997, in which the claim was made that there was a suspicion of sexual contact between Snyder and Aviva. Jacobs already knew of the two-year-long estrangement of father and daughter. Jacobs had already been fully briefed by Snyder about the ongoing disputes with Cedar and the ongoing rift with Aviva. Jacobs did not believe that Snyder

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))

was a child molester, either before or after the statement by Cedar in October 1999. Snyder suffered no actual injury to his reputation as a result of Cedar's statement to Jacobs.

*23 The evidence is that Vincent published his opinion about Snyder in the presence of LaPaglia, Rachel, and Rachel's therapist. Even if Vincent's publication had been a statement of fact rather than of opinion, there was no actual injury to Snyder from this statement. LaPaglia testified inconsistently about her reaction to Vincent's statement; but the better evidence allows the court to infer that by the time of the therapy session in December 1999, LaPaglia no longer believed that Snyder had molested Aviva and did not give any credence to Vincent's statement. There is insufficient credible evidence that Rachel Vincent, who was 12 at the time, understood Vincent's statement or attached any negative significance to it.[FN14] There is no evidence that Harlie Kesten, the therapist, understood the statement or knew the name of the person referred to or even heard the statement when it was made. There was no actual injury to Snyder's reputation as a result of Vincent's statement.

> FN14. Rachel Vincent's demeanor on the witness stand reflected such extreme animosity toward Cedar and Vincent that it affected the credibility of her testimony. The court does not believe that she had any recollection of the events about which she testified, so that the court gives no weight to her testimony.

Snyder has also offered evidence that he was overwhelmed by feelings of depression, sadness, fear, and desperation from the time the allegations surfaced in April 1997 up to the present day. He claims that these feelings are the result of the defamation of Cedar and Vincent and of their attempt to inflict emotional distress upon him. The court credits Snyder's testimony that he was fearful of arrest between the time of Aviva's police report on April 29, until May 14, 1997, the day on which all parties acknowledged that the agencies involved in

investigating the charges determined them to be unfounded.

Thereafter the evidence suggests that Snyder became consumed not so much with clearing his name but rather with winning the battle for Aviva. The distress he felt was mostly attributable to his inability to convince anyone that Cedar was a seriously disturbed unfit mother and that he was the better custodial parent for Aviva. While he felt a sense of failure over the breakdown in his relationship with Aviva, that was not a breakdown for which Cedar bears responsibility.

Cedar points out that Snyder never sought treatment for the distress he was feeling, and so the distress could not have been severe, certainly not severe enough to qualify under the standards of the intentional infliction of emotional distress tort. However it is not necessary for one to completely decompensate emotionally or for one to seek psychiatric treatment in order to prove that one's emotional distress is severe.

The distress Snyder may have been feeling did not come from Snyder's knowledge that Cedar had made statements to LaPaglia or to Jacobs about him, nor from Snyder's belief that Cedar had convinced Aviva to lie about him. From the totality of the evidence, it is clear that the most pervasive emotion felt by Snyder during the relevant time periods was not emotional distress or embarrassment or depression caused by Cedar's or Vincent's alleged statements or alleged actions. Rather Snyder was overwhelmed by a quest for vengeance, toward Aviva for aligning herself with Cedar, toward Cedar for "winning" Aviva, and toward Vincent for associating with Cedar and Aviva.

SNYDER'S DAMAGES

*24 Although there is no credible evidence that Snyder suffered any actual injury to his reputation in the community, it is true that Diane LaPaglia, for a short period of time after her December 1999

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)
**(Cite as: Not Reported in A.2d, 2006 WL 539130 (Conn.Super.))**

phone conversation with Cedar, was left with the impression that Snyder molested Aviva.[FN15] Within the same month after first hearing this claim, LaPaglia no longer believed it to be true. In fact after the phone conversation with Cedar and close in time to the therapy session with Vincent, LaPaglia had satisfied herself that the accusation was false, so much so that she sent Snyder a Christmas card along with a picture of herself and her children.

> FN15. This is unlike any such damage analysis were the court to determine that Cedar's statement to Susan Jacobs was unprivileged. Susan Jacobs never believed that the statement was true, so that any damages assessed would be nominal.

Snyder has proved common-law slander under Count One and slander per se under Count Two against Deborah Cedar, as a result of Cedar's statement to LaPaglia. In assessing damages, the court finds that Daniel Snyder is entitled to $200, assessed against Deborah Cedar, as full and fair compensation, as to Count One; and for nominal damages of $1.00 as to Count Two. Snyder has failed to prove malice and accordingly no punitive damages are awarded against Vincent or Cedar on any of the counts. The court awards no equitable relief.

The court finds the issues for Edwin Vincent, Jr., and against Daniel Snyder under Counts One, Two, and Three. The court finds the issues for Deborah Cedar and against Daniel Snyder under Count Three.

Conn.Super.,2006.
Snyder v. Cedar
Not Reported in A.2d, 2006 WL 539130 (Conn.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.