UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - x
                              :
JAMES VAN DE VELDE            :   No. 3:01CV2296(RNC)
                              :
            Plaintiff,        :
                              :
        vs                    :
                              :
MELVIN WEARING                :
                              :   HARTFORD, CONNECTICUT
            Defendant.        :   JANUARY 13, 2010
                              :
- - - - - - - - - - - - - - - x



MOTIONS HEARING



    BEFORE:

        HON. ROBERT N. CHATIGNY, U.S.D.J.




                            Darlene A. Warner, RDR-CRR
                            Official Court Reporter

```
1    APPEARANCES:

2

3         FOR THE PLAINTIFF:

4              JACOBS, GRUDBERG, BELT, DOW & KATZ
                    350 Orange Street
5                   P.O. Box 606
                    New Haven, Connecticut 06503-0606
6              BY:  DAVID T. GRUDBERG, ESQ.

7              JAMES J. MEYERSON, ESQ.
                    396 Broadway
8                   Suite 601
                    New York, NY 10013
9              BY:  JAMES I. MEYERSON, ESQ.

10

11        FOR THE DEFENDANT:

12             WIGGIN & DANA
                    265 Church Streetd
13                  P.O. Box 1832
                    New Haven, Connecticut 06510
14             BY:  AARON S. BAYER, ESQ.
                    RACHEL LEBEJKO PRIESTER, ESQ.

15             HALLORAN & SAGE
                    315 Post Road West
16                  Westport, Connecticut 06880
               BY:  ROBERT AVERY RHODES, ESQ.
17

18

19

20

21

22

23

24

25
```

1                            10:00 A.M.

2

3              THE COURT:  Good morning.  We're here for oral

4     argument on the pending motions.  Thank you for coming in

5     this morning.  Would you please state your appearances.

6              MR. GRUDBERG:  For the plaintiff, Your Honor,

7     David Grudberg.  With me is co-counsel James Meyerson and

8     the plaintiff, Mr. Van De Velde.

9              THE COURT:  Good morning.

10              MR. BAYER:  Aaron Bayer on behalf of Yale

11     University.  With me is Rachel Priester also for Yale.

12              MR. RHODES:  Your Honor, Robert Rhodes

13     representing the New Haven defendants, Melvin Wearing,

14     Brian Sullivan, Thomas Trocchio, Edward Kendall and the

15     Estate of Anthony DiLullo.

16              THE COURT:  Thank you very much.  Good morning.

17              Have you talked about how you would like to

18     proceed on the defense side?

19              MR. BAYER:  We are right now.

20              THE COURT:  Okay.

21              MR. BAYER:  I think I'll take the lead, but I'll

22     make sure that Mr. Rhodes has an opportunity to speak on

23     behalf of the New Haven defendants.

24              THE COURT:  That's fine.

25              Mr. Bayer, you're welcome to argue from where

1      you are now or your option is to use the lectern,

2      whichever is best for you.

3              MR. BAYER:  What's your preference?

4              THE COURT:  Honestly my preference is whatever

5      is best for you, and you're welcome to proceed.

6              MR. BAYER:  I guess I'll go up to the lectern.

7      I'm used to arguing in appellate courts, and it's a

8      comfortable place to be.

9              Your Honor, Yale filed this motion to dismiss

10     the Yale defendants in response to the second amended

11     complaint but in reality there are few changes in that

12     complaint from the first complaint and none of consequence

13     with respect to Your Honor's earlier ruling.  The

14     plaintiff's papers acknowledge as much, essentially asking

15     the Court to reverse its prior ruling not based on new

16     facts alleged but on the arguments that were previously

17     made and are reasserted in respect to this complaint.

18              We maintain that Your Honor's ruling is correct

19     in the first instance and that nothing has changed that

20     would warrant departing from the dismissal of the claims,

21     including the state law claims.

22              There are a large number of claims presented by

23     the plaintiff here, but the second amended complaint does

24     not plead sufficient facts to meet the clear requirements

25     of any one of those causes of action.  Nor at the end of

1    the day -- and I guess I'll start with this point, Your

2    Honor, on behalf of the Yale defendants -- it conveys the

3    misfortunes that have befallen the plaintiff with which we

4    are sympathetic, but it does not convey wrongdoing or

5    unreasonable conduct by Yale under the circumstances.

6         Really the case against Yale comes down to the

7    acknowledgment, the public acknowledgment in its

8    January 11th, 1999 statement that Mr. Van De Velde was a

9    suspect.  But the facts pleaded by the complaint really

10   underscore the reasonableness of Yale's conduct under very

11   difficult circumstances.

12        If you read paragraphs 91, 92 and 97 of the

13   complaint, which are the paragraphs that real inform and

14   around that action, it's clear from the pleadings that

15   Yale had been told by the New Haven police that the police

16   considered Mr. Van De Velde to be a suspect.  It's clear

17   that they had been thinking for several weeks about what

18   to do in light of that piece of information with respect

19   to his classes coming up in the spring semester.  They

20   also knew from the New Haven police that the police

21   intended to question Yale students and perhaps others

22   about Mr. Van De Velde.  And that they had to make a

23   decision about whether to cancel his classes.

24        This case and this Court has no role in

25   evaluating the decision on whether to cancel a faculty

1     member's classes.  It's a hard decision, but its based on

2     educational and institutional concerns.  And under the

3     circumstances given the distractions that were cited in

4     the complaint that were anticipated, it's a reasonable

5     decision for Yale to have done.

6              In response to questions and inquiries about the

7     cancellation of his classes, Yale issued the January 11

8     statement.  I'm virtually reciting from the complaint

9     here.  And if you look at that statement, it's clear that

10    Yale endeavored to protect its constituencies in the

11    university without unduly or unnecessarily impugning

12    Mr. Van De Velde who was and remained at the time one of

13    its faculty members.

14              University canceled the classes but made clear

15    in its statement that he remained a faculty member; that

16    his appointment had not been changed; that he continued to

17    hold the same rank; that he would continue to do research

18    on scholarly projects; it specifically said it presumed

19    Mr. Van De Velde to be innocent of any wrongdoing; and

20    that in light of the fact that the police had informed

21    Yale that he was a suspect and there would be questioning,

22    there would be distractions and it made the most sense to

23    cancel his classes.

24              All of those statements were true.  They reflect

25    an effort to be balanced at an extraordinarily difficult

1    time.  And none of that suggests that Yale could have done

2    something dramatically different or better.

3              All of Yale's subsequent actions that are

4    recounted in the complaint are consistent with Yale's

5    statement in that January 11th release which said that

6    they presumed him to be innocent, there was an ongoing

7    investigation, it identified him not as a suspect in that

8    statement, it identified him as one in a pool of suspects

9    because that's what they had been told by the New Haven

10   Police Department.  And in subsequent actions, all of them

11   confirmed that posture.

12             There's nothing -- they never said in their

13   public statements he was a prime or leading suspect.  And

14   everything that unfolded thereafter, other than the fact

15   that no one else was identified, nothing suggests that

16   they believed him to have committed the crime or that they

17   communicated that in any way to the public.

18             They continued to refer to him as one in a pool

19   of suspects.  They held press conferences in which they

20   solicited support from the public, as did the New Haven

21   defendants.  They increased reward money for additional

22   evidence.  All of these actions bespeak an ongoing

23   investigation that is for a crime that remained unsolved.

24             So really the case comes down to the initial

25   recognition of something that was a true statement, that

1    he was in fact considered by the New Haven police to be

2    one in a pool of suspects.

3            The plaintiff's case at the end of the day,

4    regardless of what cause of action we're referring to,

5    comes down to an effort to hold law enforcement officials

6    liable for communicating truthfully to the public in

7    identifying someone as a suspect.  They identify no case

8    that has so held.

9            Their papers also identify no case that has ever

10   held law enforcement officials liable for not identifying

11   all suspects if you identify one or two and no case

12   holding law enforcement officials liable for failing to

13   exonerate someone who was named as a suspect while there

14   is an ongoing criminal investigation for a crime that

15   hasn't been solved.

16           So even if we were to assume that the complaint

17   satisfies the pleading standards under Rule 8 and Iqbal,

18   which it does not, there would be no question, but that

19   all of these defendants would be entitled to qualified

20   immunity because you'd have to break new ground and make

21   new law in order to find that these causes of action can

22   go forward.

23           And that leaves the state law claims, and I'm

24   happy to go through these claims one by one, but I'll

25   just -- I'm briefly giving you an overview, Your Honor.

1           The state law claims simply don't meet the

2     pleading requirements under Connecticut law for those

3     claims.  For false light invasion of privacy, there must

4     be a false statement and there must be malice.  I think my

5     introductory comments should clearly address whether

6     there's malice on the part of Yale defendants.  I think

7     the opposite is true, even reading the complaint in the

8     light most favorable to the plaintiff.  And there's no

9     false statement, which is actually a very, very critical

10    point here.

11          Whether he should have been a suspect in light

12    of later evidence or not, he was a suspect at the time he

13    was identified.  What Yale stated was truthful and that

14    does not meet the pleading requirements for false light

15    invasion of privacy claim.

16          Similarly there are a number of requirements for

17    intentional infliction of emotional distress, but the most

18    obvious one that the complaint fails to meet here is that

19    there has to be extreme and outrageous conduct.  If you

20    look at the kinds of cases where -- that have held that

21    that standard is met, it's conduct beyond anything

22    tolerable in a civilized society, it's an extraordinarily

23    high threshold.  And the conduct of the Yale defendants

24    simply identifying someone as a suspect in response to

25    questions about canceling his classes in those difficult

1    circumstances doesn't even come close.  Doesn't even come

2    close to extreme and outrageous conduct.

3          So these are claims that are either new, meaning

4    there would have to be created from whole cloth and under

5    new standards, or they simply don't meet existing

6    standards of law by state law.

7          I'm going to pause here just to make sure Your

8    Honor doesn't have initial questions before I just run

9    through the causes of action briefly.

10          THE COURT:  That's fine.

11          MR. BAYER:  I'm going to go through -- quickly

12   go through the federal and state claims and then talk to a

13   few of the points that I think the plaintiff has raised in

14   his briefing.

15          On procedural due process or the stigma plus

16   claim, this is an interesting area of law but it does have

17   very stringent requirements.  These are not sort of

18   run-of-the-mill type of claims in federal law.  They

19   require a false statement that injures reputation

20   connected to a plus, which is some tangible alteration of

21   legal rights.  And it has to be connected to a false

22   statement that impugns reputation.  It can't be something

23   that's disconnected, it can't be something that the

24   defendant did not do, and it can't be something that flows

25   from reputational harm alone, otherwise it doesn't rise to

1    the level of a protected constitutional interest.

2         These requirements simply aren't met on these

3    pleadings.  There is no false statement here.  What Yale

4    said is true.  He was considered one in a pool of

5    suspects.  That's what they were told.  That's what they

6    reported.

7         Yale did not convey that he had committed this

8    crime or that he was the only suspect.  Its statements

9    said the opposite in fact.  Yale repeatedly emphasized

10   that the crime wasn't solved, there were multiple

11   suspects, they were looking for help in the investigation.

12   All of this suggested an unsolved crime and that he was

13   simply one suspect in a pool.  As I said in my opening

14   remarks, the January 11th statement really did the

15   opposite of that.

16        So this doesn't come close to the prime

17   requirement under Second Circuit law that there be a false

18   statement.  Smith v. Garretto, which is a Second Circuit

19   case in which a prosecutor had basically framed a

20   plaintiff on criminal charges and then notified the media

21   about his arrest, said perhaps he shouldn't have been

22   arrested, but the statement that he was arrested is a true

23   statement so you don't have a claim under procedural due

24   process.

25        That's a far worse case on its facts than this

1    one, but in any event, the same principle is true here,

2    the statement that he was in fact considered one in a pool

3    of suspects was a true statement.

4            Same thing on the alteration of legal rights,

5    the plus side of the equation.  Here you cannot have harm

6    that simply flows from reputational harm.  Under Siegert

7    v. Gilley, a supreme court case, that principle is well

8    established.  There was a defamatory letter that was

9    written to the army and resulted in the loss of military

10   credentials for the plaintiff.  And they said, well, that

11   really just flows from reputational harm.  Here it's the

12   same thing.  To the extent there's a protected interest.

13   And there is not a protected interest, a protected

14   property interest in plaintiff's job status with the naval

15   reserves, there's no right to that, there's no right to a

16   security clearance.  It's harm that he incurred, but it's

17   harm that flowed from general reputational harm and not

18   from actions that these defendants took.

19           These defendants, unlike, for example, Velez v.

20   Levy, which is one of the cases the plaintiff relies upon,

21   the Yale defendants and the New Haven defendants didn't

22   call and say, cancel the security clearance based on these

23   statements we made.  In Velez that's exactly what happens.

24   The board members who were seeking to oust -- it's

25   horrible facts in Velez, but they're seeking to oust a

1    board member essentially for no reason but they actually

2    call upon -- they falsely accuse the board member of

3    criminal activity and then specifically ask the chancellor

4    to investigate and remove the plaintiff from her position

5    and the chancellor does exactly that.

6         So the connection, the conduct by the defendants

7    with the stigmatizing action and the loss of rights is

8    clear.  In fact, the court -- the Second Circuit says the

9    board members publicized highly stigmatizing statements

10   explicitly requesting a removal by chancellor Levy and

11   then the chancellor removes her based on those statements.

12   The board members imposed a stigma and they asked for a

13   plus, and the chancellor against the backdrop and based

14   upon the board members' statements imposed the very plus

15   requested by the board members thereby adopting the

16   stigma.

17         So the connection there between the statements,

18   even assuming they were false, and the plus, simply is

19   there in a case like Velez v. Levy and is not there in our

20   case.

21         Same is true in Hatfill v. Ashcroft, which is

22   another case the plaintiff relies upon where there's

23   vastly more connection between the defendant's conduct and

24   the harm that befalls the plaintiff there.  I mean this is

25   a case in which the attorney general in the United States

1    went on the air to make statements about Mr. Hatfill, but

2    the justice department not only made the statements but

3    actually calls up, they contact the plaintiff's employer,

4    Louisiana State University and says don't let that guy

5    work on any research that's federally funded, which is of

6    course the work that the plaintiff did.  So he loses his

7    job.

8           So that kind of connection simply isn't there

9    based on these pleadings, and the pleadings therefore

10    don't satisfy the elements for a procedural due process

11    claim.

12           Substantive due process is probably even

13    clearer.  It is limited to a handful of very fundamental

14    liberty interests that tend to be very private:  The right

15    to marry, contraception.  As the Second Circuit made clear

16    in Benzman v. Whitman, expansion of the liberty interests

17    that are protected is disfavored.

18           The second element here in addition to having no

19    fundamental liberty interest, Your Honor, is that there is

20    no conduct that is so extreme that it shocks the

21    conscience.  I made my opening comments about what the

22    Yale defendants did to show its reasonableness, but this

23    certainly doesn't rise to the level that shocks the

24    conscience.

25           To talk about a few of the cases that you might

1    think it would rise to that level, in Benzman v. Whitman,

2    the claim was that federal officials knowingly lied to the

3    public and told them it was safe, the air was safe to

4    breathe around ground zero when it was not.  And the Court

5    doesn't even hesitate in saying that that's not conduct

6    that shocks the conscience.  Public officials have to deal

7    with competing considerations in deciding what to say to

8    the public and when to say it.

9           Well, that's certainly true here as well.  This

10   is identifying someone as a suspect when that in fact is

11   true.  And law enforcement officials who need to deal with

12   competing considerations when they do an investigation

13   certainly falls within the parameters of Benzman v.

14   Whitman.  This is not evidence of conduct that shocks the

15   conscience.

16          THE COURT:  Mr. Bayer, let me interrupt here and

17   ask you to address the plaintiff's characterization of

18   what occurred.

19          From the plaintiff's standpoint, the conduct of

20   the defendants was not reasonable and served no legitimate

21   interest.  In this regard, the plaintiff urges that Yale

22   did not merely acknowledge that he was one of a pool of

23   suspects, but collaborated with the police to, in essence,

24   manipulate public opinion by a series of steps that caused

25   the public reasonably to perceive him as the killer.

1           If we accept that construction of events as one

2     that a plaintiff is entitled to present and ask a Court to

3     consider, then where are you?

4           MR. BAYER:  Well, there are a number of

5     responses to that, Your Honor.  You have to look at what's

6     actually pleaded.  There's a kind of an overall pastiche

7     the plaintiff tries to draw.  But you have to look at

8     facts that are pleaded.

9           There are no allegations in this complaint that

10    Yale defendants actually said to the public that he was

11    the killer; that he was the prime suspect; that he was the

12    leading suspect.  There was an article in December of 1998

13    in the New Haven Register that just says unnamed sources

14    from Yale and New Haven said that there's a Yale professor

15    who is a leading suspect, which if you read the article

16    the defendants deny in the same article.  And then the

17    subsequent actions don't reinforce that impression, and

18    I'm referring to subsequent actions that are pleaded in

19    the complaint:  Their comments to the public, their

20    efforts to continue to find more out from the public,

21    their characterization of this as an unsolved case, their

22    characterization of this as a case in which they need to

23    increase reward money; they hired an investigator.  All of

24    this bespeaks actions that shout to the public not only do

25    we not know the killer or have a lead suspect but that

1    we're at odds, we're at a loss.  This is a case that is

2    open-ended and unsolved and we need help.

3         So both sets of defendants' actions are actually

4    inconsistent with the characterization the plaintiff tries

5    to draw.  And under Iqbal, when you have facts with

6    inferences drawn in the plaintiff's favor, when you have

7    facts that are consistent with liability but are also

8    consistent with no liability, consistent with illegal

9    conduct but consistent with an alternative explanation

10   that suggests legal conduct, that's insufficient.  That's

11   what Twombly and Iqbal hold.  And here you certainly have

12   facts as pleaded in this complaint which are consistent

13   with a legitimate law enforcement effort to investigate

14   and be fair and proceed forward.

15        The case -- the plaintiff's case is based upon

16   the notion that you can't identify a single suspect, and

17   to be honest with you, I am not a law enforcement

18   official.  I've had encounters with investigations when I

19   worked for the state.  And to say there are competing

20   considerations in any given investigation is obviously an

21   understatement.  But there may well be legitimate law

22   enforcement reasons for identifying no suspects, for

23   identifying one suspect, for identifying multiple or

24   identifying all of them.  And it may vary from case to

25   case and based on the circumstances and information that

1      the law enforcement officials have.

2              I mean, there may well be a case where there are

3      two leading suspects.  One is the one they are -- law

4      enforcement just really think is the one who most likely

5      did it, and they identify the other because they don't

6      want to identify and tip off the one who they want to

7      follow along.  There may be all sorts of competing

8      considerations.  But the courts have never, never

9      intervened and passed judgment and created a rule of law

10     where you're subject to constitutional liability for doing

11     nothing more than identifying someone as a suspect.  And

12     that is what happened here.

13             Now, it is true that the press reported that,

14     and because no others were identified, that it has

15     unfortunate consequences.  But the opposite suggestion,

16     that you have to identify all if you identify any is a

17     very, very troubling idea that no court has embraced.

18             THE COURT:  If you're going to identify

19     somebody, are you obliged to provide information that

20     helps put it in perspective?

21             For instance, here the plaintiff contends that

22     in branding the plaintiff as the lead suspect, in

23     cementing that image in the public mind, these defendants

24     failed to point out that they had essentially no evidence.

25             MR. BAYER:  Well, I've read that allegation,

1     Your Honor.  Two comments about that.

2             The allegation in the complaint that there's no

3     evidence is just inaccurate because the complaint has

4     evidence cited within the complaint itself.  Whether it's

5     strong enough evidence to identify someone as a suspect,

6     there is no legal standard as plaintiff's counsel points

7     out.  Suspect does not mean you did it.  In fact, the

8     definitional -- the definition of a suspect means you

9     suspect without sufficient proof.  That's the nature of

10    what it means to be a suspect.  You're part of an

11    investigation.

12            But certainly this is someone who, according to

13    the complaint, was the victim's teacher, was the victim's

14    thesis adviser, lived in the vicinity where the body was

15    found, spoke to her on the day of the murder.  Those are

16    not facts on which you can convict somebody or arrest

17    somebody, but they certainly are evidence that would lead

18    the police to think of this person as a suspect and

19    someone they needed to investigate.

20            At the stage when he is identified and classes

21    are canceled, that is evidence.  There is no

22    constitutional claim, no court has found a constitutional

23    claim or state law claim, for that matter, that says we're

24    going to look and substitute or judgment in retrospect for

25    the law enforcement officer's judgment about whether that

1    was sufficient evidence to identify someone as a suspect.

2    That would be breaking wholly new ground that would have

3    serious public policy limitation to law enforcement.

4            THE COURT:  Did the defendants have anything

5    else to support suspicion of the plaintiff besides the

6    facts you just recited?

7            MR. BAYER:  Those are the facts that are in the

8    complaint.  And this is a motion to dismiss the complaint.

9    Those are the facts that are identified in the complaint.

10   And to consider someone a suspect, that is more than

11   ample.

12           I mean, it would be almost inconceivable on

13   those facts if the police were not investigating Mr. Van

14   De Velde.  And in fact, there is not even a claim, I don't

15   believe, that law enforcement did anything wrong by

16   investigating.

17           The only claim is that by making his name public

18   without making the names of other suspects public, they

19   have somehow violated constitutional principles.  And

20   there is no case law to support that, Your Honor.

21           THE COURT:  I understand that to be one of the

22   claims and I know that that is relevant to all of the

23   claims, but I take it that the plaintiff, as a first

24   principle, would urge that nobody should be disclosed as a

25   suspect unless there is some legitimate interest to be

1    served and the facts known to the authorities support the

2    intrusion on the interests of the individual who is going

3    to be named as a suspect because they provide some

4    objective basis for, let's say, reasonable suspicion.

5            MR. BAYER:  I think there is no case law to

6    support the notion that you can look and say there's a

7    standard by which -- an evidentiary basis by which you

8    identify someone as a suspect.  And to the extent there is

9    one, it would have to be an extraordinarily low threshold.

10   Because usually in law enforcement investigations,

11   particularly with a murder investigation, they're going to

12   cast a wide net and consider people as suspect and worthy

13   of investigation if there's any evidence that suggests it

14   might be fruitful to investigate further.

15           Certainly the facts that are identified in this

16   complaint would be sufficient to meet the kind of

17   threshold standard, if there were a threshold standard in

18   the law, that would subject law enforcement officials to

19   liability, this certainly would meet it.  There is none

20   under existing case law, but certainly those facts would

21   be sufficient to at least allow the police to consider

22   someone a suspect and investigate.

23           The decision about whether to speak publicly

24   though, there's no case law where the courts say when you

25   can and can't speak to the public, particularly if you're

1   making truthful statements.

2          THE COURT:  We discussed this case in terms of

3   making public statements as if the chief of police had

4   gone before an anxious public and given a statement.  Here

5   we're dealing with leaks.  We're dealing with unidentified

6   sources.  Am I correct?

7          MR. BAYER:  There is one article that quotes

8   unidentified sources saying there is a Yale professor who

9   is a lead suspect.  As I said, the same story has the

10  defendants denying that, but the actual public statements

11  confirming that for the Yale defendants are exactly what

12  you described initially.  It's not the chief of police

13  going before an anxious public, it's the spokesperson for

14  the university issuing a very carefully worded statement

15  to an anxious university community, students, faculty and

16  staff.  It is the equivalent of that.

17         THE COURT:  It may be helpful to focus not on

18  Yale's press release of January 11, but on Yale's alleged

19  complicity in the collaborative effort to leak to the

20  press information that would cause the public to think

21  that they had their man.

22         So going back to that initial phase of the case,

23  did Yale have any legal duty toward the plaintiff to

24  refrain from engaging in that kind of thing?

25         MR. BAYER:  No, Your Honor.  I know of no legal

1       obligation in that respect.  And quite honestly, if in

2       fact as a matter of law there's no constitutional

3       liability that can be imposed based on an acknowledged

4       public disclosure of someone as a suspect, which is the

5       law, I don't see how there could be a constitutional

6       liability imposed on someone because they made a comment

7       off the record to a reporter of the same information.

8              Now, if for example they said off the record,

9       this is the killer, our investigation is over, we need not

10      do anything further, that might be a somewhat different

11      case, but that's not what's recorded.  And in fact, all of

12      the subsequent public statements and actions bespeak the

13      opposite.  So I don't think you have that situation here.

14      And again, I don't know of any legal obligation.

15             I do acknowledge that the Yale Police Department

16      and the New Haven Police Department coordinated.  They

17      coordinate frequently on criminal activity in New Haven

18      and on criminal investigations.  There's nothing nefarious

19      about that.

20             THE COURT:  What do you say to the plaintiff's

21      claim that Yale was motivated to do this because it was

22      concerned about its image?

23             MR. BAYER:  Well, I guess my answer to that is

24      during any investigation I would suggest that any law

25      enforcement officials are always anxious to show progress

1   in an investigation.  I think that shows very little.  And

2   any institution is always interested in trying to preserve

3   and protect its image.  But did they engage in conduct

4   that would allow the imposition of liability under federal

5   or state law, the answer is no.  Acknowledging that

6   someone that is in a pool of suspects is not conduct that

7   rises to that level.

8          And moreover, an allegation that an institution

9   desired to show progress and protect its image is -- could

10  be consistent with an allegation that they did something

11  wrong, but it also can be equally consistent with the

12  allegation that they did nothing wrong.  In other words,

13  there's no conclusion you could draw from that.

14         They might well have said, gee, we're worried

15  about our image and we feel we need to communicate with

16  our constituents in the university community because we're

17  going to need to cancel the classes.

18         And again, under Iqbal and Twombly, pleadings

19  that are consistent are inadequate.  You have do to more

20  than that.  It can't be something that's either/or, and

21  here, quite honestly, it's not an either/or.  I think if

22  you look at the sum total of the conduct Yale engaged in,

23  it's vastly more consistent with reasonable efforts to

24  communicate with their constituencies without

25  unnecessarily impugning Mr. Van De Velde.

1          Obviously he's impugned by the fact that he's

2     been identified.  But at the time they get those

3     inquiries, they realistically had little choice.  And

4     again, I don't -- I don't want to be -- I don't want to

5     appear to be unsympathetic to the circumstances or hyper

6     technical, but we're not talking about a free-floating

7     inquiry here about whether this course of action is more

8     reasonable than this course of action in retrospect 10

9     years after the events, we're talking about whether under

10    the pleading requirements for the various causes of action

11    that have been pleaded they meet the -- the complaint

12    meets those standards.  And quite honestly what you and I

13    are discussing is really, I think, a public policy

14    argument about what is the best way, the best and fairest

15    and most reasonable way to conduct investigations in

16    extraordinary circumstances, not whether these officials

17    can be held to have violated constitutional standards.

18          THE COURT:  I think I understand what you're

19    saying and I believe I recognize that there is much truth

20    in what you say, but one might respond:  Isn't this a

21    concern of the court under a common law system where the

22    law develops incrementally in response to the facts of

23    each case?  And here if you accept the plaintiff's

24    allegations, we have a set of facts that are troubling,

25    and we all acknowledge that they're troubling, including

1    the defendants.

2            I mean, I gather that the defendants, if they

3    had it to do all over again, wouldn't do it the same way.

4    That's no great concession.  I mean, it's no admission of

5    legal fault.  But I gather that this would not be held out

6    as a model of good practice.

7            MR. BAYER:  You know, maybe, Your Honor.  I'm

8    not so sure about that to be honest with that.  Faced with

9    the facts that Yale faced, not acknowledging something

10   that they knew at the time they canceled his classes would

11   have been extraordinarily difficult and presented a whole

12   different set of problems and concerns.

13           But your comment that the law develops

14   incrementally based on facts, well, certainly that is

15   true, both the constitutional adjudication and other kinds

16   of adjudication.  But the leap here from existing law to

17   finding these to be valid claims is not incremental, it's

18   a wholesale leap for every one of those causes of action.

19           I mean, suspects are identified publicly all the

20   time.  You're talking about a precedent that would

21   radically change the law.  And with bad consequences.

22   Sometimes it's right and the person turns out to be

23   arrested and indicted and convicted, but often not.

24           There are people identified in Amber Alerts as

25   the person last seen with the child, and the implication

1    that it's a child molester or a kidnapper, and it turns

2    out to be a wholly innocent situation.  But that person's

3    name and face is plastered everywhere.  But we do not

4    impose liability on public officials for statements that

5    are made to the public in the course of investigation that

6    are truthful.

7              With due respect, this is not -- this would not

8    be an incremental change this.  This would be a dramatic

9    and wholesale change in the law.

10             On the federal claims, definitionally, that

11   means qualified immunity applies.  I won't go through the

12   case law.  You know the case law as well as I do.

13   Definitionally it does not apply.

14             And the state law claims have actually

15   extraordinarily stringent requirements under Connecticut

16   law and they're not met here.  I'm happy to go through

17   those.  And it's important to understand that these are

18   not incremental changes in the law that the plaintiffs are

19   seeking.

20             I mean, some of them are obvious.  I mean, there

21   is no such thing as name seizure under the Fourth

22   Amendment.  These are really new, new types of claims.

23   But even under procedural due process, substantive due

24   process, equal protection, those are all well-established

25   constitutional causes of action with elements that are not

1    met here.

2           We haven't talked about the protection claim,

3    but one of the more disturbing things about that is if

4    that is a cause of action where there is an ongoing

5    criminal investigation, if that is a legitimate claim, a

6    class of one claim, it leads to what you're talking about.

7    It leads to a rule of law that you can never identify one

8    suspect without identifying all of them, because anyone,

9    particularly during an investigation that is unsolved and

10   is ongoing, anyone could file a suit and make an equal

11   protection claim on the basis that, how do I know there

12   isn't somebody else in the same situation.

13          And then what do you do?  I mean, I'll allow

14   Mr. Rhodes to speak on behalf of New Haven police who

15   really, I think, have the file, if you will, more than the

16   Yale defendants.  But the police are going to open up

17   their investigative file in an ongoing investigation to a

18   civil plaintiff and say, here's the evidence against --

19   here's what we've got on each of these potential suspects

20   for you to weigh and evaluate to keep an equal protection

21   claim alive and compromise our investigation?  That's

22   never going to happen and shouldn't happen.

23          Equal protection claims are -- have an

24   extraordinarily high standard for this kind of case and

25   it's for a good reason.  There has to be no rational

1    basis, which is really there's no conceivable basis for

2    the conduct.  And that standard just isn't met on these

3    pleadings.

4            THE COURT:  Perhaps I'm overstating the

5    plaintiff's argument, but the plaintiff appears to be

6    suggesting that it wouldn't be a great leap to hold

7    officials liable in a situation where they publicly

8    identify a person as a lead suspect in a heinous crime

9    with no supporting evidence, that is no objective indicia

10   of guilt.

11           MR. BAYER:  I mean, I guess we're talking about

12   two different things here.

13           I think the identification of a suspect would

14   not require evidence sufficient to, let alone convict,

15   indicia of guilt sufficient to convict, or indict, or even

16   arrest.  You're talking about a much lower threshold than

17   that.  And the evidence that's pleaded in the complaint

18   certainly is sufficient to identify someone as a suspect.

19           So I think I think I disagree with the fact in

20   the construction of a claim and the facts here.  And I

21   guess I would have to ask you, Your Honor, when you say

22   that would be sufficient for liability, I would ask you on

23   what cause of action you think that might be sufficient

24   for the identification of a suspect?

25           I just don't think it meets -- each cause of

1    action actually has standards that are well established in

2    the law.  I've talked about procedural due process and

3    substantive due process.  I've touched on equal

4    protection.  There isn't a Fourth Amendment claim here.

5    They're all voluntary searches.  There is no seizure here.

6         THE COURT:  Please don't read too much into this

7    question, but let's take a hypothetical scenario:  You

8    have a university that is concerned that a student has

9    been murdered and you're worried that as a result of this

10   terrible event, serious harm can befall your university.

11   You want the public to know that real progress is being

12   made in the investigation.  This is not a place where

13   people need to be concerned about their safety.  We have

14   law and order and we have an effective police force and

15   that's the message that we urgently want to convey.

16         Looking at the situation we see that this victim

17   had a relationship with a person who teaches here.  This

18   teacher apparently was among the last people to see her or

19   communicate with her, and her body was found a half a mile

20   from his house.  These facts give rise to a suspicion and

21   we want to be careful not to cause this teacher undue

22   harm, so we'll simply say that he is one of a pool of

23   suspects, and that will make it appear that we are making

24   progress here and in all likelihood the consequences to

25   him will be severe.  But under the law, we don't really

1    need to care about that because the district court

2    recently held in the Van De Velde case that we don't need

3    to be.  We can say he's one of a -- one of a pool of

4    suspects and that's life.

5            Is that what I should be saying?

6            MR. BAYER:  Well, I'm not sure I'd put it in

7    quite those words, but a lot of what you've said, Your

8    Honor, much of what you've said, is conduct that is

9    perfectly consistent with legitimate activity and would

10   not give rise to any of these causes of action.

11           When you say there's reasonable suspicion that

12   based on those facts to investigate, to consider someone a

13   suspect, and you say, we'll say that he's one of a pool of

14   suspects, well, let's just be clear what's alleged here.

15   It's not that they made that up.  That is what they were

16   told by the police.  So that statement is not an

17   untruthful statement.  It's a question of whether you say

18   something that is true, when you have a reason to say it,

19   when you speak to your public, does that give rise to

20   constitutional liability?  The answer is no.

21           And it is true that that is troubling in certain

22   ways for the person who's identified, there's no question

23   about that.  But the opposite rule of law where the courts

24   say when you can and cannot speak to the public about an

25   ongoing law enforcement investigation, where communicating

1    with the public is one of the tools in the arsenal of law

2    enforcement officials to do an investigation, has very

3    serious consequences, and I think it's one of the reasons

4    no court has ever gone there.

5             And --

6             THE COURT:  Under the law -- I'm sorry, go

7    ahead.

8             MR. BAYER:  No, I shouldn't interrupt you.

9             THE COURT:  Under the law, in most fields, it

10   serves to remind people that they need to take the other's

11   interest into account and they can't just do what they

12   please regardless of the likely consequences for the

13   other.  Why should this be different?

14            MR. BAYER:  I don't think it is different.  It's

15   just a question of how that line is drawn in the case law.

16   And I think making truthful statements to the public about

17   an ongoing investigation has never been held to cross that

18   line and it shouldn't be held to cross that line.

19            And the notion that, you know, this is some

20   outrageous conduct here -- and if you look at the cases --

21   I mean, there are cases in which the conduct is just

22   vastly different.

23            If you look at the Hatfill case, if you look at

24   that Conradt case where they actually go in and defraud a

25   judge to get a warrant at the behest of a television show

1   producer to have dramatic footage, those are the kinds of

2   things where you say they have so trampled on someone's

3   rights.

4           That's hardly this case.  This is a case where

5   they canceled classes.  There's no allegations that they

6   shouldn't have canceled classes.  I can't imagine

7   liability on a private university for making an academic

8   decision of that nature.  There are inquiries about that

9   which you would anticipate.

10          What they say -- I mean, I would disagree with

11  your characterization that they disregarded someone's

12  rights entirely.  They actually could have just said, we

13  think this guy killed her.  We're canceling his classes

14  because of that.  They actually did the opposite.  They

15  went -- bent over backwards.  They did acknowledge

16  truthfully that the police consider him a suspect, that

17  they were going to be questioning people and it would be

18  distractive to students to have him continue with his

19  classes.

20          They didn't fire him.  They could have, I

21  suppose, but they didn't.  They retained him as a faculty

22  member.

23          They could have otherwise curtailed his ability

24  to be on campus, which would have more dramatically sent a

25  message.

1              They could have canceled his research projects.

2              They could have restricted his access to the

3       library.

4              They did none of that.  They just said we're

5       canceling classes because of the distractions that we

6       think will ensue, we've been told will ensue by

7       questioning.  We presume him to be innocent of any

8       wrongdoing.  We're keeping him as an faculty member.

9              I mean, honestly, the notion that this rises to

10      the level, even if that balancing were relevant to the

11      pleading requirements for any of these causes of action, I

12      think is not right.

13             I'm not sure what else they could have done

14      other than say nothing and explain nothing.  And as I say,

15      I see no legal requirement -- a requirement of silence

16      under those circumstances on campus.

17             THE COURT:  On that point, what else could they

18      have done?  I grant you we may now be once again having a

19      conversation about what the policy should be, but bear

20      with me.  In a situation like this, would it be better for

21      the university to give more information rather than less?

22      For instance, information about the plaintiff's

23      cooperation, a statement that there is no physical

24      evidence or objective evidence linking the plaintiff to

25      the crime?  In other words, a statement saying, this is

1    what we have.  He was her thesis adviser, he spoke to her

2    on X date and the body was found a half a mile from his

3    house.  That's it.  That's what we know.  You know that.

4    We don't think that that means he did it.  But it doesn't

5    exclude him as a suspect either.  Something like that.  Is

6    there a virtue in requiring that?

7            MR. BAYER:  You know, there may be, Your Honor.

8    It's hard for me to transport back to that time.  But you

9    know, you could have had a two-page statement instead of a

10   one-page statement that added a lot more facts.

11           But A, there's no pleading here that details

12   what they actually knew at that time;

13           And B, I don't know if it's better or worse, and

14   probably we wouldn't know until much later whether it

15   would have been better or worse.

16           And I don't know what impact, as a precedent.  I

17   mean, I try not to think of this exclusively in the terms

18   of this case, but as a legal principle.  As a legal

19   principle, I don't know what impact that has on law

20   enforcement investigations.  In identifying someone as a

21   person of interest, the police -- because you're talking

22   about a rule of law presumably that would apply to the New

23   Haven defendants and the Yale defendants and any law

24   enforcement officials -- if in order to make a suspect's

25   identity known to the public, you then have to give

1    basically all the information you've gathered so far in

2    your investigation.  There may be a world of reasons why

3    from a law enforcement officer's perspective that is not

4    an effective law enforcement technique.  There may be

5    reasons to say a lot, that it might be strategically

6    advantageous to do that.

7            Again, I'll circle back to your opening

8    comments, I think it's an interesting sort of public

9    policy question and moral question.  I don't think it's an

10   interesting legal question because I don't think the law

11   is anywhere near there.

12           THE COURT:  Okay.  Last thing:  Let's suppose

13   that you were in front of a jury in this case arguing

14   about the legitimate interests that were served by the

15   conduct -- and again I'm not focusing on the release of

16   January 11, but the allegations relating to the

17   collaborative effort before then and the leaks to the

18   press -- what legitimate interests would you cite to

19   persuade the jury that this was reasonable?

20           MR. BAYER:  You know, I'm not sure, Your Honor,

21   but I would certainly say that law enforcement officials,

22   when communicating with the public, should be able to tell

23   the public some information about what's going on in the

24   investigation.  And if there is a suspect who's being

25   questioned publicly and everyone's going to see that,

1    probably, there is a legitimate basis to speak truthfully

2    to the public.

3              But, Your Honor, I mean, the reason we go

4    through this stage of litigation is because you shouldn't

5    be litigating in front of a jury if you don't meet

6    threshold standards.  I mean, it's a very -- and it's not

7    just on federal cases.

8              For example, on the state law, intentional

9    infliction of emotional distress, not only is the standard

10   of outrageous and extreme conduct required, not only is

11   that required, but the court actually has to serve as a

12   buffer under Connecticut law and make a determination

13   first.  That's not something that can go to the jury

14   unless there's clear evidence of it.

15             So there's a reason why these standards are so

16   high, because these are claims against government

17   officials that should not be lightly allowed to proceed to

18   trial, to proceed to a jury where there obviously are

19   serious issues and serious sort of public policy and

20   emotional issues, but there's a reason why we have high

21   legal standards and high legal thresholds, and those

22   thresholds haven't been met here.

23             I'm happy to answer questions about any of the

24   individual causes of action.  I think I almost covered all

25   of them in responding to the questions, but if you have

1    questions, or hopefully I'll have an opportunity to

2    respond to Mr. Grudberg's comments.

3            THE COURT:  Thank you very much.

4            Mr. Rhodes?

5            MR. RHODES:  Yes, Your Honor.  I will keep my

6    comments brief because in drafting and filing our

7    memorandum of law as we made clear in the memo and as the

8    Court has surely taken notice, almost all of our memo

9    repeats the same arguments.  We've tailored them a little

10   bit to fit the claims against the New Haven defendants,

11   but I don't feel any need to reiterate everything Attorney

12   Bayer has said.

13           What I will talk about, Your Honor, is in terms

14   of the equal protection class of one case.  In preparing

15   for today's argument, I came across the Supreme Court

16   decision in the Engquist v. Oregon Department of

17   Agriculture case.  And what the Court said in that case

18   was that to have a class of one equal protection claim, a

19   plaintiff must allege that she was treated differently

20   from others similarly situated in all relevant respects;

21   two, that the defendants had no rational basis for the

22   differential treatment; and three, that the differential

23   treatment resulted from a non-discriminatory state action.

24           Now, in that case, Your Honor, that was in the

25   employment context.  The plaintiff was an employee of the

1    department who was subsequently terminated.  The

2    underlying facts really aren't relevant to what we're

3    talking about here, but in the court's decision, it did

4    not limit, specifically limit the use of that standard to

5    the employment context.

6         The idea behind it was that the Court determined

7    that you can't have an equal protection claim when you're

8    dealing with discretionary state action because it becomes

9    too cumbersome on the state actor.

10        And what's interesting in that case is the

11   example that they used, while it was an employment case,

12   the example or the illustration they used was in the

13   criminal context.  And the example that they used is a

14   traffic officer covering a speed trap.  One car is going

15   57 miles an hour but he doesn't pull him over.  Fifteen

16   minutes later another car traveling 57 miles per hour, he

17   pulls him over.  And what the court said in a situation

18   like that, but allowing an equal protection claim on the

19   ground that a ticket was given to one person and not

20   others, even if for no discernible or articulable reason,

21   would be incompatible with the discretion inherent in the

22   challenged action.  There is no proper challenge to what

23   in its nature is a subjective individualized decision that

24   it was subjective and individualized.

25        In this case, a criminal investigation is about

1    as a discretionary state action as you can have.  So there

2    are no rules.  There are no federal standards.  There are

3    no constitutional standards for how to conduct a criminal

4    investigation, when someone can be determined to be a

5    suspect, what is the sufficient evidence needed for

6    someone to be a suspect or for someone to be a lead

7    suspect in that case.  And there are no constitutional

8    standards as to when you can make a public statement to

9    the media identifying an individual as a suspect.

10                 THE COURT:  Should there be?

11                 MR. RHODES:  Looking at it -- look at that

12    question from another point of view:  How could you have a

13    standard?  Every case is different.

14                 In this case, you have a murder that occurred at

15    night, outside, in New England, in December, without eye

16    witnesses, without any kind of real physical evidence

17    because there isn't going to be much physical evidence

18    existing in that crime setting.

19                 So in a situation like that, what amounts to

20    someone being a suspect might have a lot less evidence or

21    information behind it as opposed to a situation where

22    someone is murdered in a building where there is a camera

23    monitoring the action, where there is plenty of physical

24    evidence, where you may even have eye witnesses.

25                 I mean cases, criminal cases, are so different,

1    how could you have a standard?

2              THE COURT:  Why is this different conceptually

3    from any aspect of law enforcement that is regulated by a

4    constitutional standard?  Whether it's reasonable

5    suspicion to support a search in the countless contexts in

6    which searches are made or probable cause for an arrest?

7              The whole idea behind a standard is to establish

8    some legal control over the conduct of the actor who is

9    not left free to do whatever he or she would wish to do

10   regardless of its impact on the legitimate interests of

11   others.

12             MR. RHODES:  Because, Your Honor, at the

13   investigatory stage -- you're talking about two different

14   stages of the criminal process.  At the investigatory

15   stage, there just is not that type of context out there

16   where you can have a legal standard.  I mean, you're

17   talking about investigating in terms of determining who

18   can we look at, who can be a suspect, who can we

19   interview?  How can you set a legal standard for that?

20             When you're talking about making an arrest,

21   something further down, you are talking about something

22   that you can have a regulated standard for.  But when

23   you're talking about something at the investigatory stage,

24   it's because it is at the investigatory stage that you

25   realistically cannot have any type of legitimate standard

1      for.

2                   THE COURT:  Well, I don't mean to get bogged

3      down in this, but is it the case that law enforcement

4      would have a court assume that no standard could be

5      formulated even by law enforcement authorities?  You know,

6      the National Association of District Attorneys or some

7      other reputable organization, if asked to formulate a

8      standard or regulation, would be helpless?

9                   The question is:  In what circumstances is it

10     appropriate for police to identify a person as a suspect

11     in a serious crime?  There is no conceivable regulation,

12     no objective standard, that law enforcement itself could

13     formulate to govern their conduct in that area?

14                  MR. RHODES:  I don't believe so because, Your

15     Honor, every case and every investigation is so different.

16                  In terms of a situation like this, you may have

17     one case where you do not need to go to the public and ask

18     for help or information because you have all the

19     information there.  You may have another case where there

20     is a need to reach out to the public through the media

21     because you don't have enough information.  There could be

22     a type of case where there's almost no public interest

23     thus no outcry by the public or by the media to give us

24     reports about the status of this case.  You may have

25     another case where there is a great deal of attention,

1    thus public pressures and media pressures almost dictate

2    that you provide the public with a status update on the

3    case.  I don't think you could come up with that standard.

4           And in thinking about it, when you get to civil

5    litigation in this case, Your Honor had asked Attorney

6    Bayer questions about, well, what type of evidence do you

7    need?  What type of evidence should be sufficient before

8    someone can be considered by the police a suspect?  I

9    mean, if you follow that through, in this case, if this

10   case continues on this path, you could have a situation

11   where in an open case, an ongoing criminal investigation,

12   we're here in a courtroom, in an open forum, where New

13   Haven's entire file of this ongoing investigation is

14   opened up, presented to a jury and a jury is going to be

15   asked a question, well, is there sufficient evidence or

16   information in this file where Mr. Van De Velde or anybody

17   else in this pool could have been considered a suspect or

18   should have been considered a suspect?  I just don't see

19   how that can happen in our system.  It jeopardizes the

20   underlying criminal investigation.

21          And Your Honor also asked questions about, well,

22   when you do make a press release, should you include this

23   type of information or that type of information?  Where do

24   you draw the line about that?  There may be information in

25   this case or in any other case that nobody knows about

1    except the police and they want to keep that information

2    confidential.

3            So even under Your Honor's scenario if they're

4    allowed to keep that information confidential, then a

5    plaintiff would still have an argument, well, you didn't

6    put in all the information about me.  Good or bad.  So

7    where does that line get drawn?

8            THE COURT:  To your knowledge, is there any

9    existing standard?  Are the people in the New Haven Police

10   Department instructed as to when and under what

11   circumstances they can identify a suspect to the press?

12           MR. RHODES:  I am not aware of any standard, but

13   I do know that a lot of police departments will -- any

14   discussions with the media interviews have to go through

15   the chief's office.  I believe that's the policy in New

16   Haven, but I don't know if that's a policy that is either

17   strictly adhered to or if it's a mandatory policy.

18           THE COURT:  It would seem that one policy might

19   be to refrain from identifying people as suspects except

20   when necessary to serve a legitimate interest, and

21   examples of circumstances in which identifying a person

22   might or might not be appropriate could be given.

23           I assume that the working principle is that you

24   don't identify somebody as a suspect except in unusual

25   circumstances.  Does that sound right to you?

1              MR. RHODES:  Well, Your Honor, there could be a

2      number of reasons why identifying a suspect might work to

3      the advantage of the investigating officers.  I don't know

4      in this case, because in the complaint there's just a

5      statement that, well, information about these interviews

6      could only come from one of the New Haven defendants.  So

7      our answer that has been filed in court is we did not leak

8      this information to the media.

9              I mean, obviously when asked about it, the chief

10      of police confirmed that the plaintiff was one of a pool

11      of suspects.  I mean, that alone is a statement to the

12      press that doesn't -- that rebuts any claim that he's the

13      one who did it, he's the only person we're focusing on.

14      They said Mr. Van De Velde was one of a pool of suspects.

15              Now, would it help Mr. Van De Velde by the chief

16      then identifying everyone else in that pool thus

17      inflicting potential injuries on all others?  Would that

18      lessen the impact on Mr. Van De Velde?  I don't know

19      because the decision's made by the Department of the Navy,

20      the Department of Defense.  They were not decisions made

21      by the New Haven defendants.

22              But this idea of if you release information

23      about Mr. Van De Velde and confirm -- because those are

24      the allegations of the complaint -- if you confirm that he

25      is a member of a pool of suspects, you are now bound to

1    identify all of the individuals in that pool and that once

2    you do that, then you have to identify the information

3    that is either inculpatory or exculpatory and then to what

4    degree do you -- do you have to identify all of it?  Do

5    you have to identify just the stuff that you consider to

6    be more important information as opposed to kind of

7    minutia?  Do you have to then release statements taken

8    from witnesses?  Do you have to release notes of

9    interviews with witnesses?  That's the slippery slope that

10   you get into in a case like this.

11           And the other thing is, this leads into the idea

12   of qualified immunity.  And I would direct the Court to a

13   very recent November 2009 decision of the Second Circuit

14   in the case of Distiso v. Town of Wolcott.  And there's

15   some very good language about qualified immunity in there.

16   And it states the question is not what a lawyer would

17   learn or intuit from researching case law but what a

18   reasonable person in the defendant's position should know

19   about the constitutionality of the conduct.  The

20   determination of the right at issue, was it clearly

21   established, must be undertaken in light of the specific

22   context of the case, not as a broad, general proposition.

23   Meaning the bill of rights has existed since I believe

24   1791.  We all know that the equal protection clause has

25   been around for a long time.  But in terms of qualified

1    immunity, has there been case law out there, established

2    precedent that says you may not -- it is a violation of

3    the due process clause or the equal protection clause to

4    release the name of a suspect without releasing the names

5    of all suspects, without releasing information as to why

6    you consider that person to be a suspect.

7              THE COURT:  Understood.

8              MR. RHODES:  That's simply case law that doesn't

9    exist.  It's not out there.

10             THE COURT:  I didn't mean to cut you off.  If

11   there was anything else would like to say.

12             MR. RHODES:  That's probably a logical place for

13   me to finish.

14             THE COURT:  Thank you very much.

15             Before we turn to the plaintiff, why don't we

16   take a recess.  We'll be in recess for 20 minutes.

17                  (Whereupon, a recess followed).

18             MR. GRUDBERG:  Thank you, Your Honor, like

19   Mr. Bayer, I'll avail myself of the podium.

20             I don't know how the Court wants to proceed.  I

21   can review our causes of action.  We've had a number of

22   extensive discussion this morning with questions from Your

23   Honor that quite frankly have anticipated and focused on

24   what my responses would have been to some of Mr. --

25   particularly Mr. Bayer's arguments.  I thought I would go

1    through and perhaps highlight some of the issues that I

2    think are of particular significance as our argument and

3    discussion has evolved this morning.

4         I do think, both from the papers and even from

5    today's oral argument, it's increasingly clear that I

6    think our position that there are fact questions that

7    are -- that need to be resolved here and that this case

8    cannot be determined at the pleading stage is clearer and

9    clearer.

10         Your Honor has correctly focused on what really

11    is the gravamen of our complaint, at least the jumping off

12    point, which is that in December of 1998, Mr. Van De Velde

13    in essence was thrown to the wolves.  He was offered up by

14    the defendants as the, quote-unquote, prime suspect in the

15    case that was done to and in fact did serve the

16    defendant's interest.  And that the message conveyed at

17    that time, which continues to this day to have profound

18    and injurious impact on Mr. Van De Velde, was "we've got

19    our man."

20         The fact that it was done through leaks rather

21    than through a direct public statement identifying only

22    Mr. Van De Velde in December of '98 in many ways I think

23    makes the conduct alleged worse.

24         The Yale defendants focus on the January 11th

25    public statement as sort of the jumping off point for the

1    examination of their conduct and I think Your Honor is

2    correct to note that our allegations really go well beyond

3    that.  There's no question that what happened on

4    January 11th was extremely significant, but I think when

5    one looks at the narrative alleged in the complaint,

6    beginning shortly after the murder and then with the first

7    leaking of Mr. Van De Velde's name, as we've alleged, and

8    continuing up until the first public identification, it's

9    instructive.

10         You've got the initial improper purpose that we

11   set forth in the complaint was served right up front with

12   the -- his name getting out there and intense public

13   scrutiny focusing on Mr. Van De Velde and only him as the

14   man.  He's the one.

15         The posture taken by some of the New Haven

16   defendants after that point is in some ways curious, but

17   in other ways very enlightening, as to what was going on,

18   and perhaps most important to our discussion here, the

19   legality of what was going on.

20         The purpose was served when Jim Van De Velde was

21   front and center and with very few exceptions, news

22   organizations ran his name, his image and he was just

23   inexorably linked with the crime in a way that we've

24   complained in the complaint, branding him guilty.

25         It was about a month, a little more than a month

1    from that initial newspaper article to the official

2    declaration that Mr. Van De Velde was in fact in a pool of

3    suspects.  During that month, the law enforcement

4    officials on the record go out of their way to not name

5    him.

6            I think an inference can be drawn that a reason

7    they didn't do that or reason they perhaps were reluctant

8    to do that is because they recognize the potential legal

9    consequences of doing that, of standing up and saying,

10   yes, he's a suspect, he's our suspect.  But at that point

11   when they're taking this on-the-record position of we're

12   not focused on any particular individual, the damage had

13   already been done and their purposes had already been

14   served.

15           The status of James Van De Velde as the prime

16   suspect in the Jovin murder had been disseminated to the

17   world.  The notion that he was responsible for it had been

18   cemented in the minds of many, many people.

19           Now, what happened on January 11th is still

20   extremely important because, as I noted, during that first

21   phase when there was a tremendous flurry of publicity that

22   did great damage to Mr. Van De Velde and continues to,

23   there had been no public acknowledgment.  And the fact is

24   that Yale, and Yale defendants, were the first parties to

25   make official what had been put out there unofficially and

1     through, you know -- through leak methods or through

2     indirect channels.  They were the first party to stand up

3     and say, yeah, he is an identified suspect in a pool of

4     suspects that we're not otherwise going to identify in

5     this heinous murder.

6          The New Haven defendants, once that statement

7     got out, were -- had to confirm it, which in fact they

8     did, but that was the first on-the-record comment that

9     they had made about Mr. Van De Velde and specifically

10    identifying him as among a pool of suspects.

11         And we allege in our complaint there have been

12    many times in the ensuing months and years when the

13    defendants have not only had the opportunity but have been

14    specifically asked to identify other people in the pool

15    and have declined to do so.

16         I want to talk somewhat about this notion of

17    suspect and what it means, and particularly what it means

18    in the context of this case.

19         It is certainly true that we could have a very

20    interesting policy discussion or philosophical debate

21    about naming of suspects or standards to be applied and so

22    on, but I don't think that a -- I don't think the Court

23    need go that far in order to sustain the complaint before

24    Your Honor.

25         One of the points made this morning was that,

1    well, gee, plaintiffs don't -- they can't point to any

2    other cases like this.  There's no precedence exactly on

3    point.  And to some extent that's true because I guess

4    fortunately for other people situated like Mr. Van De

5    Velde, not just in this case but in many other heinous

6    crimes, no one -- this hasn't happened to anyone else.

7    You know, at its core, the question is really when state

8    actors single out an individual as Mr. Van De Velde was

9    singled out and grievous harm results, can the state

10   actors do that without running afoul of the constitution?

11   And we believe that what we've alleged in the complaint is

12   sufficient to sustain a number of theories under which it

13   would be found that the state actors did in fact run afoul

14   of the constitution.

15              THE COURT:  On that note, Mr. Grudberg, you and

16   I both know that I dismissed the constitutional claims.

17   And as has been pointed out by defense counsel, not much

18   has changed, so you are asking me to reconsider, and

19   that's fine.  But in that context, seeking your help, what

20   do you regard as your strongest claim under the

21   constitution?  If you could only have one, which one would

22   you choose?

23              MR. GRUDBERG:  That's a tough one, Your Honor.

24   Give me two or three and I can pick.

25              THE COURT:  May I amend my question?

1          MR. GRUDBERG:  Sure.

2          THE COURT:  If you don't have a favorite, that's

3     okay.

4          MR. GRUDBERG:  Sure.  I think -- and I

5     understand -- I think I understand the basis of Your

6     Honor's question, because when we start talking about

7     constitutional theories of liability, we of course get

8     into the qualified immunity doctrines and so on.

9          In that regard, I think there are three areas

10    that stand out as not requiring the Court to, if you will,

11    apply new ground in order to sustain the claims that we've

12    put forward.  Those are the equal protection claim, the

13    stigma plus claim, whether one characterizes it as a

14    deprivation of liberty interest or a procedural due issue,

15    the stigma plus claim, and then finally the shock the

16    conscience theory under substantive due process.  I think

17    those are, for lack of a more lofty term, those are the

18    most meat and potatoes constitutional theories that we've

19    advanced as bases for liability in the case.

20         Getting back to the notion of a suspect.  One

21    point I heard emphasized again and again and again, not

22    just in defense of our federal claims but state law claims

23    as well, was this idea of truth.  Well, he was a suspect.

24    He was in a pool of suspects.  Therefore we can't be held

25    liable.  And I discussed at some length in our briefing

1    both in this round and the earlier round that I think

2    with -- I don't think that gets the defense to where they

3    need to get.  Because when you reduce that argument to its

4    essence, it reveals what an empty concept this notion of

5    being a suspect is.  It is standardless.  It can rest on

6    nothing more than hunch, gut feeling, anything.  And we're

7    not -- so to say that well, law enforcement officials

8    considered him a suspect, therefore that absolves --

9    therefore it is true and therefore that absolves anything

10   that followed, simply doesn't wash because it allows --

11   there's a syllogistic quality to it.  It allows a

12   subjective belief of an individual that allows anything

13   they do in the future.

14          The fact of the matter is -- and I must say, you

15   know, experience always guides us into what we notice

16   later and don't notice later.  I have not surprisingly

17   been exceptionally attuned to the use of the word

18   "suspect" since these events and since this filing.  Long

19   before this filing quite frankly.  The fact of the matter

20   is, one does not read articles like those that were

21   published about Mr. Van De Velde without reading typically

22   a day or two later about the issuance of an arrest

23   warrant.

24          I take issue with -- Mr. Bayer said at one point

25   that, well, people are characterized as suspects all the

1    time.  It happens all the time.  Frankly, especially since

2    this case, that's not true.  The term of art that has come

3    into vogue -- and I can only remember noting it after this

4    case -- is "person of interest."  One I suppose can debate

5    whether the impact on an individual of that label is

6    different, but the fact of the matter is, people are not

7    branded suspects anymore for I believe the very reasons

8    that we've highlighted in our papers, that it's an empty

9    label.

10           I think also it is -- addressing in part some of

11   the concerns voiced by Mr. Rhodes, I think it's equally

12   important to understand what we're not trying to do here.

13   We're not here saying that Your Honor has to announce some

14   constitutional standard for when the police can and cannot

15   publicly label an individual a suspect, nor are we

16   advocating for a scheme of law that would enable law

17   enforcement investigations to be in effect micro managed.

18   We're not trying to say who law enforcement can and cannot

19   consider as suspects, subjectively think in their mind; as

20   suspects, you know?

21           For all we know -- as we've alleged in our

22   complaint, Mr. Van De Velde sat for hours with two of the

23   defendants in this case.  He answered many questions.

24   Volunteered any number of things:  To submit to DNA, to

25   submit to a polygraph, to have his car searched, to have

1    his residence searched.  I don't know what those

2    defendants took away from that interview.  For all I know,

3    they walked out saying, you know what?  We don't have a

4    shred of evidence but I think he's guilty.  And this

5    litigation isn't about whether defendants similarly

6    situated can walk around thinking that.  What this

7    litigation is about is whether state actors, when they go

8    beyond that and put someone out there in the way this

9    complaint alleges Mr. Van De Velde was put out there, as I

10   said, you know, in fact, throwing him to the wolves,

11   setting in motion a destructive machinery of statewide,

12   national, international publicity, they can't do that

13   without following some rules.

14            And getting back to our constitutional theories,

15   you can't pick one from a group of similarly situated

16   people who are alike in all relevant ways, relevant

17   categorization, here being suspects in the Jovin murder,

18   you can't pick one and throw them to the wolves without a

19   rational basis, and we say there's no rational basis here.

20   You can't stigmatize someone and cause corresponding

21   change in their status, be it with the Naval Reserves or

22   otherwise, be it security clearance, without

23   constitutional implications.  You can't pick someone out

24   and throw them to the wolves to serve your own personal

25   rather than legitimate law enforcement objectives without

1    running the risk that someone's going to find that that

2    conduct shocks the conscience.

3        So I think it's very important to recognize how

4    narrowly focused our legal theory is and that the

5    complaint is that we're not looking to open up a parade of

6    horribles that would enable anyone who's under

7    investigation in a crime notorious or otherwise to, you

8    know, gain access to all of the investigative files.

9    We're simply trying to hold state actors accountable for

10   conduct that caused grievous damage and that we believe

11   violated various protections guaranteed under the

12   constitution.

13       THE COURT:  Mr. Grudberg, as I read the amended

14   complaint, consistent with what I understand you to be

15   saying this morning, the harm was done when city and

16   university sources told the New Haven register that a Yale

17   educator who taught Ms. Jovin was the lead suspect.

18   Leading to the publication on December 9 of the article

19   entitled "Yale Teacher Grilled in killing" in which those

20   sources were quoted making those statements.

21       In any case, it seems to me that was a key

22   moment in this long chronology, and I gather that whoever

23   those sources might be, they weren't the chief of police

24   or the president of Yale, acting pursuant to a decision

25   that had been arrived at by responsible people.  But

1     instead, we have a situation which unnamed sources close

2     to the case took it upon themselves to tell this to a

3     reporter.

4               Is that a constitutional violation for which

5     Mr. Van De Velde has a remedy?

6               MR. GRUDBERG:  I think Your Honor's reading of

7     the complaint is a little too narrow.  Can I stand here

8     and tell you who those sources were exactly individually?

9     No, I can't.  And nor do we allege them.  But we do allege

10    that before publication of that article, this joint task

11    force, if you will, coalesced that both the Yale group of

12    defendants and the New Haven group of defendants were

13    extremely motivated for their own reasons to make it

14    appear that:  Number one, the incident was not a random

15    act of violence due to an unsafe New Haven; and number

16    two, that they had their man.

17              And taking that a step further, it's our

18    allegation that what was done to bring about that article

19    was the result of a desire to get out that message.  This

20    is our guy.  We got him.  We know he did it.  He's guilty.

21    And that that was done as a result of concerted action by

22    one or more of the defendants.

23              We allege it was done either directly or

24    indirectly, but I think based upon the facts that we've

25    alleged and fair inferences that can be drawn from them,

1    that this is not speculation and it goes beyond merely

2    conclusory allegations.  It's concrete.

3              And I think, getting back to the beginning of

4    Your Honor's question, while it is correct that great

5    damage was done at that point.  That's, you know, no doubt

6    that's a key moment both in Mr. Van De Velde's life and in

7    the legal construct of this case.  It's not the only key

8    point and it's not the only point at which damage was set

9    in motion.

10             THE COURT:  May I ask two follow-up questions?

11             MR. GRUDBERG:  Sure.

12             THE COURT:  And these questions are offered to

13   you in order to help me better understand what this case

14   is about.

15             But let's suppose hypothetically that the

16   situation was as I described it:  You had some police

17   officer, perhaps a New Haven detective, perhaps a Yale

18   University police officer, who leaked to the press without

19   authority information about what they were doing and the

20   result was this article in the paper the following day.

21   If that was the scenario, would the constitution provide

22   recourse to Mr. Van De Velde?

23             MR. GRUDBERG:  If that individual was a state

24   actor, I think it would under the theories that we've

25   alleged.  I think some of the other defendants -- if it

1    was a rogue defendant, if you will, if you're talking

2    about that situation, that might have implications for

3    other state actors who we're allegedly trying to hold

4    liable, but I don't think any state actor can do that

5    without consequences, just like -- to go back to some of

6    the examples Your Honor cited of principles that guide law

7    enforcement or other state actors.  Just like if a police

8    officer makes a bad arrest, maybe you can't hold the chief

9    of police responsible for that, but it doesn't mean that

10   there are no constitutional consequences.

11            THE COURT:  How would you go about identifying

12   this individual?

13            MR. GRUDBERG:  Take discovery.

14            THE COURT:  Specifically you might want to

15   depose the reporter?

16            MR. GRUDBERG:  Perhaps.

17            THE COURT:  And if the reporter asserted a

18   privilege?

19            MR. GRUDBERG:  Then I'd see whether there was

20   any way to penetrate that.  If I can't get directly

21   through that, then there are other ways to get at it.

22            The fact of the matter is that the sequence of

23   events laid out in the complaint permits certain

24   inferences, I think, and I frankly think that those are

25   questions that probably have to be resolved by a jury.

1          You've got Mr. Van De Velde summoned in that

2     very evening and drilled, or I forget the term they used,

3     essentially accused of complicity, of perpetrating this

4     horrible crime, and almost simultaneously you've got this

5     news story getting out there that doesn't publish his name

6     but yet as is further alleged in our complaint, the very

7     next morning, even though his name is not in the paper,

8     he's ambushed by a television crew outside his dentist's

9     office and asked:  Are you the person who they're talking

10    about in this morning's paper?

11          THE COURT:  Did the article refer to the lead

12    suspect as an educator who taught Ms. Jovin?

13          MR. GRUDBERG:  Yes.  And we've weighed out all

14    the reasons why we believe that even though the article

15    didn't use his name, that it effectively identified him

16    and branded him as the man.

17          We would have to satisfy a trier of fact that

18    one or more of the defendants were responsible for

19    bringing about that chain of events, but frankly that is a

20    burden that I'm more than happy to take on.

21          THE COURT:  Sticking with the rogue officer

22    scenario just for a moment, again just so I can be sure I

23    understand your theory.  If that occurred, if the rogue

24    leaked to the press, his favorite reporter, and the upshot

25    was this article, and thereafter Yale and New Haven

1  defendants did what they did, would they be subject to

2  liability?  Putting aside whatever vicarious liability

3  they might have regarding the rogue officer, would they

4  have any liability for their conduct following the

5  publication of that article?

6       MR. GRUDBERG:  Yes, I think they would.  It

7  might -- we'd have to try to parse out what damage flowed

8  from what, but even if that happened in December, getting

9  back to what happened on January 11th, that was, if not

10  equally important, certainly extremely important, the

11  first public identification, first public statement

12  confirming that, yes, James Van De Velde, James Van De

13  Velde is in this pool of suspects, was another critical

14  milestone in the chronology which, as we've alleged in the

15  complaint, had separate identifiable -- set in motion

16  separate identifiable cycles of damage.

17       One instance we cite in the complaint is that

18  the *Hartford Courant* alone I think, among news

19  organizations within the state of Connecticut, print and

20  otherwise, had refused to publish Mr. Van De Velde's name

21  until that date.  After the public announcement on January

22  11th, they began to run his name and they ran a

23  particularly damaging story casting all sorts of

24  aspersions on Mr. Van De Velde and his personal background

25  and whether he could have been the type of person capable

 1    of this horrible murder.

 2          So I think it's a separate set of facts, but

 3    there you'd still have, I think, the -- certainly the

 4    equal protection theory that we've talked about.  That

 5    carving out one person from an otherwise similar group and

 6    offering them up, that was done on January 11th.  That was

 7    done certainly on a much broader basis by the defendants.

 8    It's not a single rogue situation of slipping a name to a

 9    reporter for the purpose of -- for whatever purpose.  And

10    it set in motion -- caused a great deal of damage.

11          THE COURT:  With regard to the equal protection

12    claim, is it your claim that they falsely branded him as

13    the lead suspect?

14          There has been discussion this morning about

15    Mr. Van De Velde being merely one of a number of suspects.

16    Reading the papers I understood you to claim that he was

17    branded as the lead suspect with very significant harm

18    naturally following from that.  I'd like to be clear.  Is

19    it that he was falsely branded lead suspect or publicly

20    identified as one of a pool?

21          MR. GRUDBERG:  I think -- if we're talking about

22    what they actually said, I believe -- I don't know that

23    the word "lead suspect" was ever stated on the record by

24    any of the defendants.  It was used by the newspaper

25    again, you know, certainly in December and going forward.

1   Whether that was as a result of an indirect statement or

2   not, we can debate.  I don't know that it's necessary for

3   them to have stated he was our lead suspect, but in some

4   ways the mere consequence of what they did, which is:

5   We've got this terrible crime that we're scurrying to try

6   to solve, we've got one person whose name we're going to

7   give you and we've got these other people who we're not

8   going to identify.  The consequence of that statement, if

9   not the actual content of the statement, was to make him

10  or confirm that he was the lead suspect or the prime

11  suspect.

12          I mean, you had -- it's just an evolving public

13  profile that begins with the December 9th article that

14  we've talked about.  So jumping off point for any

15  discussion of James Van De Velde on a public basis in

16  connection with the Jovin murder was prime suspect.  So

17  when you've got a confirmation on January 11th simply of

18  the fact that he is among a pool of suspects, I don't

19  think you need to have an adjective attached to it to

20  cause him to be perceived as or branded as "the lead

21  suspect" or "the prime suspect."

22          THE COURT:  Do you allege that he was in fact

23  the lead or prime suspect?

24          MR. GRUDBERG:  I don't -- that's a tough one to

25  answer, Your Honor, because that gets back to the point

1    that really is -- lies with the Court in many of our

2    arguments, which is this idea of a suspect is such a

3    subjective concept, I don't think it means anything.

4           What we've tried to focus on are facts.  What

5    objective facts were there to support the position in

6    which he was placed?  If a subject can be such a

7    subjective notion that it could be that in the mind of one

8    or more of the law enforcement defendants he might have

9    been the lead suspect, but again does that entitle someone

10   with impunity to step forward and go public with that, we

11   say no.

12          So I think were this case to go forward, whether

13   he was or was not the lead suspect, the prime suspect,

14   it's our position -- our position is going to be that

15   that's irrelevant.

16          THE COURT:  So as I understand this aspect of

17   the case, you would urge that there must be an objective

18   test, that is you have to have an objective basis for this

19   action, and this is necessary because the action has dire

20   consequences for the other person.  It's not that the word

21   "suspect" is meaningless.  When you publicly identify

22   somebody as the suspect in a heinous murder, that's a very

23   significant thing, it's not meaningless and it must have

24   had an objectively sufficient basis.

25          MR. GRUDBERG:  When I say it's meaningless, I

1    mean it's meaningless in the context of the law.

2    "Suspect," getting back to my observations of nomenclature

3    and usage and so on in this case, "suspect" is often used

4    interchangeably with a defendant who has been charged with

5    a crime but not convicted.  So in that case you would have

6    a probable cause standard that applies if this one doesn't

7    get arrested in fact for probable cause.

8            I think the -- I think Your Honor's right that

9    there has to be some objective standard, but I don't think

10   that we need to go there -- I don't think we need

11   necessarily to make new law there in order to find

12   potential merit to one or more of our constitutional

13   liability.

14           If we're talking about, for instance, equal

15   protection, the question is not going to be:  Did they

16   meet some as yet undefined standard for publicly calling

17   someone a suspect?  We're going to have to show that there

18   was no rational basis for treating him differently than a

19   similarly situated group.

20           THE COURT:  The other side says there was a

21   rational basis because of the facts they cite.  He had a

22   relationship with her --

23           MR. GRUDBERG:  I've got them written down, Your

24   Honor.

25           My response -- I heard that, and my thought was

1   that if being her faculty instructor, living within a half

2   mile radius in a residential neighborhood -- where the

3   body was found in a residential neighborhood dotted with

4   Yale faculty and students and having been one of the

5   people to see her on the day she was murdered, if that's

6   enough to justify what happened to Mr. Van De Velde, then

7   God help us all.  That was my gut reaction to that.  And

8   again, that -- one can debate whether that's rational or

9   not.

10          Your Honor asked, I thought some very

11   appropriate and focused questions about if one does speak,

12   is there some obligation to speak fully and fairly?

13          It was never announced that Mr. Van De Velde

14   cooperated at length with an interview, Mr. Van De Velde

15   volunteered to do this, Mr. Van De Velde volunteered to

16   help us in that fashion, Mr. Van De Velde let us search

17   his car and reveal no forensic evidence linking -- so it's

18   incomplete.

19          But I think at the end of the day one of the

20   observations the Court made is correct, that if -- why not

21   just not say anything?  Can the public interest be served

22   adequately by not identifying people.  Apprise people,

23   apprise the public of progress and so on without naming

24   names.

25          Again, that may be geared toward the policy

1    area, but I think it's a fair question based upon the

2    allegations we've made here.

3         THE COURT:  Let's suppose that the chief of

4    police issued a public statement informing the people at

5    Yale and in the city generally that Mr. Van De Velde was a

6    person of interest and if anybody had information they

7    would like to hear from them and in this way try to

8    advance the investigation by encouraging Yale students and

9    people in the neighborhood to come forward if they had

10   information consistent with the idea that Mr. Van De Velde

11   might be the perpetrator?

12        MR. GRUDBERG:  I think that would probably be a

13   tougher case for us.  As I said, I think the person of

14   interest formulation grew up in the wake of -- in the wake

15   of -- I don't know if in the wake of is accurate -- but

16   certainly after this case.  And I think it was done for

17   reasons that Your Honor's question recognizes and that my

18   answer recognizes, which is it's not nearly as accusatory

19   as what was done here.

20        Now, would -- if conduct had been more

21   restrained and more balanced, would Mr. Van De Velde have

22   suffered the -- in the same ways that he did?  I don't

23   know and the defendants don't have that justification to

24   fall back on and we don't -- we don't have to grapple with

25   that.  But what I do know, what I do believe is that what

1       did happen here was wrong and violated the constitution.

2               The person of interest formulation is tougher.

3       I think there is a certain -- there's a certain intimation

4       of either culpability or certain tarnishing that goes

5       along with that anyway, and if I'm ever litigating one of

6       those cases in the future, perhaps I'll have that debate.

7       I don't think we have to have it here.

8               I think both cases in any situation such as

9       this, there is great potential for damage and the cost of

10      a public rush to judgment is enormous.  The stakes are

11      extremely high.

12              So whether -- when you've got this swirl of

13      interest in a high profile murder, whether someone's

14      presented as the prime suspect, the lead suspect, or

15      whether they're merely described as a person of interest,

16      I think there's potential for great damage either way.

17      But in Mr. Van De Velde's case where he was, at least

18      during the leak, offered up as the lead suspect or prime

19      suspect, it's much clearer that there have to be

20      consequences for that.

21              THE COURT:  Does a person in Mr. Van De Velde's

22      position have any other recourse under the law?  The

23      defendants say that the law provides no cause of action,

24      and at least with regard to the constitutional claims, I

25      agreed with them before.  But the idea that there can be

1    wrongdoing and grievous harm with no legal remedy doesn't

2    sit well with any of us.

3              But is there any other recourse under the law

4    for Mr. Van De Velde?  Assuming he doesn't have a cause of

5    action, is there anything he can do?

6              MR. GRUDBERG:  None that I'm aware of.  One

7    thing I think it's important to recognize certainly in the

8    context of federal claims and particularly with the

9    immunity doctrine, we've also in our prayer for relief

10   sought injunctive relief, which of course does not

11   implicate the qualified immunity notions.  Short of what

12   we've alleged, I'm not aware of any legal recourse he

13   would have.

14             THE COURT:  When the law grants absolute

15   immunity to a state actor, a person harmed by misconduct

16   on the part of a state actor has no cause of action in

17   court but may have other recourse through a disciplinary

18   complaint or other means.  Is anything like that available

19   to Mr. Van De Velde?

20             MR. GRUDBERG:  Theoretically I suppose.  Does it

21   even -- I was going to say it doesn't come close to trying

22   to compensate him for the damage he suffered.  It doesn't

23   at all compensate him for the damage he suffered.

24   Something like that, an internal affairs complaint,

25   something of that nature.  At some level could one

1     describe that as a remedy or a recourse?  I suppose.  But

2     if we're talking about the damage that was done here and

3     how one can potentially obtain redress for it, I don't

4     think that's a viable alternative.

5                THE COURT:  Is there anything that these

6     defendants could do for Mr. Van De Velde at this point

7     besides concede and pay money?  Is there anything else

8     that they can do?  Are there any statements that can be

9     issued or other actions that could be taken?

10                MR. GRUDBERG:  There are.  One of the -- it's no

11    surprise, it's in our complaint, they've never retracted

12    the "suspect" label from him.  We are 11 plus years down

13    the road from this terrible crime and they've never stood

14    up and said, he's not a suspect, we're withdrawing that

15    label from him.  We were wrong.

16                Now, speaking cynically, this case has been

17    pending a long time.  Were there strong reasons for them

18    not to make such a statement?  Yeah, there were.  Pendency

19    of this lawsuit being chief among them.  Even if they

20    concluded long ago that you know what?  We blew it, we

21    made an enormous mistake and he's not our guy, the cynic

22    in me -- I shouldn't even say cynic -- the realist in me

23    told me long ago that none of the defendants were ever

24    going to stand up and admit their error if in fact they

25    concluded that an error had been made just because of the

1    situation in which we find ourselves.

2         THE COURT:  And in that regard, Mr. Rhodes

3    mentioned that if this case went forward, I would be

4    confronted with the difficult situation of Mr. Van De

5    Velde seeking basically open file discovery of a pending

6    investigation, and I suppose that does underscore the

7    unusual nature of the case.  Eleven years later we have a

8    pending investigation.

9         MR. GRUDBERG:  I acknowledge that there might be

10   some tricky discovery issues but, you know, the courts

11   deal with those on a regular basis, albeit not in this

12   exact procedural framework.  Lawsuits involving

13   intellectual property between competitors come to mind.

14   There are troubling, tricky issues that the courts are

15   called upon to grapple with, but I don't think they're

16   insoluble, and most importantly I don't think they're a

17   reason to conclude that the complaint is insufficient to

18   state a claim.

19        One point I do want to close with, Your Honor,

20   is Your Honor has noted the court did, you know -- no

21   secret -- Your Honor, found our constitutional claims

22   insufficient last time around and we haven't -- we've

23   broadened the complaint somewhat and tried to make

24   explicit in the complaint some of what we thought was

25   sufficiently pleaded but perhaps the Court did not think.

1    But, yeah, Your Honor, knows that we filed a motion to

2    reconsider.  I don't know that in 20 plus years of

3    practice I'd ever filed a motion like that.  But I think

4    my strong feeling then and now was that the Court's

5    initial ruling was based simply on a misreading of our

6    complaint and I think Your Honor has, both from what I

7    said and from questions Your Honor asked before I even

8    stepped to the podium today, I think Your Honor has --

9    whatever the Court concludes, Your Honor clearly has an

10   understanding of the core of what we're alleging here.

11   And it's our feeling that once the complaint is fully

12   understood and fully parsed, that the defendant's motion

13   should be denied.

14            THE COURT:  Thank you very much.

15            MR. GRUDBERG:  Unless Your Honor has further

16   questions, I will --

17            THE COURT:  Thank you.

18            MR. MEYERSON:  Your Honor, may I have the

19   opportunity of a minute or two to supplement what my

20   colleague has said to you?

21            THE COURT:  Yes.

22            MR. MEYERSON:  I have the benefit of sitting

23   here and seeing the give and take and I know it's not the

24   usual practice of gang up, but I think I --

25            THE COURT:  That would be fine.  As long as it's

1   okay with Mr. Grudberg.

2          MR. GRUDBERG:  Of course, Your Honor, happy to

3   pass.

4          MR. MEYERSON:  Just a couple of points.  And I

5   recognize this case poses very complicated human issues.

6   And without meaning to use the vernacular "suck up to

7   you," I'm extraordinarily impressed, having been around

8   courts for 40 years with the struggle in which you are

9   engaging both on the human and legal aspects of this case.

10  It's not inconsistent with what I've heard, as lawyers are

11  prone to hear, of your reputation in that regard.

12          Let me just say at the outset that I might argue

13  with you if I could in a seminar room sense of that word

14  "argue" about the rogue officer theory of the case.  And I

15  would argue with that assumption.  And also what we allege

16  in the complaint, which is at paragraph 83 -- well, let

17  me -- before I get to that particular paragraph, let me

18  just say that it goes without saying on the morning that

19  it was learned that Ms. Jovin had been murdered and that

20  she was a Yale student, there is no question that

21  defendant Levin, Brodhead, Lorimer, among others, were

22  immediately involved in addressing the matter.

23  Immediately.  That's not alleged in the complaint.  But I

24  think that assumption should be taken into account.

25          It very well may be that there's an article that

1    I am not familiar with in my review right at this moment

2    where Richard Levin is making a public statement to the

3    world, please, we're sorry about what happened and we're

4    looking into it immediately.  So I'm -- let me -- you got

5    each of the legal questions about, well, what about

6    Wearing and what about Levin, reasonably broached by Your

7    Honor.

8            Under the law, there clearly would be

9    supervisory responsibility for Section 1983 constitutional

10   liability and there are four -- I had an opportunity to

11   brief this recently -- and there are four bases for it,

12   not the least of which is knowing that wrongful conduct

13   has been taken.  Subsequently the supervisor -- let's use

14   Levin and Lorimer and Wearing as the managers, the

15   supervisors in the command structure, civil and police

16   command structure -- they can be responsible knowing that

17   some problematic conduct has occurred here and they've

18   ratified its sanction given their perimeter.  And in this

19   case there's no question.  They didn't come out on

20   January 11th and say we're not going to have any further

21   comments about this.  There are a lot of people who are

22   suspects.  We -- however this came about, there's no

23   further comment.  Rest assured, world, we're doing what we

24   need to do.

25            Now we know, as a matter of fact and continuing

1   up until a couple of months ago when the most recent

2   murder situation took place and the Van De Velde and Jovin

3   situation was resurrected, they are addressing that

4   matter.  As a matter of fact, I think it was one of the

5   top ranking Yale people said, we've learned from that

6   matter, as his picture was then again shown in the

7   newspaper, Van De Velde's next to Jovin, as they showed

8   the most recent murder suspect now having been arrested

9   and his victim, alleged victim.

10          So what I would argue to you, Your Honor, again

11  in the context in which we're having this discussion and

12  debate, the that there is plenty of room for supervisory

13  liability in this case and that I would not assume that

14  even from the beginning those top officials, including the

15  president of Yale, were not intimately involved directly

16  and through their top aids and thereby indirectly in the

17  micro managing early on of this whole process, if nothing

18  else from a public relation's point of view.  But we argue

19  that's one in the same in this context.  That in fact the

20  non-legitimate law enforcement justification for this is

21  all about public relations both from the City of New Haven

22  perspective and certainly from the Yale perspective.

23          I might add that in the allegations at paragraph

24  83, we say, during this time between December 7th, 1998

25  and January 11th, 1999, the two relevant dates, isn't that

1    New Haven police officials, including some or all of the

2    New Haven defendants, spoke regularly with Yale officials,

3    including one or more of the Yale defendants, about the

4    general progress of the Jovin investigation and

5    specifically about the investigation of the plaintiff.

6            At paragraph 93 it is asserted that a

7    spokesperson for defendant Wearing admitted the defendant

8    Wearing had been involved in formulating the pool of

9    suspect statements released by Yale.

10           At paragraph 97, according to published reports,

11   Yale's decision to cancel Van De Velde's classes came

12   after, quote, weeks of discussion between Yale and police

13   officials about what to do about Van De Velde.

14           And at 109 and 110, Your Honor, and I appreciate

15   your indulgence, on January 21st, 1999, plaintiff remained

16   as a nominal lecturer and Yale employee after Yale

17   canceled his classes, in response to our adversary's point

18   that he continued to be part of the Yale community -- was

19   summoned to meet with deputy dean of Yale college, Joseph

20   Gordon, who was working under the direction of defendants

21   Levin, Brodhead and Lorimer.  Gordon stated he had been

22   tasked by defendant Lorimer to discuss certain questions

23   with plaintiff about his political science classes.

24           Gordon further indicated that the question had

25   been prompted by a letter received by Yale from the family

1     of Suzanne Jovin.  Maybe the most significant part of that

2     is that a letter had been received by Yale from the

3     family -- from the parents of the -- of Suzanne Jovin.

4     That letter again assumption-wise but reasonable, is that

5     that letter was directed to the president of Yale, I am

6     sure.

7              So this is all about, to respond to your

8     appropriate and complicated discussion of what's -- why is

9     Wearing and why are Levin in here and what's your legal

10    crutch or trigger for that?  And I think there's plenty of

11    strong legal theory.

12             I might disagree with my esteemed colleague and

13    try to prioritize what I think is in fact our strongest

14    constitutional claim.  And there is, not to suggest, merit

15    to the others; but in my judgment, the strongest

16    constitutional claim in this case, notwithstanding efforts

17    to minimize the theory, is the equal protection case.  And

18    what that seeks is not the exposure of all.  That's not

19    what the equal protection claim is about that he and only

20    he was exposed and rather than everybody being exposed.

21    No, it's -- the content which is constitutionally

22    offensive is the exposure of one when the exposure of none

23    should have taken place and could easily be addressed in

24    the only legitimate law enforcement mission in this whole

25    scenario, which is to solve a crime.  And if a serious and

1    heinous crime -- and if attached to that it is calming the

2    waters as contrasted to self-servingly say we're great,

3    we're doing it, but if associated with that is calming the

4    waters, the waters are not calmed at all by the exposure

5    of any one or all rather than the exposure of none.  It is

6    calmed by informing that we have people of interest or

7    suspects.  We are covering every angle of this.  It is a

8    tragedy to everyone, the New Haven community, the Yale

9    community, certainly the Jovins.  And it would be a

10   tragedy to magnify to others by exposing people who are

11   suspects when it turns out that they shouldn't have been

12   either suspects or exposed.

13            Now, the legitimacy or the rational legitimacy

14   of the law enforcement purpose, Your Honor, rests not on

15   the plaintiff to construct.  Civil rights litigation is

16   all about burdens of proof, when it really comes down to

17   the technical theoretics of it.  It would be up to them to

18   describe for us and the Court when there's a

19   particularly -- there's sufficient discovery that could be

20   managed by the Court as to what the legitimate law

21   enforcement purpose was, law enforcement purpose was, for

22   the exposure of Van De Velde and whether or not there was

23   even in fact a pool of suspects or that's pretext for just

24   hanging him out there.

25            I must say that I asked David while we were

1     sitting here, David, do you think there really was a pool

2     of suspects?  We don't know that.

3             Finally, and, Your Honor, caught this and I was

4     a little bit nervous in the way David addressed it,

5     although he's a brilliant lawyer for sure -- I said -- I

6     had this note here when David said "suspect does not mean

7     anything," and I wrote down that could be misconstrued.

8     Suspect means everything in this case legally and it means

9     everything damage-wise to the human being that's sitting

10    at our table.

11            Finally -- and I appreciate again your

12    indulgence -- there is something which this Court can do,

13    inadequate as it may be as a remedy, absent damages to

14    construct, allow the plaintiff to have redress -- and we

15    believe that on the equal protection claim and perhaps the

16    others, that damages can flow without -- and that the

17    qualified immunity defense would not insulate in that

18    regard.  But assuming that we wound up in the context of a

19    problem because of qualified immunity on any one of the

20    claims from the weakest to the strongest -- and I must

21    tell you, I believe that the plaintiff has under the

22    Fourth Amendment been constructively seized.  Forget his

23    name.  His picture appeared in a paper a month ago or two

24    months ago in the context of the recent event next to

25    Jovin.  He has been constructively seized from now until

1    he dies.  That to me an is a Fourth Amendment claim.  It

2    might have a qualified immunity defense insofar as that

3    relates to monetary relief.

4            David has pointed out we have asked for

5    injunctive relief, under Saucier or Pierson, whichever of

6    the Supreme Court decisions you want to use in measuring

7    whether qualified immunity should take place by

8    determining whether the law was clearly established at the

9    outset, or doing that, I call it forward-backwards,

10   backwards-forward, if you were to conclude that there was

11   a qualified immunity but nonetheless there was a

12   constitutional violation, you could then award injunctive

13   relief.  And I dare say, you know, that the injunctive

14   relief of requiring the defendants to redress, if not

15   monetarily, in some other creative equitable manner, to

16   give back Jim Van De Velde part of his reputation, part,

17   and his life, would not be inappropriate and would not be

18   foreclosed even if there was qualified immunity but a

19   constitutional violation that you as the judge deemed to

20   be an appropriate, in your analysis, violation.

21           And so I appreciate your listening to me, Your

22   Honor.

23           THE COURT:  Thank you for your comments.

24           MR. BAYER:  Your Honor, I would just request two

25   minutes to make a couple of points.

```
 1              THE COURT:  That's fine.

 2              MR. BAYER:  As evidence of that, I'm not

 3    bringing the big notebook up.

 4              THE COURT:  Okay.

 5              MR. BAYER:  And I'm not disrespecting the

 6    arguments that plaintiff's counsel has ably made, I just

 7    think that most of these points were well elucidated in

 8    your dialogues with both sides and in the briefs.  I would

 9    like to return to a question I think you asked earlier

10    that I think was an interesting and important question.

11              You asked Mr. Rhodes earlier today:  Why

12    shouldn't there be some rule that the courts developed, a

13    rule of law that the courts developed for the

14    identification of a suspect because of the consequences of

15    that?  And it's an interesting question and it's worthy of

16    a couple of moments' discussion because a few things are

17    clear.

18              Suspects are identified publicly all the time,

19    for better or for worse.  If you read the newspaper or

20    listen to the radio, watch law enforcement, reality TV

21    shows, this is something that happens all the time.  And

22    it is clear to me that this complaint can't go forward

23    without establishing some new rule of law given the

24    constraints of existing law on each cause of action.

25              And so you ask Mr. Rhodes that question
```

1    saying -- noting that there are already a number of rules

2    that the courts have developed to implement constitutional

3    standards that have an effect on how law enforcement

4    investigations are conducted, how searches are conducted,

5    how interrogations are conducted, and why not this?  I'd

6    like to answer that question -- amplify the answer that

7    Mr. Rhodes gave.

8            The other kinds of constitutional rules that --

9    and standards that the courts have developed, have been to

10   implement express constitutional protections that are in

11   the constitution.  So you -- you already have a right of

12   protection against unreasonable searches and seizures, so

13   there were rules the courts have developed to make that

14   right meaningful and implemented.  There are rights

15   against self-incrimination.  So there are rules that

16   govern how interrogations may be conducted by the police

17   that are part of the criminal process.  They have a right

18   to counsel under the Sixth Amendment, et cetera.

19           Here there is no recognized right not to be

20   identified as a suspect in an ongoing investigation.  So

21   the court would not only have to make up a standard, a set

22   of standards and rules, it would have to actually make up

23   the constitutional right itself and then make up rules and

24   standards to implement it.  So that really is a different

25   situation.

1          The Second Circuit in Benzman v. Whitman was at

2     pains to point out that public officials never been held

3     to violate the constitution for statements they made to

4     the public.  And I think there's a good reason for that,

5     and that's one of the reasons other than the text of the

6     constitution that there isn't a constitutional right that

7     prevents a law enforcement official from speaking

8     truthfully to the public.  If there were a standard, if

9     you made up a constitutional right and the standards and

10    the rules, the standard would have to be extraordinarily

11    flexible and extraordinarily low given the fact, as

12    Mr. Rhodes pointed out, that law enforcement

13    investigations vary so widely from case to case.  It would

14    have to be very low because you're really only talking

15    about whether someone should be investigated.  And that

16    standard has to be low given facts and circumstances that

17    might lead someone to think -- a law enforcement person to

18    think of an individual as a suspect.  And under the

19    pleadings here, the facts that are pleaded would be

20    sufficient even to meet a new standard given what I think

21    the standard would have to be.

22         The last point I'll make is I don't quite know

23    what injunctive relief has been asked for here because the

24    complaint specifies none.  I'll just say that given the

25    passage of time in this investigation, what's transpired

1    that's reflected in the complaint, the defendants, all of

2    the defendants have made clear that this is a --

3    investigation is at a different stage.  They've said

4    repeatedly, everyone's a suspect, no one's a suspect,

5    we're starting over.

6         So the injunctive relief that might actually do

7    something, I don't think a Court would ever order, which

8    is to say require as a matter of law, require law

9    enforcement officials to say this person did not commit a

10   crime when an investigation is still continuing.  That's

11   the problem here.

12        So I don't think there is meaningful injunctive

13   relief that's available that could be ordered here.  And I

14   think under the circumstances you have to go well beyond

15   the bounds of existing law to do that.

16        Thank you, Your Honor, for your patience today.

17        THE COURT:  Thank you very much.

18        It is a difficult case and a sad case.  I wish

19   it weren't so, but here we are.

20        I want to take this opportunity to, first of

21   all, thank you for the work that you've put into the case

22   over the years.  I want to compliment you on the quality

23   of the work.  It makes my job perhaps more challenging,

24   but it's a pleasure to have such good lawyering in a case,

25   especially a case of this importance.  I also want to take

1    this opportunity to sincerely apologize to you and

2    especially to you, Mr. Van De Velde, for allowing this

3    case to sit for so long.

4              I had thought that the case would no longer be

5    on my docket when I ruled years ago.  Even then it was a

6    long time pending.  The idea that we're here these many

7    years later is a source of, frankly, deep concern to me,

8    and I want to tell you that I'm sorry that it's taken us

9    this long.

10             With regard to where we go from here, I intend

11   to have a decision for you soon.  With that, I will

12   adjourn for today, but I would like to see counsel, if I

13   may, in chambers briefly.  I have another matter at 2:00.

14   But if you could stay just a few minutes longer, I know

15   I've kept you a long time today, but I'd like to have a

16   chance to speak with you in chambers.  All right?

17             We'll adjourn.

18                  (Proceedings adjourned at 1:10 p.m.)

19

20

21

22

23

24

25

1

2

3                      C E R T I F I C A T E

4

5              In Re: VAN DE VELDE  vs. WEARING

6

7

8           I, Darlene A. Warner, RDR-CRR, Official Court

9    Reporter for the United States District Court for the

10   District of Connecticut, do hereby certify that the

11   foregoing pages are a true and accurate transcription of

12   my shorthand notes taken in the aforementioned matter to

13   the best of my skill and ability.

14

15

16

17

                     /s/_____
18
                      DARLENE A. WARNER, RDR-CRR
19                      Official Court Reporter
                      450 Main Street, Room #223
20                    Hartford, Connecticut 06103
                         (860) 547-0580
21

22

23

24

25